1  Angela Alioto, Esq. SBN 130328
   Steven L. Robinson, Esq. SBN 116146
2  Joshua D. Boxer, Esq. SBN 226712
   **Law Offices of Mayor Joseph L. Alioto**
3      **& Angela Alioto**
   700 Montgomery Street
4  San Francisco, CA  94111
   Telephone: (415) 434-8700
5  Facsimile: (415) 438-4638

6  Attorneys for Plaintiffs

7             **UNITED STATES DISTRICT COURT**

8             **SOUTHERN DISTRICT OF TEXAS**

9

| | |
|---|---|
| **BORIS BRYANT, DARREN MAYO, EDWARD PIERRE, LAWRENCE GRICE, KEVIN MCINTYRE, MAURICE GALIMORE, JAMES BROWN, CARLOS BEATTY, MARCUS PAREJO, LAMAR NEWTON, JOHN LUCAS, CARLTON SYKES,** | **Case No.** |

10
11
12
13

        **Plaintiffs,**

14

15          v.

16

17 **FMC TECHNOLOGIES, INC.,**
   **PROSTAFF PERSONNEL**
18 **ACQUISITION CORP.**

19         **Defendants.**

20

21

22

23

24

25

26

27

28

**Case No.**

**COMPLAINT FOR DAMAGES**
1. Race Discrimination
   (Title VII against FMC)
2. Race Discrimination
   (Title VII against Prostaff)
3. Retaliation
   (Title VII against FMC)
4. Retaliation
   (Title VII against Prostaff)
5. Race Discrimination in violation of
   public policy (against FMC)
6. Race Discrimination in violation of
   public policy (against Prostaff)
7. Retaliation in violation of public
   policy (against FMC)
8. Retaliation in violation of public
   policy (against Prostaff)
9. Intentional infliction of emotional
   distress (against FMC)
10. Intentional infliction of emotional
    distress (against Prostaff)
11. National Origin Discrimination
    (against FMC and Prostaff)
12. Discrimination–Hostile work
    environment (against FMC)
13. Discrimination–Hostile work
    environment (against Prostaff)
14. Race Discrimination
    (Texas Labor Code Section 21.051
    against FMC)
15. Race Discrimination
    (Texas Labor Code Section 21.052
    against Prostaff)

**DEMAND FOR JURY TRIAL**

## **PARTIES AND JURISDICTION**

1. Plaintiffs are eleven African-Americans and one West Indian individual.

2. At all pertinent times mentioned in this complaint, Plaintiffs were residents of the State of Texas, within the Southern District of Texas.

3. Subject matter jurisdiction in this court is invoked pursuant to Title VII of the United States Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000(e)-5(f)(30).

4. This Court has supplemental jurisdiction over Plaintiffs' state statutory and common law causes of action arising out of the same case or controversy as the civil action over which this Court has original jurisdiction.  28 U.S.C. § 1367(a).

5. The unlawful employment practices described herein were committed in the Southern District of Texas, and, on information and belief, all records relevant to the causes of action alleged in this complaint are kept in the Southern District of Texas.  Therefore, venue is proper pursuant to §707(f)(3) of Title VII, 42 U.S.C. §2000e-5(f)(3).

6. Plaintiffs were at all times herein relevant were employees, de facto employees or applicants for employment with FMC Technologies, Inc. (hereinafter "FMC").

7. Defendant FMC Technologies, Inc. is a Delaware corporation, operating in the State of Texas.

8. At all times relevant herein, Plaintiffs reported directly to FMC managers and leads, received day-to-day orders from FMC personnel, received performance evaluation from FMC personnel, had their hours, vacations and schedules set by FMC, received disciplinary action from FMC personnel, were paid on an hourly basis, and reported to human resources managers of FMC.

9. Defendant PROSTAFF PERSONNEL ACQUISITION CORP. (Hereinafter "Prostaff"), is a Delaware corporation, operating in the State of Texas. Many Plaintiffs were originally placed at the FMC facility through the Prostaff agency. Plaintiffs repeatedly complained of harassment and discrimination to managers and human resources of Prostaff, but Prostaff failed to take any remedial action

1    to stop the harassment and discrimination from occurring.

2  10.    At all times mentioned in the causes of action into which this paragraph is

3    incorporated by reference, each and every defendant was the agent or employee

4    of each and every other defendant.  In doing the things alleged in the causes of

5    action into which this paragraph is incorporated by reference, each and every

6    defendant was acting within the course and scope of this agency or employment

7    and was acting with the consent, permission, and authorization of each

8    remaining defendant.  All actions of each defendant alleged in the causes of

9    action into which this paragraph is incorporated by reference were ratified and

10    approved by the officers or managing agents of every other defendants.

11

12                    **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

13  11.    Plaintiffs have exhausted all applicable administrative remedies.

14

15                             **STATEMENT OF FACTS**

16  **Boris Bryant**

17  12.    Plaintiff Boris Bryant was hired by Prostaff in or about December of 1999.

18  13.    At all times relevant herein, Plaintiff worked at the FMC Technologies plant,

19    located at 1777 Gears Road, Houston, Texas.

20  14.    In August of 2000, Plaintiff was hired as a full-time employee of FMC

21    Technologies as an "Assembly Technician I."

22  15.    Throughout his career, Plaintiff Bryant has been subjected to numerous acts of

23    racial hostility and discrimination.

24  16.    In or around January 2000, Plaintiff was transferred from the Low Bay to the

25    High Bay, where James Faucett became his supervisor.

26  17.    Plaintiff heard Facuett make numerous racial slurs, including *nigger* and *monkey*.

27  18.    In 2001, Plaintiff witnessed racist graffiti on the wall, including a drawing of a

28    noose with the word "nigger." Plaintiff complained to James Faucett, who

1   dismissed Plaintiff's complaint, telling him, "this is a shop; that kind of thing

2   happens."

3   19.   In or around 2002, Plaintiff was working the night shift and listening to his radio.

4         Shannon, a lead, came by and told Plaintiff, *I don't want to listen to that*

5         *f. . .ing nigger music.*" Plaintiff complained to James Faucett and human

6         resources manager, Michelle Risinger, who told Plaintiff that she would

7         investigate and get back to Plaintiff. No one from human resources ever got back

8         to Plaintiff with the results and Shannon continued to be Plaintiff's lead person.

9   20.   Later in 2002, on Martin Luther King Day, Shannon put on a paper KKK hat and

10        stated, "f. . .k that MLK, they should have killed him." Plaintiff complained to

11        human resources managers Vicky Vargas, Debra Grey and Michelle Risinger,

12        however, nothing changed and Shannon continued to be Plaintiff's lead person.

13  21.   Additionally, Faucett would discipline Plaintiff more severely than his non-

14        African-American coworkers for the same alleged offenses.  Further, Faucett

15        issued Plaintiff numerous unwarranted negative performance appraisals, costing

16        Plaintiff raises and hampering his prospects for advancement within the

17        company.

18  22.   In 2003 or 2004, Lead Roy Boden called Plaintiff "boy." Plaintiff explained to

19        Boden that this term was unacceptable because this was a slavery term. Boden

20        merely laughed at Plaintiff.

21  23.   In 2004, Plaintiff applied for a lead position. However, Plaintiff was not even

22        interviewed and James Faucett gave the position to a non-African-American

23        employee with less seniority, who Plaintiff was forced to train. Plaintiff

24        complained Michelle Risinger and Vicky Vargas from human resources,

25        however, nothing happened.

26  24.   In 2005, Plaintiff applied for another lead position. There were five applicants for

27        four open positions.  Plaintiff and another African-American employee, Robert

28        Graves, applied for the position. However, three non-African-American

employees, with less seniority than Plaintiff and Graves, got the lead positions. The fourth position was never filled.  A month before the interviews, the names of the three non-African-American applicants were already written in to the organizational chart. Plaintiff complained to James Faucett and to Vicky Vargas from human resources, however, nothing happened.

25.     Plaintiff suffered incredible stress as a result of this discriminatory promotion practices. Plaintiff suffered loss of sleep, anxiety, nervousness and loss of appetite.  Plaintiff's doctor put him out on stress leave for three months so he could recover.

26.     Plaintiff used to carpool with a non-African-American employee named Brad Hooker. In 2005, Plaintiff was suspended for 3 days without pay for being tardy. However, Brad Hooker, who arrived at the same time as Plaintiff, received no disciplinary action at all. Plaintiff complained to James Faucett, who dismissed Plaintiff's allegation and did nothing about it.

27.     In 2006, Plaintiff applied for another lead position. However, this position was once again given to a non-African-American employee with less experience than Plaintiff. Plaintiff complained to human resources, however, nothing was done.

28.     In September, 20006, Plaintiff received a negative Performance Development Disclosure ("PDD") after an accident on the job site, even though Plaintiff was not even present at the time and Plaintiff was found to be faultless. As a result of this incident, Plaintiff was placed on probation for one year and he was denied a raise.

29.     In November, 2006, Plaintiff applied for a "service tech" position. Plaintiff was interviewed by James Philips, a non-African-American employee who Plaintiff had trained. However, Plaintiff was denied the promotion. Philips told Plaintiff that James Faucett [Plaintiff's supervisor] "black balled you." Plaintiff complained to human resources about being denied this promotion, however, nothing was done.

30.   In September of 2007, Plaintiff saw Lead James Bryan, looking at Ku Klux Klan and other white supremacist, racist websites on the job. Plaintiff complained to human resources, however, Bryan was not disciplined and nothing changed.

31.   Plaintiff complained to Wendell Beborski in human resources about the fact that people Plaintiff trained became leads and supervisors, while Plaintiff was continually denied promotions. Plaintiff told Deborski about how African-Americans were required to sweep, while non-African-Americans were put in positions of responsibility, where they could improve their job skills. Deborski agreed that there was a hostile work environment.

32.   In September of 2007, a hangman's noose was found in the machine shop. Plaintiff Bryant and each of the other Plaintiffs were incredibly shocked and offended by this racist act and complained to human resources. However, the harassment continued and additional nooses were found.

33.   In October of 2007, another hangman's noose was found in the "high bay," where Plaintiff works. Plaintiff learned about the noose from coworkers and he was incredibly upset that a noose would be in his workplace. Plaintiff complained to Vicky Vargas and Wendell Deborski in human resources, however, nothing changed.

34.   In November of 2007, yet another hangman's noose was found in the "high bay." Wendell Deborski, from human resources, told Plaintiff that they found the noose there. FMC then held a sensitivity training session with all of the employees put on by a team of lawyers. However, the video that was played contained offensive language and racial slurs, including children using the word "nigger." Plaintiff, as well as other employees, walked out of the video in protest of such a demeaning and inappropriate video. Plaintiff complained to the trainers about the incredible insensitivity of this video.

35.   Upset at the racial atmosphere at the workplace, Wendel Deborski from human resources quit FMC.

36.  In December of 2007, employee Steven Henderson showed Plaintiff the swastika and rebel flag tattoos on his back. Plaintiff again complained to human resources, however, nothing changed.

37.  In May of 2008, yet another noose was found. However, as with the prior nooses, management attempted to minimize the severity of the incident and took no remedial action.

**Darren Mayo**

38.  Plaintiff Darren Mayo was hired by FMC on or about January 8, 1997 as an assembly technician.

39.  In 1999 Plaintiff was recommended for a promotion to the surface department. However, Plaintiff was denied the promotion and the job went to a non-African-American employee. Plaintiff complained to human resources, however, Plaintiff was still denied the job and nothing ever changed.

40.  During his tenure with FMC, Plaintiff trained several non-African-American employees, who were later promoted over him.

41.  In 2000, while Plaintiff was working as a lead subsea technician, Plaintiff, another African-American employee and one non-African-American employee were working offsite. When the job was done, the three employees left. However, the following day, Plaintiff Mayo and the other African-American employee were accused of stealing time. The non-African-American employee, who left with them, was not disciplined at all. As a result of this incident, Plaintiff was no longer allowed the privilege of working offsite, and denied the opportunity to grow within the company. Further, management falsely told Plaintiff's coworkers that he had been stealing time, leading to embarrassment and hurting his chances for promotion.

42.  Plaintiff complained about this incident to human resources, who allegedly investigated, but took no action.

43.  In 2002, Supervisor James Faucett was talking to Plaintiff about another African-

1    American employee and said, **"that's what I call a nigger right there, I just use**
2    **him to get what I need out of him."** Previously, Faucett told Plaintiff that his
3    father was in the KKK.

4    44.   Plaintiff knew that other employees complained about James Faucett to human
5          resources, including the fact that Faucett had used racial slurs such as "nigger
6          lover." Faucett was never disciplined.

7    45.   In 2004, a hangman's noose was found in the weld shop, however the company
8          did nothing to prevent further recurrences.

9    46.   Throughout his career working with James Faucett, Faucett would write negative
10         performance appraisals of Plaintiff, costing him raises and opportunities for
11         advancement. Faucett constantly berated Plaintiff and embarrassed him in front
12         of his coworkers. Faucett would tell him, "get your stupid ass back on the floor"
13         and other demeaning comments.

14   47.   In 2006, Plaintiff was given an unwarranted writeup by James Faucett for
15         allegedly failing to complete an assignment, leading to Plaintiff being denied a
16         raise.  However, Plaintiff did in fact complete the assignment but the contractor,
17         SAS, took down his work to do the insulation work. Plaintiff complained to Eric
18         Heuring about this disparate treatment and about Faucett's harassing treatment,
19         and asked to be moved to a different assignment.

20   48.   In May of 2007, Plaintiff was injured in a car accident. At that time, Plaintiff was
21         also scheduled to take a vacation. After confirming with human resources,
22         Plaintiff took his planned vacation.  Plaintiff was accused of being a "no call no
23         show," even though his leave was approved.

24   49.   At that same time, May of 2007, Plaintiff was denied a promotion to a team lead
25         position. The job instead went to Roy Bolton, a non-African-American with less
26         seniority than Plaintiff and who had committed five "no call no show"
27         violations. Instead of being terminated, Bolton was promoted.

28   50.   Plaintiff complained to Wendell Deborski in human resources about being

1    denied the promotion. Plaintiff told Deborski that his managers had denied him
2    the position because of his race. After investigating for two or three weeks,
3    Deborski told Plaintiff, "I've been getting retaliated against because I have been
4    asking about this promotion and that's why I'm putting in my two weeks
5    notice." Deborski said that he was going to tell the truth about the discrimination
6    at FMC during his exit interview.

7  51.   In October 2007, a noose was found in the workplace. In early November, 2007
8        yet another noose was found in the workplace.  At that time, Plaintiff learned
9        about that noose, as well as a noose the previous month.  Plaintiff was incredibly
10       upset and offended that a noose would be in his workplace. Plaintiff complained
11       about the hangman's noose to Michelle Risinger in human resources. Risinger
12       told Plaintiff that the incident was under investigation. In later November, 2007,
13       a third noose was found at the workplace.  Lead John Zeizmer confirmed to
14       Plaintiff that a third noose had been found.

15 52.   In January of 2008, Plaintiff was ordered to attend a mutual respect meeting. At
16       that time, a video was shown contained offensive language and racial slurs,
17       including children using the word "nigger." Plaintiff complained to the
18       facilitator of the meeting about how offensive the video was.

19 53.   In February of 2008, Plaintiff opened his desk drawer to find a black glove with
20       four fingers stapled down exposing the middle finger. Plaintiff complained to his
21       lead, John Troxell, that this was offensive to him, however nothing was done.

22 54.   On or about February 22, 2008, Plaintiff wrote an email to Michelle Risinger in
23       human resources, complaining about how offensive this was and how
24       disappointing at how slow the response was and the fact that there was no
25       "stand down" meeting to discuss it, especially in light of the noose incidents.

26 55.   The following Wednesday, Plaintiff met with Susan Webb from Human
27       Resources, Jon Troxell and Brian Janak, to discuss the situation. Susan Webb

28

1   acknowledged that the company should have acted quicker to address the issue.

2   However, nothing was done to improve the hostile work environment.

3   56.   On or about May 17, 2008, yet another noose was found in the High Bay.

4   Plaintiff learned about it from his coworkers and was incredibly upset about it.

5   The following Monday, May 19th, the company held a meeting to discuss the

6   noose.  After the meeting, Plaintiff complained to Jon Troxell that he couldn't

7   take this any more. Plaintiff suffered loss of sleep, stress and anxiety, forcing

8   Plaintiff's doctor to take him out of the workplace on stress leave for three

9   weeks.

10   57.   During his leave, Plaintiff spoke with Jon Troxell and told him that the stress was

11   caused by the noose incident. Troxell said that he was disappointed with

12   Plaintiff's work performance. Prior to Plaintiff's stress leave, Troxell had never

13   complained about Plaintiff's performance.  When Plaintiff returned, Troxell

14   issued new guidelines for Plaintiff's job.

15   58.   Plaintiff currently reports to John Troxell. However, Troxell constantly criticizes,

16   berates, swears at and yells at Plaintiff publicly, making his job nearly

17   impossible. However, Troxell never yells at the non-African-Americans.

18   59.   Plaintiff is currently under constant stress and anxiety as a result of working for

19   Defendant. He suffers loss of sleep, eating issues, headaches and mental anguish.

20   **Edward Pierre**

21   60.   Prior to working for Prostaff and FMC, Plaintiff Pierre was in the military for

22   almost twelve years.

23   61.   Plaintiff Pierre began working at the FMC facility on or about April 4, 2007.

24   62.   On May 22, 2007, Plaintiff suffered an injury to his thumb, which was caused by

25   his Caucasian lead, James Bryant. Plaintiff's direct supervisor, James Faucett, told

26   Plaintiff, "I bet you'll pay attention next time." A few weeks later, the company

27   fired Plaintiff's Latino coworker over the incident, even though it was James

28

1  Bryant's fault.

2  63.  Throughout his tenure, Plaintiff has been trying to secure full-time employment

3  with FMC. However, while Plaintiff was told that he needed more experience,

4  Plaintiff's non-African-American coworkers with less experience and time on the

5  job were hired by FMC, while Plaintiff was not.

6  64.  On October 25, 2007, Plaintiff discovered a hangman's noose in his work area.

7  Plaintiff was incredibly offended by this racist symbol. Plaintiff immediately

8  called over his coworker, Plaintiff Lamar Newton, to see it. Lamar was also

9  outraged at the sight of this noose in the workplace. Newton went to see the Low

10  Bay Team Lead, Joe McHenry, who said that he would come down to check it

11  out. In the mean time, lead James Bryant came over to Plaintiff's work area.

12  Bryant joked, "Ed, are you tying nooses around here?" Plaintiff told him no, and

13  that he was waiting for McHenry to arrive.

14  65.  James Bryant left to speak with Roy Bolton, the High Bay Team Lead. Instead of

15  giving this serious situation the attention it deserved, Bolton said, "I don't have

16  time for this kind of stuff; I need these trees to get done." James Bryant then cut

17  down the noose and took it to Joe McHenry.

18  66.  Wendell Deborski, from human resources, came down to interview Plaintiff.

19  Plaintiff told Deborski what happened and Deborski said that HR was going to

20  investigate. Plaintiff was later summoned to human resources, where be met

21  with Vicky Vargas and Paige Fuller from Prostaff. Vicky Vargas tried to get

22  Plaintiff to say that the rope wasn't really a noose but Plaintiff explained to

23  everyone that it was in fact a hangman's noose. Plaintiff gave them a written

24  statement about what happened.  Vargas told Plaintiff that she would get back to

25  him with the results of the investigation, however, Vargas never did.

26  67.  As a result of the this incident, Plaintiff suffered from severe stress, loss of sleep,

27  anxiety and fear. Plaintiff wondered every day whether he would be able to keep

28

1    his job and work in this atmosphere, always feeling like he needed to look over

2    his shoulder.

3    68.   Plaintiff was still concerned about the fact the one of his coworkers has placed a

4    noose in the workplace and so on February 7, 2008, Plaintiff went back to HR to

5    ask why no one got back to him about the investigation.  Plaintiff explained to

6    Susan Webb in human resources that people were not pleased with the way the

7    noose incident was handled and how no one from the company informed them

8    of the investigation. Considering the racial hostility in the workplace, and the

9    fact that the Jenna 6 incident had recently occurred, Plaintiff expressed how

10   upset and offended he was and how more immediate action should have

11   occurred. Webb said that the investigation was ongoing.

12   69.   However, as no one ever got back to Plaintiff about the investigation and the

13   racial hostility continued, Plaintiff filed a complaint with the E.E.O.C.

14   70.   On March 18, 2008, Plaintiff was called by Paige Fuller to go see Susan Webb in

15   HR regarding his E.E.O.C. complaint. Plaintiff explained to them each of the

16   issues he addressed to the E.E.O.C. Plaintiff explained that the "good old boys'

17   club" and the intimidating atmosphere needed to stop and that he wanted to see

18   appropriate training in the workplace that would directly address the issue of

19   the hangman's noose. Plaintiff explained that the noose is one of the single most

20   offensive symbol to African-Americans and that this needs to be reinforced.

21   However, no training has ever addressed the significance of hangman's nooses in

22   the workplace.

23   **Lawrence Grice**

24   71.   Plaintiff Grice was hired on or about March 15, 2001 as a Assembler Technician at

25   the FMC site.

26   72.   In July of 2006, Plaintiff applied for an Assembler II position, however the job

27   was given to a non-African-American temporary employee with far less

28

1    experience than Plaintiff.

2    73.   In late 2006, Plaintiff was moved from the High Bay area to the Direct Vertical

3          Access (DVA) area. Plaintiff's manager, Dean Winkler, told Plaintiff that he was

4          never going to get a lead position in the High Bay and that he should get a fresh

5          start somewhere else.

6    74.   In July 2007, Heith Huering told Plaintiff that because of his prior complaint,

7          Dean Winckler would never promote him and would considered him for a lead

8          man position. Plaintiff complained about this comment to Michelle Risinger in

9          human resources. Risinger said that she would talk to Dean but she never got

10         back to Plaintiff. Later, Huering repeated this comment in front of Wendell

11         Deborsky from human resources.

12   75.   In October 2007, a hangman's noose was found in the workplace.  Plaintiff was

13         told about it by Wendell Deborski from human resources.  Plaintiff was

14         incredibly offended by this racist symbol being displayed in his workplace.

15   76.   During this same time period, Plaintiff was in the process of being promoted to

16         an Assembler IV. However, even though Dean Winkler had signed off on the

17         promotion, Eric Huering refused to honor Dean's promotional decision when he

18         took over the department. Huering told Wendell Deborsky that he would not

19         promote Plaintiff unless he can pass a test, even though Plaintiff was already

20         approved for the job. Nonetheless, Plaintiff took and passed the test. However,

21         Huering still refused to promote Plaintiff to this position. None of the non-

22         African-American Assembler IV's had to take a test.

23   77.   Earlier in 2007, Plaintiff's managers had given him an annual performance plan,

24         which stated that he would be promoted by December 2007 if he met certain

25         requirements.  Even though Plaintiff met all of the requirements, he has still not

26         been promoted.

27   78.   In November 2007, Plaintiff was present when another Plaintiff, James Brown,

28

1   was recalling a story from his childhood.  At that time, an employee named

2   Stanley Norris commented that, **"you better be glad that you weren't in my**

3   **neck of the woods when you did that or we would have done you like they did**

4   **to James Byrd in Jasper,"** referring to the highly-publicized racial killing in

5   Jasper, Texas. Plaintiff reported this comment to his manager, Brian Sangster.

6   Sangster dismissed the comment, stating that, "that's just the way he is." Several

7   employees complained to human resources, however nothing was done to

8   discipline Norris.

9   79.   Norris previously told Plaintiff about how his uncle was a sheriff, and that after a

10   black man raped a white girl, they dragged him out of his cell and was never

11   seen again.

12   80.   In March 2008, during Plaintiff's performance development discussion ("PDD")

13   with Eric Trammel, Plaintiff complained about why he still had not been made a

14   lead man.  Trammel told Plaintiff that the two non-African-American employees

15   who were currently acting as lead men had "SAP training," which Plaintiff did

16   not. However, Plaintiff had been consistently denied SAP training and had in

17   fact complained to Heath Herring, Dean Winkler and HR about being denied

18   access to SAP.

19   81.   Further, during this discussion Plaintiff complained to Trammel about not being

20   promoted to Assembler IV, even though he was promised this title by Heath

21   Herring if he met certain criteria, which he did. Trammel said that this decision

22   was up to Eric Herring.

23   82.   On or about April 3, 2008, Plaintiff met with Eric Herring, Eric Trammel and

24   Plaintiff Darren Mayo. At that meeting, Plaintiff Grice handed them a letter,

25   complaining about discrimination and harassment.

26   83.   On April 14, 2008, Plaintiff met with Michelle Risinger from HR and explained to

27   her that Heath Herring had promised to make him and Assembler IV and the

28

1    fact that Heath Herring had confirmed his intention to Susan Webb from HR.

2    Risinger failed to respond to Plaintiff's complaints in any way.

3    84.   The following day, Plaintiff asked Risinger for a copy of her notes of that

4          discussion, however, Risinger refused and Plaintiff has still not been made an

5          Assembler IV.

6    85.   In May of 2008, another noose was found in the workplace. Plaintiff was

7          incredibly offended and upset that the company had not done anything to

8          change the hostile work environment after prior nooses were found. The

9          company held a meeting with human resources, who told employees that they

10         were investigating, however,  Plaintiff has never heard the results of any

11         investigation and nothing has changed.

12   86.   In June of 2008, Plaintiff complained to management about harassing comments

13         made by a FMC contractor. This contractor yelled at Plaintiff, "ya mule, yah, pull

14         mule pull." Plaintiff told him that he was a man, not a mule, and complained to

15         management. Despite his complaints, the contractor continued with his racially-

16         offensive comments, including telling Plaintiff and other employee, "fine work

17         boys, y'all were slave driving today."

18   87.   On September 2, 2008, yet another hangman's noose was found in the workplace.

19         While several people saw the noose, management has claimed that the noose was

20         a "slipknot" and refused to take appropriate action against the individual who

21         committed this racist act.

22   88.   During Plaintiffs' training, he was given a manual that includes an offensive

23         picture of a man in blackface. This picture is also found on FMC's intranet and

24         has been viewed by countless employees, including many of the Plaintiffs.

25   89.   On December 12, 2008, Plaintiff's non-African-American coworker made several

26   90.    racist remarks to Plaintiff, telling him, "I didn't think you wanted any coffee

27         anyway because you are already dark enough." He then put his arm next to

28

1    Grices' and said, "see, you have been drinking to much coffee." This coworker
2    then asked Grice, "what was the name of the guy in the bible who God changed
3    the color of his skin because he sinned?"

4  91.   Plaintiff complained to HR about these comments, however, Patsy Livingston
5        from HR tried to minimize this racist conduct, and tried to get Grice to say that it
6        was just a joke.

7  **Kevin McIntyre**

8  92.   Plaintiff began working at the FMC site through Prostaff in October of 2005.

9  93.   In August of 2006, Plaintiff heard Stanley Norris call another employee a "**creole**
10       **nigger**." Plaintiff knew of other employees who had complained to human
11       resources about racial comments but who received no response or action from
12       the company.

13 94.   Later, Plaintiff heard Stanley Norris comment, "I'm glad that Mexican got fired,
14       he was hard-headed," in reference to a Latino employee who was terminated.

15 95.   Throughout his time at the FMC facility, Plaintiff applied for full-time position
16       with FMC. However, non-African-Americans with less experience than Plaintiff
17       were hired, while Plaintiff was not. Plaintiff had to fill out applications multiple
18       times because his applications were allegedly "lost."

19 96.   As a result of allegedly "losing" Plaintiff's applications, Plaintiff was passed over
20       for higher-paying promotional opportunities. Those jobs instead went to non-
21       African-American employees.

22 97.   Plaintiff was finally hired as a full-time employee of FMC in March of 2007.

23 98.   In October 2007, a hangman's noose was found in the workplace. Plaintiff
24       learned about it during his safety meeting. Plaintiff was shocked and incredibly
25       offended by this racist act.

26 99.   FMC then held a sensitivity training session with all of the employees put on by
27       a team of lawyers. However, the video that was played contained offensive

28

1    language and racial slurs, including children using the word "**nigger**." Plaintiff

2    was incredibly offended by the racist video.

3    100.   In November of 2007, Plaintiff learned that Stanley Norris said, "**who nigger-**

4            **rigged this sh. .?**" Stanley Norris constantly drove to work in a pickup truck

5            with a bumper sticker, stating "I'm a registered coonass." Norris' truck could be

6            seen by FMC management because it was parked in the company lot.

7    101.   Plaintiff currently holds the title of Level I technician, and is only paid as a Level

8            I technician, however he does the work of a Level II technician. Other, non-

9            African-American employees with the same level of experience as Plaintiff are

10           paid as Level II technicians.

11   **Maurice Galimore**

12   102.   Plaintiff Maurice Galimore was hired on or about December 21, 2006. At the

13           time, Plaintiff was hired as an assembly technician, working in Factory Accepted

14           Testing (F.A.T). Instead of teaching him the F.A.T. protocols, Plaintiff was

15           assigned to mopping, tool organization and other menial tasks.  Non-African-

16           American employees with less seniority than Plaintiff were quickly trained in

17           F.A.T. and assigned more responsible duties, which allowed them to move up in

18           the company. Plaintiff complained to his supervisor, High Bay Team Lead James

19           Faucett, who told him, "you're lucky to have a job, get back to work!" Plaintiff

20           then complained to human resources on multiple occasions. However, Plaintiff

21           was told that he needed to wait it out. Plaintiff remained in that capacity for a

22           full year.

23   103.   In May or June of 2007, Plaintiff received a negative performance evaluation

24           from High Bay Team Lead Roy Bolton. Bolton told him that the evaluation was

25           poor because he Plaintiff could not work independently in different areas.

26           However, unlike the non-African-American employees, Plaintiff had been

27           consistently denied the opportunity to train in those areas.

28

104. Plaintiff asked Bolton when he would be given a full-time job with FMC. Bolton said, "what do you need a job for?" Bolton then told him that HR needed to make a position available but that he could submit an application. Plaintiff submitted an application, however he has been continually denied employment by FMC.

105. On three separate occasions, human resources claimed that they "lost" Plaintiff's job application, which is an experience shared by several African-Americans. Plaintiff does not know of any non-minority individuals who have had their application"lost" by human resources.

106. In June or July of 2007, Plaintiff and another African-American employee, Willy Howard, were taking their 15 minute break in the break room.  However, only two minutes into their break, Lead Brett Mohn yelled at Plaintiff and Howard to "get back to work!" Plaintiff and Howard immediately returned to their job in the High Bay.  When they arrived, four or five non-African-American employees were watching pornography on Brett Mohn's computer and other employees were literally lying down and relaxing.  Mohn was present and witnessed this, but did nothing.

107. Plaintiff Boris Bryant complained to Brett Mohn about harassing Galimore, as well as to HR, however, nothing was done.

108. Later in July of 2007, Plaintiff again asked Brett Mohn for training in F.A.T. Mohn told Plaintiff, "F.A.T. requires a mind-set that you don't have."  Mohn told Plaintiff, "you need a bra, you're a double-D." Plaintiff never heard Mohn makes those degrading comments to non-African-American employees.

109. In August of 2007, Plaintiff Galimore saw Lead James Bryant viewing a racist "White Aryan Resistance" website, as well as several other violent websites. Plaintiff complained about this to his lead, Darren Mayo, as well as Wendell Duborski in human resources.  Plaintiff complained about the racist websites,

1    and also explained that the non-African-American employees were given
2    preferential treatment and that he was only assigned menial tasks, janitorial
3    work, and that he was harassed during his break times. Deborski told Plaintiff
4    that he should apply for job as an assembly tech position in the High Bay and an
5    apprenticeship position in the machine shop. Plaintiff applied for both positions
6    at the same time. Once again, Plaintiff was told by human resources that his
7    application for the High Bay position was "lost." Plaintiff was denied the
8    apprenticeship, allegedly because he was not a veteran employee.

9    110.   Several non-African-American employees, with less experience on the job site
10          were hired by FMC, including Michael Woods, Steven Henderson, and Brian
11          Holden, however, Plaintiff has been continually denied employment because of
12          his race.  Steven Henderson was given a full-time job even though he was caught
13          sleeping on the job.

14   111.   In November of 2007, a noose was found in the High Bay, where Plaintiff works.
15          Plaintiff was incredibly upset and offended by this racist act. Plaintiff and several
16          other employees complained to management about this incident. Plaintiff was
17          required to attend a sensitivity training, where he was shown an incredibly
18          offensive video, which included children using the word "nigger."

19   112.   In 2007, when FMC held a farewell party for Manager James Faucett, the
20          company prominently displayed on every table a picture of Faucett wearing a
21          confederate flag hat. This picture has also been displayed in the Prostaff office
22          and on the "Why I Work Safely" board in the Low Bay.

23   113.   Later in January of 2008, during an all-hands meeting, Plaintiff complained to
24          managers Eric Huering and Brian Januk about discrimination and harassment.
25          Specifically, Plaintiff complained about an atmosphere of racism in the High Bay,
26          about the discriminatory hiring practices and how his applications were
27          allegedly lost, about the nooses that have been found in the workplace, about

28

1   being denied cross-training, about how African-Americans are assigned menial
2   tasks, and how non-African-American employees sit around while on the clock.
3   Huering and Januk said that they would look into it and make changes,
4   however, nothing was done.

5   114.   In January of 2008, Plaintiff submitted a third application for employment with
6   FMC. Once again, Plaintiff was told that his application was "lost."

7   115.   In February of 2008, Plaintiff heard Lead Brett Mohn talking about how he had
8   found a noose in Manager Roy Bolton's office two times in one day. Mohn said
9   that Manager Eric Huering had placed it there.

10   116.   On or about March 25, 2008, Plaintiff had a meeting with Susan Webb, human
11   resources manager for FMC and Paige Fuller, human resources manager for
12   Prostaff. Plaintiff explained to them about everything he had complained to
13   Huering and Januk about, which is described above.  Plaintiff also told Webb
14   about the noose in Roy Bolton's office and the racist websites.

15   117.   Plaintiff met with human resources manager, Susan Webb again in May of 2008.
16   Webb stated that she could not substantiate the claims about the racist websites
17   and/or that managers had placed nooses on their desks. Webb did say that Roy
18   Bolton does have a rope on his desk and that sometimes people tie knots in it
19   while they are meeting with him.

20   118.   In May of 2008, yet another noose was found in the workplace. Plaintiff saw the
21   noose hanging on one of the "trees," which is what the employees call the
22   underwater production units that they build.  Plaintiff was incredibly offended
23   and upset that the company had not done anything to change the hostile work
24   environment after prior nooses were found. The company held a meeting with
25   human resources, who told employees that they were investigating, however,
26   Plaintiff has never heard the results of any investigation and nothing has
27   changed.

28

119.  On or about June 6, 2008, Plaintiff was written up by John Troxell, allegedly for "bringing negativity to the workplace," for allegedly making negative or inappropriate comments during a meeting and for ignoring him. However, Plaintiff never made negative or inappropriate comments during this meeting, he have an honest answer to Troxell's questions. Other non-African-American employees made similar comments during the meeting, but were not disciplined. Further, Plaintiff never intentionally ignored Troxell. During the time in question, Plaintiff was operating a crane, and company policy dictates that a crane operator give their undivided attention to this task, which includes moving thousands of pounds of expensive equipment and materials.

120.  Plaintiff complained about his writeup to Patsy Livingston, human resources representative, however, the writeup went into his personnel file anyway.

121.  In December of 2008, while everyone in the Low Bay and High Bay was given an FMC jacket, Maurice's supervisor, Eric Heuring did not get one for him. Plaintiff was the only employee who did not get one.

122.  Currently, one of Plaintiff's leads, Leon Acosta, displays a prominent "Aryan Nation" spider web tattoo on his elbow that is visible to all of the employees.

**James Brown**

123.  Plaintiff Brown was hired on or around March of 2006 as an Assembly Technician.

124.  In late 2006, Plaintiff attended his safety meeting. During that time, Plaintiff brought up one of his experiences in his youth. Stanley Norris replied, "**if you did that where I grew up, we would have drug you like they did to that guy in Jasper,**" referring to the African-American hate-crime victim in Jasper, James Byrd.  Plaintiff Lawrence Grice and several other employees, including Plaintiff's non-African-American Lead Man, Lewis Brown, were present when Norris made this comment.

125. Approximately one month later, during a conversation among several employees about different recipes, Plaintiff heard Stanley Norris call one recipe, a "nigger recipe" in front of several other employees.

126. While working at the FMC site, Plaintiff applied for full-time employment with FMC on multiple occasions. Several non-African-American employees with less seniority than Plaintiff were hired on full-time. As with several other Plaintiffs, human resources managers told Plaintiff that his applications were "lost."

127. Plaintiff was eventually hired full-time at the end of February, 2007. However, Plaintiff Brown as well as Plaintiff Kevin McIntyre were falsely told that they failed the urine test. It took several days for Plaintiffs Brown and McIntyre to be cleared to work. As a result of this delay, Plaintiffs Brown and McIntyre were given a lower seniority date than the new Non-African-American hires.

128. In November of 2007, a noose was found in the High Bay. Plaintiff was incredibly upset and offended by this racist act. Several of Plaintiff's coworkers complained to management about this incident and Plaintiff explained to his superiors about how offended he was when he was questioned about the incident.

129. In December of 2007, Plaintiff asked Stanley Norris for some pipe plugs. Norris told Plaintiff, **"who has you nigger-rigging this?"** Plaintiff was shocked by this racist comment and he complained to Lewis Brown, his Lead. Brown was stunned and said, "I can't believe he would continue saying stupid things like that." Brown told Plaintiff that he was going to tell Eric Trammel, the shop coordinator (manager), who then held a conversation with Norris.

130. While Brown told Plaintiff that he spoke with Norris and told him that it was wrong, no discipline was imposed and nothing changed.

131. On July of 2008, Plaintiff went to the restroom in the receiving area. In the last stall, Plaintiff noticed numerous KKK signs and symbols all over the stall, the

1    paper dispenser and the walls. Plaintiff was shocked at this racist act and

2    immediately went to find Plaintiff Darren Mayo, lead in High Bay. When

3    Plaintiff and Mayo returned to the restroom, the door was locked and taped up.

4  132.  Plaintiff wrote a complaint letter to human resources about this racist incident.

5    Plaintiff was summoned to a meeting with Patty Livingston, from human

6    resources, who told him that the company had known about the incident several

7    days before Plaintiff had seen it.  Plaintiff asked Livingston why they didn't paint

8    over it immediately, instead of allowing Plaintiff and other employees to

9    continue to be confronted by the racial epithets. Livingston said, "why do y'all

10    assume that nothing is being done?" Plaintiff asked her who she meant by

11    "y'all?" Livingston did not provide Plaintiff with an explanation for who she was

12    referring to or why no one took care of the situation immediately. Livingston

13    told Plaintiff that she would get back to him when she found out any more. To

14    date, Livingston has not responded to Plaintiff.

15  **Carlos Beatty**

16  133.  Plaintiff Beatty was hired in or around October of 2005 as an assembly

17    technician.

18  134.  In the Spring of 2006, Plaintiff's Caucasian coworker, Stanley Norris, told

19    Plaintiff that an African-American employee was, "**not a nigger but a creole**

20    **nigger**." Plaintiff was incredibly offended and complained to his lead, Lewis

21    Brown. Brown forwarded Plaintiff's complaint up to Manager Brian Sangster,

22    who told Plaintiff that he was going to speak with Norris about it. Plaintiff is not

23    aware of any disciplinary action being taken or any investigation into his

24    complaints.

25  135.  Later in 2006, Plaintiff was present when Stanley Norris Stanley made

26    threatening and racist comments to Plaintiff James Brown. Norris replied to

27    Brown, "**if you did that where I grew up, we would have drug you like they**

28

1    **did to that guy in Jasper,**" referring to the African-American hate-crime victim

2    in Jasper, James Byrd.  Plaintiff, who happened to know James Byrd, was

3    incredibly upset and offended. Plaintiff and several other employees, including

4    Lead Lewis Brown, were present when Norris made this comment.

5  136.   Plaintiff applied for full-time employment at FMC starting in October of 2006. As

6    with other Plaintiffs, FMC told Plaintiff Beatty that his application was "lost."

7    Plaintiff saw numerous non-African-American employees with less experience

8    get hired on full-time at FMC.

9  137.   As with Plaintiff Brown, FMC was slow to process Plaintiff Beatty's application.

10    Plaintiff was told that he lied about his previous employer. However, Plaintiff

11    proved to FMC that he had in fact worked for that employer for two and a half

12    years, as he stated on his application. Eventually, Plaintiff was hired full-time at

13    FMC in February of 2007.

14  138.   In November of 2007, a noose was found in the High Bay.  Plaintiff was

15    incredibly upset and offended by this racist act.  Several of Plaintiff's coworkers

16    complained to management about this incident and Plaintiff explained to his

17    superiors about how offended he was when he was questioned about the

18    incident.

19  139.   In May of 2008, another noose was found in the workplace. The company held a

20    meeting with human resources, who told employees that they were

21    investigating, however,  Plaintiff has never heard the results of any investigation

22    and nothing has changed.

23  140.   On September 2, 2008, yet another hangman's noose was found in the workplace.

24    While several people saw the noose, management has claimed that the noose was

25    a "slipknot." Plaintiff is incredibly fearful working in an environment where hate

26    crimes continually occur and management has done nothing to stop these racist

27    acts.

28

141.   Throughout his career, Plaintiff has seen numerous non-African-American employees, including many with less seniority, receive promotions without the jobs even being posted.

**Marcus Parejo**

142.   Plaintiff Parejo, who is from Trinidad & Tobago, began working at the FMC facility in July of 2006.

143.   Plaintiff Parejo is of West Indian ancestry, born in Trinidad & Tobago.

144.   Plaintiff first applied for a full-time welder position with FMC in April of 2007. At the time, Plaintiff was told that he needed to be with the company for a year before he could change departments.

145.   However, several Caucasian employees with less seniority were given full-time positions with FMC.

146.   Because Plaintiff wanted welding experience, he asked to practice in the weld shop. For a short time, Plaintiff was allowed to practice welding, however, his superior, Heath Heuring would not allow it. Huering said that Plaintiff needed the proper paperwork in order to be in the welding area.  Despite Plaintiff's expressed interest in working in the weld shop, and the fact that Plaintiff was already doing some welding work on the job, Plaintiff was not given the opportunity to join the welding apprenticeship.

147.   Plaintiff is currently attending Lone Star College, majoring in welding. However, Plaintiff's repeated requests for welding training were denied, even though Caucasian employees are allowed to practice welding.

148.   In October of 2007, Plaintiff noticed a KKK symbol drawn on a piece of machinery. Plaintiff complained to his lead, John Troxell, however it was never removed.

149.   In November of 2007, Plaintiff saw employee James Bryan looking at racist website on the company computers, including websites for the "White Aryan

1    Resistance." Plaintiff had previously seen Bryan viewing violent websites.

2   150.  In February of 2008, Plaintiff complained to Manager Roy Bolton about being

3    denied welding opportunities. Bolton never responded to Plaintiff's complaints.

4   151.  Shortly after making his complaints, Plaintiff was denied overtime opportunities.

5   152.  In March of 2008, Plaintiff's locker was vandalized. Some one took Plaintiff's flag

6    of Trinidad & Tobago and turned it upside down and wrote, "Cuba is #1."

7    Plaintiff complained to human resources, however, nothing was done.

8   153.  Plaintiff complained to human resources about being continually denied the

9    welding opportunities that are given to Caucasian employees. Human Resources

10    dismissed Plaintiff's complaints and directed him to speak with Welding

11    Supervisor, Steward Stout. Stout told Plaintiff that he needed to go to school for

12    welding, even though he allowed Caucasians to train.

13   154.  In July, 2008, a position became available in the weld shop. However, even

14    though Plaintiff had expressed interest in the job, the position was given to a

15    Caucasian employee with else seniority than Plaintiff. Plaintiff complained to

16    human resources about being denied this position. However, even though

17    Plaintiff was initially scheduled for an interview, his interview was cancelled and

18    Plaintiff was told that he was not qualified.  Plaintiff has been consistently denied

19    welder positions and assistant welder positions, even though he has been asking

20    for them for several years.

21   155.  Throughout his employment, Plaintiff was denied a login for the company

22    computers. However, while Plaintiff needs login this in order to do his job,

23    Plaintiff was denied even though Caucasian employees with the same jobs as

24    Plaintiff were given logins.

25   156.  In November of 2007, a noose was found in the High Bay.  Plaintiff was

26    incredibly upset and offended by this racist act.  Several of Plaintiff's coworkers

27    complained to management about this incident and Plaintiff explained to human

28

1    resources and Defendant's alleged investigator about how offended he was when

2    he was questioned about the incident.

3    157.   Plaintiff's supervisor, Tony Leal, constantly scrutinizes Plaintiff's work and

4    questions him whenever he takes a break. Leal never does this for Caucasian or

5    Latino employees. Plaintiff and Leal were hired at the same time, however, Leal

6    was promoted over Plaintiff.

7    158.   Plaintiff complained to Roy Bolton, Patsy Livingston in HR, as well as John

8    Troxell about Leal. Plaintiff told Bolton and Livingston was like a "slave driver,"

9    and that he could not work with him. However, while other Caucasian

10   employees were allowed to transfer, Plaintiff's requests were denied.

11   **Lamar Newton**

12   159.   Plaintiff newton was hired as an Assembly Technician in May of 2007.

13   160.   Plaintiff noticed that several non-African-American employees, with similar

14   experience, were given full-time positions with FMC, while Plaintiff was passed

15   up.

16   161.   In August/ September of 2007, Plaintiff asked Recruiter/ Coordinator, Daniel

17   Castillo, about the Field Service Technician Apprenticeship Program. Plaintiff

18   was told that he needed to have a least a year working in the shop before he

19   could get the job. However, a non-African-American employee was given the job

20   even though he did not have a year's worth of experience in the shop.

21   162.   In late October of 2007, Plaintiff saw a hangman's noose hanging in the High

22   Bay. Plaintiff was shocked and offended at this racist act and immediately

23   informed Supervisor Joe McHenry, who brought it to the attention of

24   management and human resources. Susan Webb from human resources later

25   took a statement from Plaintiff and he expressed concern about how the

26   company would handle the situation. Webb assured plaintiff that she would

27   keep him informed about the process. However, Webb never followed up with

28

1   Plaintiff about the investigation.

2 163. FMC then held a sensitivity training session with all of the employees put on by

3   a team of lawyers. However, the video that was played contained offensive

4   language and racial slurs, including children using the word "nigger."

5 164. Brian Holden, a non-African-American employee who was given a full-time job

6   over Plaintiff, called Plaintiff and another African-American employee, "Boy."

7 165. Eventually, Plaintiff was accepted into the apprenticeship program, however he

8   was required to wait until March to begin.

9 166. In February of 2008, Chris Aaron would continually take Plaintiff off of his

10   projects and assign him menial tasks, such as sweeping and other maintenance

11   tasks.  Aaron would scrutinize Plaintiff's breaks, while non-African-American

12   employees were allowed to slack off and take lengthy smoke breaks.

13 167. Later in February of 2008, Plaintiff saw racist graffiti in the bathroom. There was

14   a graphic drawing of one of the African-American female employees engaging in

15   sex acts. After one of Plaintiff's coworkers reported the incident, Manager John

16   Troxell told employees that this is unacceptable, however no discipline was

17   imposed and racist graffiti continued to appear.

18 168. On September 2, 2008, yet another hangman's noose was found in the workplace.

19   While several people saw the noose, management has claimed that the noose was

20   a "slipknot." Plaintiff, a former Navy signalman, knew that this type of knot was

21   no accident, as management had suggested.

22 169. In December, 2008, Plaintiff Lamar Newton was denied the opportunity to

23   transfer into the international division of the service department, where he

24   would earn more money. While he was told that he needed more experience, a

25   non-African-American with less experience was given this opportunity instead

26   of Newton.

27 **John Lucas**

28

170.   Plaintiff initially began working at the FMC plant in June of 2005.

171.   Plaintiff was finally hired by FMC on or about January 23, 2006 as an Assembler I.

172.   Throughout his career, employee James Bryant made racial comments and jokes to Plaintiff. In early 2006, Plaintiff heard James Bryant joking about African-Americans eating "chicken and watermelons." Plaintiff was offended by this racist remark and reported the incident to his Lead, Joe Aerola. However, instead of investing this racist comment, Aerola told Plaintiff, "if you come to me about any other teammate, you'll be fired." When Joe Aerola failed to take any action, Plaintiff complained to Lead James Faucett.  Instead of taking approprioate action, Faucett threatened Plaintiff, telling him, "this couldn't happen because I hand-pick my guys," and "if you're going to be a problem, you'll be walked out the door."

173.   Later in 2006, Plaintiff and several other employees complained to James Faucett about the fact that one of his coworkers, Chris Aaron, had a confederate flag on his dashboard. It took FMC two months before they took any action.

174.   Later, Plaintiff complained to his Lead, James Faucett, about a contractor showing people racial jokes on the computer. The contractor was showing people a cartoon of Colin Powell, Jesse Jackson and Bill Clinton, where Clinton was hanging Colin Powell.  Plaintiff had heard several racial comments from this contractor in the past.  Faucett told Plaintiff that he would look into his complaints. However, even though this contractor had two previous harassment complaints against him, Faucett did nothing to stop it.

175.   In the Summer of 2006, a lead position became available. Plaintiff expressed interested in the promotion to his Team Leader, James Faucett. However, Faucett told Plaintiff, "because of who you associate with, you need not apply." Plaintiff knew that Faucett was referring to some of the African-American employees he

1    was friendly with at the facility.

2   176.   The promotion went to Chris Aaron, a non-African-American employee with less
3          seniority than Plaintiff.

4   177.   Throughout his employment with FMC, Plaintiff was consistently disciplined
5          and criticized by his managers for the misconduct of his non-African-American
6          coworkers and leads. When a new employee who was being directed by Chris
7          Aaron nearly hit someone with a forklift, Supervisor James Faucett yelled at
8          Plaintiff, even though it was Aaron's fault.

9   178.   Throughout his employment with FMC, Plaintiff was denied training
10         opportunities that were given to non-African-American employees. This led to
11         Plaintiff receiving lower performance appraisals than he deserved.

12  179.   In late 2006, FMC restructured the work week so that many employees lost
13         hours. However, while the non-African-American employees were allowed to
14         come in and work extra hours, Plaintiff and the other African-American
15         employees were not.

16  180.   In October of 2007, another hangman's noose was found in the "High Bay,"
17         where Plaintiff worked. Plaintiff learned about the noose from coworkers and he
18         was incredibly upset that a noose would be in his workplace.

19  181.   In November of 2007, yet another noose was found in the workplace. In
20         response, FMC then held a sensitivity training session with all of the employees.
21         However, the video that was played contained offensive language and racial
22         slurs, including children using the word "nigger." Plaintiff, as well as other
23         employees, walked out of the video in protest of such a demeaning and
24         inappropriate video. Plaintiff complained to HR about the incredible
25         insensitivity of this video.

26  182.   Later, Plaintiff had a meeting with Steve Barrett, head of the Western Region.
27         Plaintiff complained to Barrett about the insensitivity of the film, who told

28

1    Plaintiff that he couldn't believe that it was shown. However, even after this

2    meeting, employees were still shown this film.

3    183.    Two weeks after this meeting, Plaintiff heard Manager Jim Hanus make a racial

4    joke to Lead Chris Fergusen about African-Americans.  Hanus also asked

5    Plaintiff, "why are you guys over here playing with footballs like the monkeys

6    do?" Plaintiff asked Hanus what he meant. Hanus stammered and blurted out,

7    "there's too many of you guys working there," and ran away.  Plaintiff then

8    asked Fergusen about it. Fergusen said that it was an old racist joke.  Plaintiff

9    heard that Hanus had previously used the word "nigger."

10    184.    In late March of 2008, Plaintiff met with an investigator from Pope and

11    Associates. Plaintiff complained extensively about how segregated FMC was,

12    about the threats, retaliation and harassment, and about how the atmosphere

13    was gotten much worse since the nooses were found. The investigator told

14    Plaintiff that she was going to forward these complaints to management for

15    resolution. However, nothing has changed.

16    185.    On September 2, 2008, yet another hangman's noose was found in the workplace.

17    While several people saw the noose, management has claimed that the noose was

18    a "slipknot" and refused to take appropriate action against the individual who

19    committed this racist act.

20    **Carlton Sykes**

21    186.    Plaintiff Sykes began working at the FMC facility in April of 2006 as an assembly

22    technician.

23    187.    Plaintiff was injured on the job in September of 2006 in what the company

24    deemed an "equipment failure." However, even though he was not at fault,

25    Plaintiff Boris Bryant was denied a raise and was given a negative evaluation

26    because of the incident, even though he had nothing to do with Plaintiff Sykes

27    getting injured.

28


188. Plaintiff was consistently denied training and assistance by non-African-American leads and coworkers. Many refused to even answer Plaintiff's questions. This greatly impacted Plaintiff's job performance and his ability to move up within the company. Additionally, the fact that non-African-Americans were given assistance while the African-Americans were not led to segregation within the workplace.

189. Throughout his employment, Plaintiff saw that non-African-American employees were offered full-time employment, even though they had less seniority than Plaintiff. In fact, Plaintiff had trained some of the non-African-Americans who were hired over him.

190. Plaintiff was eventually offered full-time employment with FMC in March of 2007.

191. In mid-2007, Plaintiff applied for a "Planner I" position. However, even though he was more qualified, the job went to a non-African-American employee. Plaintiff was told by management that he did not get the job because he was not in his position for over a year, however, non-African-American employees were routinely promoted or granted lateral transfers even though they had not been in their positions for over a year.

192. In November of 2007, a noose was found in the High Bay, where Plaintiff works. Plaintiff Pierre and Newton showed the noose to Plaintiff Sykes, who was incredibly offended and upset by this racist act. Eventually, Wendell Beborski, and manager Roy Bolton arrived. Bolton attempted to minimize the incident, but Plaintiff complained to Bolton that this was a noose, not a "tag line."

193. Plaintiff learned that there had been a noose incident prior to this one but that management did nothing about it.

194. Even though Plaintiff Sykes was one of the employees who witnessed the noose hanging in the High Bay, he was never interviewed by anyone from the

1    company about it.

2    195.   FMC then held a sensitivity training session with all of the employees put on by

3         a team of lawyers. However, the video that was played contained offensive

4         language and racial slurs, including children using the word "nigger." The video

5         singled out African-Americans as opposed to any other minority group. Plaintiff

6         was very offended by management's response to this incident and their failure to

7         take it seriously.

8

9                        **FIRST CLAIM FOR RELIEF**
                        Race Discrimination (Title VII)
10                      (All Plaintiffs as to Defendant FMC)

11   196.   Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1

12        through 195 as if fully pleaded at length herein.

13   197.   This is an action for damages arising out of racial discrimination in employment.

14        At all times relevant herein, Plaintiffs' job performance was always satisfactory

15        or better.

16   198.   Defendants, as alleged herein, discriminated against Plaintiffs as follows: refusal

17        to hire, denial of promotions and pay, denial of raises, unwarranted disciplinary

18        action, unwarranted negative performance appraisals, denial of training and

19        assistance, denial of work hours, threats and intimidation, assignment of menial

20        tasks, and harassment.

21   199.   As a result of the racial discrimination as described herein, Plaintiffs have been

22        held up to great derision and embarrassment by their fellow coworkers, friends,

23        and members of the community. Plaintiffs have suffered emotional distress

24        because Defendants have subjected them to disparate treatment on account of

25        race. Plaintiffs are informed and believe that Defendants discriminated against

26        them knowing that such discrimination would cause severe emotional distress.

27        Plaintiffs therefore seek damages for such emotional distress in an amount to be

28

1      proved at the time of trial.

2  200.  Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been

3      and will be required to employ physicians to examine, treat and care for them

4      and will incur additional medical and economic damages in an mount to be

5      proven at the time of trial.

6  201.  As a result of the wrongful conduct as described herein, Plaintiffs have been

7      denied employment, denied promotions, and denied raises. As a result, Plaintiffs

8      seek an award of back pay, front pay, and injunctive relief, according to proof at

9      the time of trial.

10 202.  In doing the acts set forth above, Defendants acted intentionally, and with a

11      conscious disregard of Plaintiffs' rights to equal employment opportunities

12      regardless of race. Defendants have acted, and continue to act, with a reckless

13      disregard of their obligations under the law. The Defendants' conduct, as alleged

14      herein, was and is despicable, malicious and oppressive. The Plaintiffs are

15      therefore entitles to an award of punitive damages in an amount to be proven at

16      the time of trial.

17          **SECOND CLAIM FOR RELIEF**
            Race Discrimination (Title VII)
18      (Plaintiffs Parejo, Pierre and Galimore as to Defendant Prostaff)

19 203.  Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1

20      through 195 as if fully pleaded at length herein.

21 204.  This is an action for damages arising out of racial discrimination in employment.

22      At all times relevant herein, Plaintiffs' job performance was always satisfactory

23      or better.

24 205.  Defendants, as alleged herein, discriminated against Plaintiffs as follows: refusal

25      to hire, denial of promotions and pay, denial of raises, unwarranted disciplinary

26      action, unwarranted negative performance appraisals, denial of training and

27      assistance, denial of work hours, threats and intimidation, assignment of menial

28

1   tasks, and harassment.

2   206.   As a result of the racial discrimination as described herein, Plaintiffs have been

3   held up to great derision and embarrassment by their fellow coworkers, friends,

4   and members of the community. Plaintiffs have suffered emotional distress

5   because Defendants have subjected them to disparate treatment on account of

6   race. Plaintiffs are informed and believe that Defendants discriminated against

7   them knowing that such discrimination would cause severe emotional distress.

8   Plaintiffs therefore seek damages for such emotional distress in an amount to be

9   proved at the time of trial.

10   207.   Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been

11   and will be required to employ physicians to examine, treat and care for them

12   and will incur additional medical and economic damages in an mount to be

13   proven at the time of trial.

14   208.   As a result of the wrongful conduct as described herein, Plaintiffs have been

15   denied employment, denied promotions, and denied raises. As a result, Plaintiffs

16   seek an award of back pay, front pay, and injunctive relief, according to proof at

17   the time of trial.

18   209.   In doing the acts set forth above, Defendants acted intentionally, and with a

19   conscious disregard of Plaintiffs' rights to equal employment opportunities

20   regardless of race. Defendants have acted, and continue to act, with a reckless

21   disregard of their obligations under the law. The Defendants' conduct, as alleged

22   herein, was and is despicable, malicious and oppressive. The Plaintiffs are

23   therefore entitles to an award of punitive damages in an amount to be proven at

24   the time of trial.

25   **THIRD CLAIM FOR RELIEF**
Retaliation  (Title VII)

26   (All Plaintiffs as to Defendant FMC)

27   210.   Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1

28

through 195 as if fully pleaded at length herein.

211. This is an action for damages arising out of retaliation in employment. At all times relevant herein, Plaintiffs' job performance was always satisfactory or better.

212. Defendants, as alleged herein, retaliated against Plaintiffs for making complaints of discrimination and harassment as follows: refusal to hire, denial of promotions and pay, denial of raises, unwarranted disciplinary action, unwarranted negative performance appraisals, denial of training and assistance, denial of work hours, threats and intimidation, assignment of menial tasks, and harassment.

213. As a result of the retaliation as described herein, Plaintiffs have been held up to great derision and embarrassment by their fellow coworkers, friends, and members of the community. Plaintiffs have suffered emotional distress because Defendants have subjected them to retaliation because of their complaints of discrimination and harassment. Plaintiffs are informed and believe that Defendants retaliated against them knowing that such retaliation would cause severe emotional distress. Plaintiffs therefore seek damages for such emotional distress in an amount to be proved at the time of trial.

214. Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been and will be required to employ physicians to examine, treat and care for them and will incur additional medical and economic damages in an mount to be proven at the time of trial.

215. As a result of the wrongful conduct as described herein, Plaintiffs have been denied employment, denied promotions, and denied raises. As a result, Plaintiffs seek an award of back pay, front pay, and injunctive relief, according to proof at the time of trial.

216. In doing the acts set forth above, Defendants acted intentionally, and with a conscious disregard of Plaintiffs' rights to equal employment opportunities

1    regardless of their complaints. Defendants have acted, and continue to act, with a

2    reckless disregard of their obligations under the law. The Defendants' conduct,

3    as alleged herein, was and is despicable, malicious and oppressive. The Plaintiffs

4    are therefore entitles to an award of punitive damages in an amount to be proven

5    at the time of trial.

6    <div align="center">**FOURTH CLAIM FOR RELIEF**
Retaliation  (Title VII)</div>

7    <div align="center">(Plaintiffs Parejo, Pierre and Galimore as to Defendant Prostaff)</div>

8    217.   Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1

9    through 195 as if fully pleaded at length herein.

10   218.   This is an action for damages arising out of retaliation in employment. At all

11          times relevant herein, Plaintiffs' job performance was always satisfactory or

12          better.

13   219.   Defendants, as alleged herein, retaliated against Plaintiffs for making complaints

14          of discrimination and harassment as follows: refusal to hire, denial of promotions

15          and pay, denial of raises, unwarranted disciplinary action, unwarranted negative

16          performance appraisals, denial of training and assistance, denial of work hours,

17          threats and intimidation, assignment of menial tasks, and harassment.

18   220.   As a result of the retaliation as described herein, Plaintiffs have been held up to

19          great derision and embarrassment by their fellow coworkers, friends, and

20          members of the community. Plaintiffs have suffered emotional distress because

21          Defendants have subjected them to retaliation because of their complaints of

22          discrimination and harassment. Plaintiffs are informed and believe that

23          Defendants retaliated against them knowing that such retaliation would cause

24          severe emotional distress. Plaintiffs therefore seek damages for such emotional

25          distress in an amount to be proved at the time of trial.

26   221.   Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been

27          and will be required to employ physicians to examine, treat and care for them

28

1     and will incur additional medical and economic damages in an mount to be

2     proven at the time of trial.

3    222.    As a result of the wrongful conduct as described herein, Plaintiffs have been

4         denied employment, denied promotions, and denied raises. As a result, Plaintiffs

5         seek an award of back pay, front pay, and injunctive relief, according to proof at

6         the time of trial.

7    223.    In doing the acts set forth above, Defendants acted intentionally, and with a

8         conscious disregard of Plaintiffs' rights to equal employment opportunities

9         regardless of their complaints. Defendants have acted, and continue to act, with a

10        reckless disregard of their obligations under the law. The Defendants' conduct,

11        as alleged herein, was and is despicable, malicious and oppressive. The Plaintiffs

12        are therefore entitles to an award of punitive damages in an amount to be proven

13        at the time of trial.

14 <div align="center">**FIFTH CLAIM FOR RELIEF**<br>Race Discrimination In Violation of Public Policy (Common Law)</div>

15 <div align="center">(All Plaintiffs as to Defendant FMC)</div>

16    224.    Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1

17         through 195 as if fully pleaded at length herein.

18    225.    There is a fundamental and well-established public policy against discrimination

19         in employment on the basis of race, age, gender, disability and national origin.

20    226.    Defendant, as alleged herein, has a long standing policy and practice of making

21         personnel decisions on the basis of factors prohibited by public policies, as well

22         as creating and maintaining a hostile work environment based on race.

23    227.    As a result of the racial discrimination as described herein, Plaintiffs have been

24         held up to great derision and embarrassment by their fellow coworkers, friends,

25         and members of the community. Plaintiffs have suffered emotional distress

26         because Defendants have subjected them to disparate treatment on account of

27         race. Plaintiffs are informed and believe that Defendants discriminated against

28

1    them knowing that such discrimination would cause severe emotional distress.

2    Plaintiffs therefore seek damages for such emotional distress in an amount to be

3    proved at the time of trial.

4  228.   Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been

5    and will be required to employ physicians to examine, treat and care for them

6    and will incur additional medical and economic damages in an mount to be

7    proven at the time of trial.

8  229.   As a result of the wrongful conduct as described herein, Plaintiffs have been

9    denied employment, denied promotions, and denied raises. As a result, Plaintiffs

10    seek an award of back pay, front pay, and injunctive relief, according to proof at

11    the time of trial.

12  230.   In doing the acts set forth above, Defendants acted intentionally, and with a

13    conscious disregard of Plaintiffs' rights to equal employment opportunities

14    regardless of race. Defendants have acted, and continue to act, with a reckless

15    disregard of their obligations under the law. The Defendants' conduct, as alleged

16    herein, was and is despicable, malicious and oppressive. The Plaintiffs are

17    therefore entitles to an award of punitive damages in an amount to be proven at

18    the time of trial.

19                          **SIXTH CLAIM FOR RELIEF**
                   Race Discrimination In Violation of Public Policy (Common Law)
20    (Plaintiffs Parejo, McIntyre, Brown, Beatty, Pierre, Galimore, Sykes and Lucas as to
                                   Defendant Prostaff)
21
   231.   Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1
22
      through 195 as if fully pleaded at length herein.
23
   232.   There is a fundamental and well-established public policy against discrimination
24
      in employment on the basis of race, age, gender, disability and national origin.
25
   233.   Defendant, as alleged herein, has a long standing policy and practice of making
26
      personnel decisions on the basis of factors prohibited by public policies, as well
27
      as creating and maintaining a hostile work environment based on race.
28

234.   As a result of the racial discrimination as described herein, Plaintiffs have been held up to great derision and embarrassment by their fellow coworkers, friends, and members of the community. Plaintiffs have suffered emotional distress because Defendants have subjected them to disparate treatment on account of race. Plaintiffs are informed and believe that Defendants discriminated against them knowing that such discrimination would cause severe emotional distress. Plaintiffs therefore seek damages for such emotional distress in an amount to be proved at the time of trial.

235.   Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been and will be required to employ physicians to examine, treat and care for them and will incur additional medical and economic damages in an mount to be proven at the time of trial.

236.   As a result of the wrongful conduct as described herein, Plaintiffs have been denied employment, denied promotions, and denied raises. As a result, Plaintiffs seek an award of back pay, front pay, and injunctive relief, according to proof at the time of trial.

237.   In doing the acts set forth above, Defendants acted intentionally, and with a conscious disregard of Plaintiffs' rights to equal employment opportunities regardless of race. Defendants have acted, and continue to act, with a reckless disregard of their obligations under the law. The Defendants' conduct, as alleged herein, was and is despicable, malicious and oppressive. The Plaintiffs are therefore entitles to an award of punitive damages in an amount to be proven at the time of trial.

### SEVENTH CLAIM FOR RELIEF
Retaliation In Violation of Public Policy (Common Law)
(All Plaintiffs as to Defendant FMC)

238.   Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1 through 195 as if fully pleaded at length herein.

239.   There is a fundamental and well-established public policy against retaliating against employees who raise complaints of discrimination and harassment.

240.   Defendant, as alleged herein, has a long standing policy and practice of retaliating against employees who raise complaints of discrimination and harassment.

241.   As a result of the retaliation as described herein, Plaintiffs have been held up to great derision and embarrassment by their fellow coworkers, friends, and members of the community. Plaintiffs have suffered emotional distress because Defendants have subjected them to retaliation. Plaintiffs are informed and believe that Defendants retaliated against them knowing that such retaliation would cause severe emotional distress. Plaintiffs therefore seek damages for such emotional distress at the time of trial.

242.   Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been and will be required to employ physicians to examine, treat and care for them and will incur additional medical and economic damages in an mount to be proven at the time of trial.

243.   As a result of the wrongful conduct as described herein, Plaintiffs have been denied employment, denied promotions, and denied raises. As a result, Plaintiffs seek an award of back pay, front pay, and injunctive relief, according to proof at the time of trial.

244.   In doing the acts set forth above, Defendants acted intentionally, and with a conscious disregard of Plaintiffs' rights to equal employment opportunities. Defendants have acted, and continue to act, with a reckless disregard of their obligations under the law. The Defendants' conduct, as alleged herein, was and is despicable, malicious and oppressive. The Plaintiffs are therefore entitles to an award of punitive damages in an amount to be proven at the time of trial.

## EIGHTH CLAIM FOR RELIEF
Retaliation In Violation of Public Policy (Common Law)
(Plaintiffs Parejo, McIntyre, Brown, Beatty, Pierre, Galimore, Sykes and Lucas as to Defendant Prostaff)

245.    Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1 through 195 as if fully pleaded at length herein.

246.    There is a fundamental and well-established public policy against retaliating against employees who raise complaints of discrimination and harassment.

247.    Defendant, as alleged herein, has a long standing policy and practice of retaliating against employees who raise complaints of discrimination and harassment.

248.    As a result of the retaliation as described herein, Plaintiffs have been held up to great derision and embarrassment by their fellow coworkers, friends, and members of the community. Plaintiffs have suffered emotional distress because Defendants have subjected them to retaliation. Plaintiffs are informed and believe that Defendants retaliated against them knowing that such retaliation would cause severe emotional distress. Plaintiffs therefore seek damages for such emotional distress at the time of trial.

249.    Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been and will be required to employ physicians to examine, treat and care for them and will incur additional medical and economic damages in an mount to be proven at the time of trial.

250.    As a result of the wrongful conduct as described herein, Plaintiffs have been denied employment, denied promotions, and denied raises. As a result, Plaintiffs seek an award of back pay, front pay, and injunctive relief, according to proof at the time of trial.

251.    In doing the acts set forth above, Defendants acted intentionally, and with a conscious disregard of Plaintiffs' rights to equal employment opportunities. Defendants have acted, and continue to act, with a reckless disregard of their

1    obligations under the law. The Defendants' conduct, as alleged herein, was and

2    is despicable, malicious and oppressive. The Plaintiffs are therefore entitles to an

3    award of punitive damages in an amount to be proven at the time of trial.

4

5                              **NINTH CLAIM FOR RELIEF**
                  Intentional Infliction of Emotional Distress (Common Law)
6                          (All Plaintiffs as to Defendant FMC)

7    252.   Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1

8           through 195 as if fully pleaded at length herein.

9    253.   Defendant, as alleged herein, acted with the intent to cause, and/or acted with

10          reckless disregard for the possibility of Plaintiffs suffering severe emotional

11          distress. The acts described herein are separately, as well as in their totality, so

12          extreme and outrageous that they cannot be tolerated by a civilized society. As a

13          result of such conduct, Plaintiffs suffered severe emotional distress.

14   254.   As a result of the extreme and outrageous conduct described herein, Plaintiffs

15          have been held up to great derision and embarrassment by their fellow

16          coworkers, friends, and members of the community. Plaintiffs have suffered

17          emotional distress because Defendants have subjected them to intentional

18          misconduct.

19   255.   Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been

20          and will be required to employ physicians to examine, treat and care for them

21          and will incur additional medical and economic damages in an mount to be

22          proven at the time of trial.

23   256.   In doing the acts set forth above, Defendants acted intentionally, and with a

24          conscious disregard of Plaintiffs' rights to equal employment opportunities.

25          Defendants have acted, and continue to act, with a reckless disregard of their

26          obligations under the law. The Defendants' conduct, as alleged herein, was and

27          is despicable, malicious and oppressive. The Plaintiffs are therefore entitles to an

28

1   award of punitive damages in an amount to be proven at the time of trial.

2

3   **TENTH CLAIM FOR RELIEF**
    Intentional Infliction of Emotional Distress (Common Law)
4   (Plaintiffs Parejo, McIntyre, Brown, Beatty, Pierre, Galimore, Sykes and Lucas as to
    Defendant Prostaff Defendant Prostaff)
5

6   257.   Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1

7   through 195 as if fully pleaded at length herein.

8   258.   Defendant, as alleged herein, acted with the intent to cause, and/or acted with

9   reckless disregard for the possibility of Plaintiffs suffering severe emotional

10  distress. The acts described herein are separately, as well as in their totality, so

11  extreme and outrageous that they cannot be tolerated by a civilized society. As a

12  result of such conduct, Plaintiffs suffered severe emotional distress.

13  259.   As a result of the extreme and outrageous conduct described herein, Plaintiffs

14  have been held up to great derision and embarrassment by their fellow

15  coworkers, friends, and members of the community. Plaintiffs have suffered

16  emotional distress because Defendants have subjected them to intentional

17  misconduct.

18  260.   Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been

19  and will be required to employ physicians to examine, treat and care for them

20  and will incur additional medical and economic damages in an mount to be

21  proven at the time of trial.

22  261.   In doing the acts set forth above, Defendants acted intentionally, and with a

23  conscious disregard of Plaintiffs' rights to equal employment opportunities.

24  Defendants have acted, and continue to act, with a reckless disregard of their

25  obligations under the law. The Defendants' conduct, as alleged herein, was and

26  is despicable, malicious and oppressive. The Plaintiffs are therefore entitles to an

27  award of punitive damages in an amount to be proven at the time of trial.

28

1

### ELEVENTH CLAIM FOR RELIEF
National Origin Discrimination (Title VII)
(Plaintiff Parejo as to Defendants FMC and Prostaff)

2

3

262.   Plaintiff incorporates by reference each of the facts alleged in paragraphs 1
4
through 195 as if fully pleaded at length herein.
5

263.   This is an action for damages arising out of national origin discrimination in
6
employment. At all times relevant herein, Plaintiff Marcus Parejo's job
7
performance was always satisfactory or better.
8

264.   Defendants, as alleged herein, discriminated against Plaintiff as follows: refusal
9
to hire, denial of promotions, threats and intimidation, assignment of menial
10
tasks, and harassment.
11

265.   As a result of the national origin discrimination as described herein, Plaintiff has
12
been held up to great derision and embarrassment by their his coworkers,
13
friends, and members of the community. Plaintiff has suffered emotional distress
14
because Defendants have subjected him to disparate treatment on account of
15
national origin. Plaintiff is informed and believes that Defendants discriminated
16
against him, knowing that such discrimination would cause severe emotional
17
distress. Plaintiff therefore seeks damages for such emotional distress in an
18
amount to be proved at the time of trial.
19

266.   Because of the wrongful acts of Defendants as alleged herein, Plaintiff has been
20
and will be required to employ physicians to examine, treat and care for him and
21
will incur additional medical and economic damages in an mount to be proven at
22
the time of trial.
23

267.   As a result of the wrongful conduct as described herein, Plaintiff has been denied
24
employment, denied promotions, and denied raises. As a result, Plaintiff seeks
25
an award of back pay, front pay, and injunctive relief, according to proof at the
26
time of trial.
27

268.   In doing the acts set forth above, Defendants acted intentionally, and with a
28

conscious disregard of Plaintiff's rights to equal employment opportunities regardless of national origin. Defendants have acted, and continue to act, with a reckless disregard of their obligations under the law. The Defendants' conduct, as alleged herein, was and is despicable, malicious and oppressive. The Plaintiff is therefore entitles to an award of punitive damages in an amount to be proven at the time of trial.

### TWELFTH CLAIM FOR RELIEF
Discrimination – Hostile Work Environment (Title VII)
(All Plaintiffs as to Defendant FMC)

269.  Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1 through 195 as if fully pleaded at length herein.

270.  This is an action for damages arising out of racial harassment in employment.

271.  Defendants have an obligation under the law to assure and environment free from harassment on the basis of race.

272.  Defendants, as alleged herein, knowingly created and/or maintained a hostile work environment on the basis of race. Defendants, by and through their and their managers, directors and managing agents, either knew about the hostile work environment and failed to take remedial action, or themselves created a hostile work environment based on race.

273.  As a result of the hostile work environment as described herein, Plaintiffs have been held up to great derision and embarrassment by their fellow coworkers, friends, and members of the community. Plaintiffs have suffered emotional distress because Defendants have subjected them to a racially hostile work environment. Plaintiffs are informed and believe that Defendants maintained such a racially hostile work environment, knowing that it would cause severe emotional distress. Plaintiffs therefore seek damages for such emotional distress in an amount to be proved at the time of trial.

274.  Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been and will be required to employ physicians to examine, treat and care for them and will incur additional medical and economic damages in an mount to be proven at the time of trial.

275.  In doing the acts set forth above, Defendants acted intentionally, and with a conscious disregard of Plaintiffs' rights to work in an environment free from racial hostility. Defendants have acted, and continue to act, with a reckless disregard of their obligations under the law. The Defendants' conduct, as alleged herein, was and is despicable, malicious and oppressive. The Plaintiffs are therefore entitles to an award of punitive damages in an amount to be proven at the time of trial.

## THIRTEENTH CLAIM FOR RELIEF
Discrimination – Hostile Work Environment (Title VII)
(Plaintiffs Parejo, Pierre and Galimore as to Defendant Prostaff)

276.  Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1 through 195 as if fully pleaded at length herein.

277.  This is an action for damages arising out of racial harassment in employment.

278.  Defendants have an obligation under the law to assure and environment free from harassment on the basis of race.

279.  Defendants, as alleged herein, knowingly created and/or maintained a hostile work environment on the basis of race. Defendants, by and through their and their managers, directors and managing agents, either knew about the hostile work environment and failed to take remedial action, or themselves created a hostile work environment based on race.

280.  As a result of the hostile work environment as described herein, Plaintiffs have been held up to great derision and embarrassment by their fellow coworkers, friends, and members of the community. Plaintiffs have suffered emotional distress because Defendants have subjected them to a racially hostile work

1   environment. Plaintiffs are informed and believe that Defendants maintained

2   such a racially hostile work environment, knowing that it would cause severe

3   emotional distress. Plaintiffs therefore seek damages for such emotional distress

4   in an amount to be proved at the time of trial.

5   281.   Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been

6   and will be required to employ physicians to examine, treat and care for them

7   and will incur additional medical and economic damages in an mount to be

8   proven at the time of trial.

9   282.   In doing the acts set forth above, Defendants acted intentionally, and with a

10   conscious disregard of Plaintiffs' rights to work in an environment free from

11   racial hostility. Defendants have acted, and continue to act, with a reckless

12   disregard of their obligations under the law. The Defendants' conduct, as alleged

13   herein, was and is despicable, malicious and oppressive. The Plaintiffs are

14   therefore entitles to an award of punitive damages in an amount to be proven at

15   the time of trial.

16

17                        **FOURTEENTH CLAIM FOR RELIEF**
                       Race Discrimination (Texas Labor Code Section 21.051)
18                        (All Plaintiffs as to Defendant FMC)

19   283.   Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1

20   through 195 as if fully pleaded at length herein.

21   284.   This is an action for damages arising out of racial discrimination in employment.

22   At all times relevant herein, Plaintiffs' job performance was always satisfactory

23   or better.

24   285.   Defendants, as alleged herein, discriminated against Plaintiffs as follows: refusal

25   to hire, denial of promotions and pay, denial of raises, unwarranted disciplinary

26   action, unwarranted negative performance appraisals, denial of training and

27   assistance, denial of work hours, threats and intimidation, assignment of menial

28

1   tasks, and creating and maintaining a harassment.

2   286.   As a result of the racial discrimination as described herein, Plaintiffs have been

3   held up to great derision and embarrassment by their fellow coworkers, friends,

4   and members of the community. Plaintiffs have suffered emotional distress

5   because Defendants have subjected them to disparate treatment on account of

6   race. Plaintiffs are informed and believe that Defendants discriminated against

7   them knowing that such discrimination would cause severe emotional distress.

8   Plaintiffs therefore seek damages for such emotional distress in an amount to be

9   proved at the time of trial.

10   287.   Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been

11   and will be required to employ physicians to examine, treat and care for them

12   and will incur additional medical and economic damages in an mount to be

13   proven at the time of trial.

14   288.   As a result of the wrongful conduct as described herein, Plaintiffs have been

15   denied employment, denied promotions, and denied raises. As a result, Plaintiffs

16   seek an award of back pay, front pay, and injunctive relief, according to proof at

17   the time of trial.

18   289.   In doing the acts set forth above, Defendants acted intentionally, and with a

19   conscious disregard of Plaintiffs' rights to equal employment opportunities

20   regardless of race. Defendants have acted, and continue to act, with a reckless

21   disregard of their obligations under the law. The Defendants' conduct, as alleged

22   herein, was and is despicable, malicious and oppressive. The Plaintiffs are

23   therefore entitles to an award of punitive damages in an amount to be proven at

24   the time of trial.

25

26                    **FIFTEENTH CLAIM FOR RELIEF**
                   Race Discrimination (Texas Labor Code Section 21.052)
27          (Plaintiffs Parejo, Pierre and Galimore as to Defendant Prostaff)

28

290. Plaintiffs incorporate by reference each of the facts alleged in paragraphs 1 through 195 as if fully pleaded at length herein.

291. This is an action for damages arising out of racial discrimination in employment. At all times relevant herein, Plaintiffs' job performance was always satisfactory or better.

292. Defendants, as alleged herein, discriminated against Plaintiffs as follows: refusal to hire, denial of promotions and pay, denial of raises, unwarranted disciplinary action, unwarranted negative performance appraisals, denial of training and assistance, denial of work hours, threats and intimidation, assignment of menial tasks, and creating and maintaining a harassment.

293. As a result of the racial discrimination as described herein, Plaintiffs have been held up to great derision and embarrassment by their fellow coworkers, friends, and members of the community. Plaintiffs have suffered emotional distress because Defendants have subjected them to disparate treatment on account of race. Plaintiffs are informed and believe that Defendants discriminated against them knowing that such discrimination would cause severe emotional distress. Plaintiffs therefore seek damages for such emotional distress in an amount to be proved at the time of trial.

294. As a result of the wrongful conduct as described herein, Plaintiffs have been denied employment, denied promotions, and denied raises. As a result, Plaintiffs seek an award of back pay, front pay, and injunctive relief, according to proof at the time of trial.

295. Because of the wrongful acts of Defendants as alleged herein, Plaintiffs have been and will be required to employ physicians to examine, treat and care for them and will incur additional medical and economic damages in an mount to be proven at the time of trial.

296. In doing the acts set forth above, Defendants acted intentionally, and with a

conscious disregard of Plaintiffs' rights to equal employment opportunities regardless of race. Defendants have acted, and continue to act, with a reckless disregard of their obligations under the law. The Defendants' conduct, as alleged herein, was and is despicable, malicious and oppressive. The Plaintiffs are therefore entitles to an award of punitive damages in an amount to be proven at the time of trial.

## DEMAND FOR JURY TRIAL

297.  Plaintiffs hereby request a jury trial for all claims.

## PRAYER FOR RELIEF

298.  Wherefore, Plaintiffs pray that the Court grant them the following relief:

   A.  Compensatory damages;

   B.  Back pay;

   C.  Front pay;

   D.  Damages for mental pain and suffering;

   E.  Reasonable attorneys' fees;

   F.  Costs of suit;

   G.  Punitive damages;

   H.  Injunctive relief;

   I.  Such other relief as the Court deems just and reasonable.

Plaintiffs seek damages in an amount not less than $120,000,000.

Dated: December 23, 2008          LAW OFFICES OF MAYOR JOSEPH L. ALIOTO
                                   & ANGELA ALIOTO


                                   _____
                                   JOSHUA D. BOXER