IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BORIS BRYANT, DARREN MAYO, EDWARD PIERRE, LAWRENCE GRICE, KEVIN MCINTYRE, MAURICE GALIMORE, JAMES BROWN, CARLOS BEATTY, MARCUS PAREJO, LAMAR NEWTON, JOHN LUCAS, CARLTON SYKES, | § § § § § § § § | |
| | § | NO. 04:08-CV-03744 |
| Plaintiffs | § § | |
| vs. | § § | |
| FMC TECHNOLOGIES, INC., PROSTAFF PERSONNEL ACQUISITION CORP. , | § § § | |
| Defendants. | § § | |

---

**DEFENDANT FMC TECHNOLOGIES, INC.'S
MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

PAGE

I.  NATURE AND STAGE OF THE PROCEEDING .......................................... 1

II.  STATEMENT OF ISSUES AND STANDARD FOR REVIEW ................... 2

III.  SUMMARY OF THE ARGUMENT .......................................................... 2

IV.  FACTUAL BACKGROUND ..................................................................... 2

    A.  The Plaintiffs' Employments With FMCTI ..................................... 2

    B.  Background of Allegations ............................................................... 4

V.  ARGUMENT AND AUTHORITIES ......................................................... 9

    A.  FMCTI is Entitled to Summary Judgment on the Plaintiffs' Hostile Work Environment Claims ................................................................. 9

        1.  The Noose Incidents, Standing Alone, are Insufficient to Establish a Hostile Work Environment ................................ 10

        2.  Some Alleged Harassment was Not Based on Race or National Origin ................................................................ 11

        3.  Other Alleged Treatment Did Not Affect a Term, Condition, or Privilege of Employment .................................................. 13

        4.  FMCTI Took Prompt, Remedial Measures ........................... 22

    B.  The Plaintiffs' Discrimination Claims Fail as a Matter of Law ......... 24

        1.  Some of the Plaintiffs' Claims Are Not Actionable Adverse Employment Actions ............................................................ 24

            a.  Write-Ups ................................................................... 25

            b.  Performance Reviews ................................................. 26

            c.  Training ...................................................................... 27

            d.  Miscellaneous Actions ............................................... 28

        2.  The Plaintiffs Fail to Identify Similar Situated Employees ..... 31

# TABLE OF CONTENTS
## (CONTINUED)

PAGE

a.  Hiring or Position Decisions ....................................................... 32

b.  Other Employment Actions ....................................................... 34

3.  The Plaintiffs' Failure to Hire and Promote Claims Fail ........................ 34

4.  The Plaintiffs Cannot Establish Pretext .................................. 38

a.  Hiring or Position Decisions ....................................................... 38

b.  Training and Overtime Opportunities ......................................... 41

c.  Lost Applications ...................................................................... 42

C.  The Plaintiffs Cannot Establish Retaliation ...................................... 44

1.  The Plaintiffs Did Not Suffer Materially Adverse Employment Actions ........................................................................................... 44

2.  The Plaintiffs Have No Evidence of Pretext ......................................... 47

a.  Overtime Opportunities ............................................................. 47

b.  Terminations ............................................................................ 48

VI.  CONCLUSION .................................................................................... 50

# TABLE OF AUTHORITIES

PAGE

Cases

Beaumont v. Tex. Dep't of Crim. Justice,
  468 F. Supp. 2d 907 (E.D. Tex. 2006) .............................................................13, 14, 21, 47

Blow v. City of San Antonio,
  236 F.3d 293 (5th Cir. 2001) ...................................................................................... 35, 36

Burlington Northern & Santa Fe Ry. v. White,
  548 U.S. 53 (2006) ...............................................................................................25, 44, 45, 46

Burrell v. Crown Petroleum, Inc.,
  255 F. Supp. 2d 591 (E.D. Tex. 2003) ...................................................................... 18, 21

Byers v. Dallas Morning News, Inc.,
  209 F.3d 419 (5th Cir. 2000) .................................................................................40, 41, 43, 50

Casey v. Coca-Cola Enters., No. 05-0152,
  2006 U.S. Dist. LEXIS 94378 (W.D. La. Dec. 28, 2006) ...................... 10, 11, 14, 16, 19, 21

Ceasar v. Lamar Univ.,
  147 F. Supp. 2d 547 (E.D. Tex. 2001) ............................................................................. 33

Celestine v. Petroleos,
  108 Fed. Appx 180 (5th Cir. 2004) .................................................................................. 10

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) ........................................................................................................... 2

Chambers v. Joseph T. Ryerson & Son, Inc., No. 3:05-cv-1553-D, 2007 U.S. Dist.
  LEXIS 48338 (N.D. Tex. July 2, 2007) ............................................................... 31, 32, 34

Crawford v. Formosa Plastics Corp.,
  234 F.3d 899 (5th Cir. 2000) ........................................................................................... 36

Daniels v. Essex Group, Inc.,
  937 F.2d 1264 (7th Cir. 1991) ......................................................................................... 20

Davis v. Monsanto Chem. Co.,
  858 F.2d 345 (6th Cir. 1988) ..................................................................................... 20, 24

DeAngelis v. El Paso Mun. Police Officers Ass'n,
  51 F.3d 591 (5th Cir. 1995) ....................................................................................... 11, 16

DeHart v. Baker Hughes Oilfield Operations, Inc.,
  214 Fed. Appx. 437, No. 05-21087, 2007 U.S. App. LEXIS 1362 (5th Cir.
  Jan. 19, 2007) .................................................................................................................. 47

Desert Palace, Inc. v. Costa,
  539 U.S. 90 (2003) ........................................................................................................... 38

Dilworth v. Cont'l Constr. Co.,
  No. 07-60850, 2008 U.S. App. LEXIS 13042 (5th Cir. June 19, 2008) ........................... 25

Dixon v. Moore Wallace, Inc., No. 3:04-cv-1532-D, 2006 U.S. Dist. LEXIS
  47560 (N. D. Tex. July 13, 2006) ............................................................................... 10, 28

# TABLE OF AUTHORITIES

## (CONTINUED)

PAGE

*Dogan-Carr v. Saks Fifth Ave.*,
Ho. H-05-1236, 2007 U.S. Dist. LEXIS 12977 (S.D. Tex. Feb. 26, 2007) ......................... 10

*Dollis v. Rubin*,
77 F.3d 777 (5th Cir. 1995)................................................................................................ 27

*Dotson v. Gulf*,
No. H-05-0106, 2006 U.S. Dist. LEXIS 1893 (S.D. Tex. Jan. 9, 2006)............................. 30

*Drummond v. Stone*,
No. 91-2719, 1993 U.S. Dist. LEXIS 593 (E. D. La. Jan. 13, 1993)....................... 11, 20, 21

*EEOC v. Hewlett Packard Co.*,
No. H-05-1197, 2007 U.S. Dist. LEXIS 22957 (S.D. Tex. Mar. 29, 2007)......................... 25

*Faragher v. City of Boca Raton*,
524 U.S. 775 (1998)............................................................................................... 13, 14

*Felton v. Polles*,
315 F.3d 470 (5th Cir. 2002) ............................................................................................ 30

*Fields v. J.C. Penney*,
968 F.2d 533 (5th Cir. 1992) ............................................................................................ 10

*Fisher v. Certified Safety Specialists, LLC*, No. H-06-2232, 2007 U.S. Dist.
LEXIS 73989 (S.D. Tex. Oct. 2, 2007)....................................................................... 11, 16

*Grice v. FMC Techs.*, No. 06-20509,
216 Fed. Appx. 401 (5th Cir. Jan. 30, 2007)............................................................... 15, 29

*Harris v. Forklife Sys., Inc.*,
510 U.S. 17 (1993)........................................................................................................... 14

*Hart v. Life Care Ctr. of Plano*,
243 Fed. Appx. 816 (5th Cir. 2007)..................................................................... 26, 29, 45

*Hockman v. Westward Commc'ns*, 407 F.3d 317 (5th Cir. 2004)........... 10, 13, 14, 15, 18, 20, 21

*Indest v. Freeman Decorating, Inc.*,
164 F.3d 258 (5th Cir. 1999)............................................................................................ 23

*Ingram v. Papa John's Int'l, Inc.*,
171 Fed. Appx. 439 (5th Cir. 2006).............................................................................. 20, 24

*Jeffrey v. Dallas County Med. Examiner*,
37 F.Supp. 2d 525 (N.D. Tex. 1999) ............................................................................... 18

*Krystek v. University of S. Mississippi*,
164 F.3d 251 (5th Cir. 1999)............................................................................................ 34

*Lauderdale v. Texas Department of Criminal Justice, Institutional Div.*,
512 F.3d 157 (5th Cir. 2007)............................................................................................ 10

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*,
127 S. Ct. 2162 (2002) .................................................................................................... 16

# TABLE OF AUTHORITIES
## (CONTINUED)

PAGE

*Lenthan v. Boeing Co.*,
  994 F. Supp. 776 (S.D. Tex. 1998) ............................................................................. 12

*Little v. Republic Refining Co.*,
  924 F.2d 93 (5th Cir. 1991) ....................................................................................... 38

*Long v. Eastfield Coll.*,
  88 F.3d 300 (5th Cir. 1996) ................................................................................. 44, 47

*Martin v. Kroger Co.*,
  65 F. Supp. 2d 516 (S. D. Tex. 1999) ............................................................. 26, 29, 31

*Martin v. Lennox Int'l, Inc.*,
  342 Fed. Appx. 15 (5th Cir. 2009) ............................................................................ 28

*McCoy v. City of Shreveport*,
  492 F.3d 551 (5th Cir. 2007) ............................................................................... 25, 37

*McCoy-Eddington v. Brazos Cty.*,
  No. H-05-0395, 2007 U.S. Dist. LEXIS 30052 (S.D. Tex. Apr. 24, 2007) ...................... 31

*McCray v. DPC Indus., Inc.*,
  942 F. Supp. 288 (E.D. Tex. 1996) ........................................................................... 19

*McDonnell Douglas Corp. v. Green*,
  93 S. Ct. 1817 (1973) ......................................................................................... 35, 44

*Meritor Sav. Bank, FSB v. Vinson*,
  477 U.S. 57 (1986) ................................................................................................. 13

*Mims v. Carrier Corp.*,
  88 F. Supp. 2d 706 (E.D. Tex. 2000) ......................................................................... 14

*Molina v. Equistar Chems., L.P.*,
  No. C-05-327, 2006 U.S. Dist. LEXIS 47075 (S.D. Tex. June 30, 2006) ......................... 47

*Nat'l Passenger R.R. Corp. (AMTRAK) v. Morgan*,
  536 U.S. 101 (2002) ............................................................................................... 19

*Nicholas v. Lewis Grocer et. al.*,
  138 F.3d 563 (5th Cir. 1998) .................................................................................... 44

*Nunnery v. Elgin Joliet Eastern Railway Co.*, 48 F. Supp. 2d 1122 (N.D. Ind.
  1999) .................................................................................................................... 34

*Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*,
  45 F.3d 507 (5th Cir. 2001) ..........................................................................24, 31, 32, 38

*Oncale v. Sundowner Offshore Servs., Inc.*,
  523 U.S. 75 (1998) ................................................................................................. 14

*Pegram v. Honeywell, Inc.*,
  361 F.3d 272 (5th Cir. 2004) .................................................................................... 31

*Pineda v. UPS*,
  360 F.3d 483 (5th Cir. 2004) ............................................................................... 44, 47

## TABLE OF AUTHORITIES
### (CONTINUED)

PAGE

*Porter v. Erie Foods Intl.*, No. 08-1996,
  2009 U.S. App. LEXIS 17843 (7th Cir. Jan. 7, 2009) ....................................... 18

*Preston v. Tex. Dep't of Family & Protective Servs.*, No. 06-20752,
  2007 U.S. App. LEXIS 2870 (5th Cir. Feb. 7, 2007) ............................... 25, 31, 34

*Pryor v. Wolfe*,
  196 Fed. Appx. 260 (5th Cir. 2006)..................................................................... 25

*Rachid v. Jack in the Box, Inc.*,
  376 F.3d 305 (5th Cir. 2004).............................................................................. 38

*Reeves v. Sanderson Plumbing Prods.*,
  530 U.S. 133 (2000)...................................................................................... 38, 44

*Richardson v. Monotronics, Int'l, Inc.*,
  484 F.3d 327 (5th Cir. 2005).............................................................................. 38

*Rios v. Rossotti*,
  252 F.3d 375 (5th Cir. 2001).............................................................................. 10

*Roberson v. Game Stop/Babbage's*,
  152 Fed. Appx. 356 (5th Cir. 2005).................................................................... 28

*Robertson v. Alltel Info. Servs.*,
   373 F.3d 647 (5th Cir. 2004)..................................................... 40, 41, 43, 50

*Rosales v. TXI Operations*,
  No. 3:03-CV-2923-N, 2005 U.S. Dist. LEXIS 3977 (N.D. Tex. March 14,
  2005................................................................................................................... 35

*Septimus v. Univ. of Houston*,
  399 F.3d 601 (5th Cir. 2005)............................................. 10, 14, 16, 33, 44, 47

*Shackelford v. Deloitte & Touche, LLP*,
  190 F.3d 398 (5th Cir. 1999)......................................................................... 24, 27

*Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871 (5th Cir. 1999) ................. 14, 18, 21

*Skidmore v. Precision Printing & Packaging, Inc.*,
  188 F.3d 606 (5th Cir. 1999).............................................................................. 23

*Skinner v. Brown*,
  951 F. Supp. 1307 (S.D. Tex. 1996).................................................................... 14

*Slaughter v. Jones Day*,
  No. H-05-3455, 2007 U.S. Dist. LEXIS 2198 (S.D. Tex. Jan. 11, 2007)............. 47

*Speedy v. Rexnord Corp.*,
  243 F.3d 397 (7th Cir. 2001).............................................................................. 10

*Speer v. Rand McNally & Co.*,
  123 F.3d 658 (7th Cir. 1997).............................................................................. 26

*Stanley v. Univ. of Tex. Med. Branch, Galveston*,
  425 F. Supp. 2d 816 (S.D. Tex. 2003)................................................................. 29

# TABLE OF AUTHORITIES
## (CONTINUED)

PAGE

*Stewart v. Miss. Transp. Comm'n,*
  586 F.3d 321 (5th Cir. 2009) ............................................................................. 45

*Swanson v. Gen Servs. Admin.,*
  110 F.3d 1180 (5th Cir. 1997) ............................................................................ 10

*Wilkinson v. Potter,*
  No. 06-30921, 2007 U.S. App. LEXIS 11941 (5th Cir. May 21, 2007) .............................. 29

*Wooten v. Fed. Express,* No. 3:04-cv-1194-D, 2007 U.S. Dist. LEXIS 2195 (N.D.
  Tex. Jan. 9, 2007) .................................................................................... 13, 31

*Wyvill v. United Cos. Life Ins. Co.,*
  212 F.3d 296 (5th Cir. 2000) ............................................................................. 10

**Statutes**

42 U.S.C. § 1981 (§ 1981) ....................................................................................... 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BORIS BRYANT, DARREN MAYO, EDWARD PIERRE, LAWRENCE GRICE, KEVIN MCINTYRE, MAURICE GALIMORE, JAMES BROWN, CARLOS BEATTY, MARCUS PAREJO, LAMAR NEWTON, JOHN LUCAS, CARLTON SYKES, | § § § § § § § § § | NO. 04:08-CV-03744 |
| Plaintiffs | § § | |
| vs. | § § | |
| FMC TECHNOLOGIES, INC., PROSTAFF PERSONNEL ACQUISITION CORP. , | § § § | |
| Defendants. | § § | |

## DEFENDANT FMC TECHNOLOGIES INC.'S MOTION FOR SUMMARY JUDGMENT

The defendant, FMC Technologies, Inc. (FMCTI), moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## I.     NATURE AND STAGE OF THE PROCEEDING

In this employment discrimination lawsuit, the plaintiffs allege that FMCTI violated Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 1981 (§ 1981), and Chapter 21 of the Texas Labor Code.  Specially, the plaintiffs allege that FMCTI discriminated against each of them because of their race through various allegedly adverse employment actions, subjected them to a racially hostile work environment, and retaliated against them for making complaints of discrimination and harassment.  Plaintiff Parejo further alleges discrimination based upon national origin.  The parties have completed discovery and docket call is October 4, 2010.  FMCTI now moves for summary judgment on all claims made by each plaintiff.

## II.   STATEMENT OF ISSUES AND STANDARD FOR REVIEW

The issues that the court must decide in this motion are whether FMCTI unlawfully discriminated against any of the plaintiffs based on race (or in the case of Parejo, national origin) and whether the defendants unlawfully retaliated against any plaintiff.  The standard for review is the familiar standard under Rule 56 that FMCTI must establish that there is no genuine issue of material fact and it is entitled to summary judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986)

## III.   SUMMARY OF THE ARGUMENT

FMCTI did not unlawfully discriminate against any plaintiff because of race or national origin, nor did FMCTI unlawfully retaliate against any plaintiff.  The plaintiffs cannot establish essential elements of their discrimination and retaliation claims and the evidence demonstrates that FMCTI investigated and took prompt remedial action related to the alleged hostile environment.

## IV.   FACTUAL BACKGROUND

### A.   The Plaintiffs' Employments With FMCTI

FMCTI manufactures sophisticated subsea oil and gas production equipment.  The plaintiffs are all current or former employees of FMCTI who worked at some point in FMCTI's Assembly Department.  All of the plaintiffs are African-American except Marcus Parejo.  Co-defendant ProStaff supplies individuals to work at FMCTI, and FMCTI hires individuals from the temporary labor pool for full-time positions.  All of the plaintiffs worked for ProStaff as temporary employees at FMCTI except Darren Mayo, whom FMCTI hired directly as an Assembly Technician on January 8, 1997, and Lamar Newton, who worked for Employer Flexible (E-Flex), another staffing agency, before FMCTI offered him a full-time position in January 2008.  *Complaint at ¶ 38* and *¶ 166*.  Several of the plaintiffs remain employed in the Assembly Department, including **Lawrence Grice**, who currently works as an Assembler IV in Direct Vertical Access (DVA), *Complaint at ¶*

*74; Declaration of Susan Webb, attached as Exhibit A, at Ex. 5 and Ex. 9*; **Kevin McIntyre**, who is a full-time Assembler I, *Complaint at ¶ 98*; **Maurice Galimore**, who is currently an Assembler II, *Ex. A at Ex. 6*; **James Brown**, who is currently an Assembler II, *Ex. A at Ex. 7*; and **Carlton Sykes**, who is an Assembler IV lead, *Ex. A at Exs. 14 and 24*.

Several of the plaintiffs no longer work in the Assembly Department, which they claim was where the racially hostile environment occurred. These plaintiffs include **Boris Bryant**, who transferred from the Assembly Department to FMCTI's Service Apprenticeship Program on March 3, 2008, *Ex. A at Ex. 3*;[1] **Carlos Beatty**, who transferred from the Assembly Department to the Service Apprenticeship Program in November 2009, *Ex. A. at Ex. 8*; **Marcus Parejo**, who is of East Indian ancestry, was born in and claims his national origin from the country Trinidad & Tobago, and who transferred into FMCTI's Service Apprenticeship Program in January of 2010, *Complaint at ¶ 143-44; Deposition of Marcus Parejo*,[2] *attached as Ex. E, at 13;* and **Lamar Newton**, who never worked as a full-time employee in Assembly but moved directly from a temporary position with E-Flex to FMCTI's Service Apprenticeship Program in January of 2008 and became a Service Apprentice I in March of 2008, *Ex. A at Ex. 11*.[3]

Three of the plaintiffs are no longer actively employed at FMCTI. **Edward Pierre**, a current employee with an Assembler position, is on extended leave. *Pierre Dep. Ex. G, at Ex. 61; Ex. A at Ex. 15.* Pierre began a short term disability leave of absence unrelated to the alleged hostile environment on December 11, 2008, for an on-the-job injury to his abdomen. *Ex. A at Ex. 16.* Following the expiration of his short term disability leave, FMCTI placed Pierre on an extended unpaid leave of absence. *Id. at Exs. 16, 17.* Pierre remains on extended leave presently and has performed no work for the company since December 10, 2008. *Declaration of Michael Turner,*

---

[1] Bryant later graduated from the Service Apprenticeship Program on October 6, 2008. *Exhibit A at Ex. 4.*

[2] The depositions used in support of this Motion are cited with the deponent's last name throughout this motion.

[3] Newton later graduated from the Field Service Apprenticeship Program on September 10, 2008. *Ex. A at Ex. 12.*

*attached as Ex. H, at ¶ 5.*[4]  **John Lucas** previously worked as an Assembler II but transferred to a position in FMCTI's Service Apprenticeship Program on May 5, 2008.  *Ex. A. at Ex. 19.*  FMCTI terminated Lucas's employment on February 5, 2009, for falsifying time records.  *Complaint at ¶ 187; Ex. A at Ex. 20.*  **Darren Mayo** was an Assembler III Lead in the High Bay area.  *Id. at Exs. 18, 21.*  FMCTI terminated Mayo's employment in September 2009 after discovering that he had received, stored, and distributed a large volume of pornographic, racist, and other improper material on the company's computer system.  *Ex. H at Ex. 1.*

### B.    Background of Allegations

On September 24, 2007, at approximately 10:45 P.M., ProStaff employee Sam Ruth (C)[5] discovered a noose hanging from a sign in the receiving area of the FMCTI warehouse. *Deposition of Susan Webb*, *attached as Exhibit I, at Ex. 6.*  Ruth notified FMCTI employee Virgil Zarate (H), and the two men removed the noose and took it to supervisor Melissa Gomez (H).  *Id.*  The following morning, the noose was given to Susan Webb (C), Subsea HR Manager, and Webb immediately assigned Wendell Deboskie (AA), the HR representative assigned to the warehouse area, to investigate.  *Id.*  Webb also informed Steve Barrett (C), the Subsea General Manager, about the noose and that Deboskie was investigating.  *Id.*

One of Deboskie's initial interviews was of David Grey (C), an employee of a contractor, whom Deboskie and Webb believed by his conduct in the interview had tied and displayed the noose.  *Id.*  Grey informed his supervisor at his contractor company that he did not want to return to FMCTI's facility and Deboskie barred him from FMCTI's facilities.  Deboskie continued his investigation thereafter.[6]  At the suggestion of Joseph Richardson (AA), Webb also began to write a

---

[4] Pierre raises no allegations of discrimination or retaliation related to his extended leave of absence.

[5] Individuals are identified by race as Caucasian (C), African-American (AA), Hispanic (H), Asian (AS) and African (A).  All plaintiffs are AA except Parejo who is from Trinidad and of East Indian descent.

[6] Deboskie had difficulty scheduling all the necessary interviews because many of the individuals he wanted to interview worked nights.  On October 19, 2007, Deboskie submitted his resignation to the company without having

notice to all employees about the noose incident, restating the company's policy against racial harassment, as part of the remedial measures the company planned to implement after Deboskie completed his investigation.[7] *Exhibit A at ¶ 4.*    FMCTI management also barred two other contractors, James Cowan (C), and Laura Raley (C), as a result of Deboskie's investigation because they had been in the area, seen and discussed the noose, and had left it hanging in the warehouse without reporting it to anyone. *Ex. I at Ex. 6.*

Two days after Deboskie had turned in his report, and before Webb had finalized her all-employee notice, Plaintiffs Pierre and Newton discovered a second noose on October 25, 2007, at 10:45 a.m., that was tied to a tagline and lying on the floor in the High Bay area of the Assembly Department.  *See Ex. I at Ex. 7.*  Newton called supervisor Joe McHenry (AA) and reported to him that a noose had been found.  *Id.*  McHenry told Newton to leave it there until he could return to the plant and see it for himself.  *Id.*  In the meantime, Newton and Pierre also informed Assembly Lead James Bryan (C) and Team Lead Roy Bolton (C) about the noose. *Id.*  Bryan cut the noose from the tagline, and Bolton took it to his office.  When McHenry returned to the plant at approximately 1:00 p.m., he took the noose to FMCTI's HR department. *Id.*  Mark McDonald (C), the HR Director for Global Subsea, immediately assembled a team to investigate.  *Id.*  That same day, during the investigation interviews, Joe Henderson (C), a contract employee with Acute Technological Services, admitted to tying the noose. *Id.*  FMCTI immediately removed Henderson and banned him from the facility. *Id.*

The following day, October 26, Barrett sent an email to all employees notifying them that a racial incident had occurred in the facility, and that the company had taken action against the third

---

[7] Webb preferred to follow company policy and maintain the confidentiality of the investigation until Deboskie had completed the investigation and recommended appropriate corrective action.

turned in his report.  Mark McDonald (C), the HR Director for Global Subsea, met with Deboskie to try and convince him not to resign but was unsuccessful.  McDonald also asked Deboskie to finish his investigation and submit his written report and recommendations for corrective action.

party contractor responsible. *Sykes Dep.*, *attached as Ex. F, at Ex. 26.* Barrett's email also reaffirmed FMCTI's commitment to a harassment-free work environment[8] and encouraged employees to report incidents of harassment to management, human resources, or FMCTI's confidential hotline. *Id.* That same day, FMCTI supervisors began conducting meetings with their employees to discuss and reaffirm FMCTI's zero tolerance policy for racial harassment. *Ex. F at Ex. 8.* On October 30, 2007, FMCTI President and CEO Peter Kinnear (C) sent a similar memo to all employees worldwide. *Ex. F at Ex. 16.*[9] The company distributed this information to employees by email and posted it on bulletin boards. FMCTI issued additional statements regarding the nooses and the company's response by all-employee newsletters and postings on FMCTI's website. *Ex. F at 18, 19.* Additionally, FMCTI contacted FBI investigator Alfred Tribble (AA), Department of Justice investigator Jared Fishman (C), and local community leaders to discuss and seek advice regarding the presence of nooses in the facility.

In January of 2008, Barrett announced mandatory diversity training for all FMCTI employees. *Ex. A at ¶ 5.* Outside consultant Don Carter (AA) conducted the training. *Id.* Part of this training included viewing a mutual respect video illustrating the effects of discrimination. *Id.* The video included segments from the 1968 program "A Class Divided," an award winning documentary presentation of a teacher in a small, all-white Iowa town, who divided her third grade class into two groups to give them a lesson in discrimination. *Id.* During one portion of the film, when describing how it felt to be treated differently, one child uses the "n-word." *Id.* Mayo and Lucas complained and, in response, FMCTI edited the video to remove the "n-word" for future

---

[8] FMCTI maintains an Equal Employment Opportunity policy and prohibits unlawful discrimination against any employee or applicant in any form. *Ex. F at Ex. 15.* Similarly, FMCTI's Policies & Procedures Manual also prohibits unlawful harassment, intimidation, discrimination and retaliation. *Id.* Should an employee encounter a perceived incident of discrimination or harassment, the Manual specifically outlines the complaint procedure the employee should follow. *Id.*

[9] Kinnear attached a press release to the memo stating that four contractors had been permanently banned from the FMC facilities as a result of the two noose incidents. *See Ex. F at Ex. 17.*

training.  *Id.; Risinger Dep.*, *attached as Exhibit GG*, *at 199-200; Complaint at ¶ 182.*[10]

Despite FMCTI's response to the prior noose incidents, on May 17, 2008, at approximately 2:00 p.m., Assembler John Duncan (C) discovered a rope tied in a loop and resembling a noose hanging from a tree in the High Bay area.  *Ex. I at Ex. 14.*  The rope was reported to supervisor Jon Troxell (C), who immediately reported it to HR.  *Id.*  On Sunday, May 18, at 6:00 a.m., a team of HR personnel from FMCTI and staffing agencies ProStaff and E-Flex began investigating.  *Id.*  The investigation team interviewed over 150 individuals.  *Id.*  No one admitted to tying the rope and there were no witnesses to the event.  *Id.*  FMCTI management held meetings afterward with all assembly personnel to discuss the incident and reaffirm its zero tolerance policy for racial symbols in the workplace.  *Id.*  Barrett sent all-employee messages on May 19 and 20.  *Id.; Ex. F at Exs. 22, 23.*  Counselors from the Employee Assistance Program came onsite on May 20.  *Id.; Ex. I at Ex. 56.*  FMCTI again contacted FBI investigator Tribble, who declined to investigate.  *Id.*  As a result, FMCTI hired Gary Stegar (C), a retired FBI agent-turned-security consultant, to investigate the incident.  *Id.*  The company also self-reported the noose to the EEOC, and on May 28, 2008, three EEOC investigators toured the Assembly area.  *Id.*  Despite its best efforts, the company was unable to determine who had tied and hung the third noose.  *Id.*

The company informed employees and contractors that failure to report a noose could be grounds for dismissal (in the case of employees) or the that company might bar them from company premises (in the case of contractors).  *See, e.g.*, *Ex. I at Ex. 21.*  This heightened awareness among workers at the facility and resulted in a number of reports of ropes that the company determined were not nooses, but rather knots tied with loops.[11]  In addition, the company received other reports

---

[10] On January 24, 2008, General Manager Steve Barrett met with Lucas to discuss his concerns regarding the video. *Ex. A at Ex.1.* Barrett thanked Lucas for voicing his concerns, told them he would relay the sentiment to the presenter, and encouraged him to bring similar issues to his attention in the future. *Id.*

[11] On September 2, 2008, a rope was found by two contract employees hanging in a tool cabinet in the Assembly area. *See Ex. F at Ex. 21.* The company again brought in Stegar to investigate the incident. *Id.* After a full investigation,

about some alleged nooses that workers had found or seen in the past,[12] but because of the timing of the complaints, the company could not confirm the existence of any nooses and found it difficult to investigate these historical accounts.[13]   Nevertheless, the company investigated each report, and where possible, took appropriate corrective action.   At no time did anyone allege or did any investigation determine that an FMCTI employee tied or displayed a noose at the facility.

In addition to hostile environment claims based on the noose, the plaintiffs make certain other allegations in support of their claims of racial harassment.   For example, the plaintiffs complain of particular comments by their FMCTI coworkers or third party contractors and of isolated incidents of graffiti found at the workplace.   *See*, *e.g.*, *Complaint at ¶¶ 79, 94, 168.*   The plaintiffs also make certain additional claims of discrimination and/or retaliation, as detailed in particular below.   Because these acts, even as alleged, are insufficient to meet the legal standards applicable to discrimination and retaliation claims, FMCTI is entitled to summary judgment as a matter of law.   FMCTI addresses the factual details of each of these claims of discrimination,

_____

FMC determined that the rope was not intended to resemble a noose, but was instead tied in a "daisy chain" formation, a common way to store ropes and cords. *Id.*  Barrett issued another all-employee email on September 4, 2008, relaying the results of the investigation and applauding the contract employees for reporting something they felt could have been offensive to others. *Id.*

[12] On November 4, 2007, Assembly Technician Antonio Trejo (H) found a rope looped around a metal stand and secured with black tape in the High Bay area. *See Ex. I at Ex. 14.*  Trejo immediately reported the rope to his supervisor as a potential noose, and Human Resources immediately began an investigation. *Id.*  FMCTI interviewed witnesses in the area, examined the rope, and allowed Agent Tribble to do the same, and the company determined that the rope was not intended to be a racial symbol or resemble a noose. *Id.*

[13] FMCTI's investigation revealed that in the timeframe between the September 24 and October 25 incidents, other nooses may have been present, but not reported. *Ex. I at Ex. 7.*  Willie Howard (AA), a Pro Staff employee, told investigators that he had seen a W-Industries contract employee with a noose in his hands about three weeks earlier. Gabriel Leal (H) and Juan Esquivel (H), two W-Industries contract employees, told HR investigators that they too had seen what they described as a small noose in the shop about three weeks earlier. *Id.*  Leal stated he had picked up a small noose lying on a filing cabinet and set it down when he noticed another employee watching him. Esquivel similarly stated that he had seen a small noose on the floor. *Id.*  It was unclear from their interviews whether these incidents described the same noose or two separate nooses.  All three men admitted that they did not report the noose to anyone at the time they saw it. *Id.*  Finally, the investigation also revealed that John Luong (AS), a third W-Industries employee, had had a rope thrown around his neck by an Acute employee during the same timeframe, approximately three weeks earlier. *Id.*  Like Howard, Leal and Esquivel, Luong had not reported this incident to anyone at the time that it happened. *Id.*  Luong was shown a picture of Joe Henderson, the Acute employee who had been removed for the October 25th noose incident, and he identified Henderson as the person who had previously thrown the rope around his neck. *Id.*

harassment, and retaliation in detail in the body of this motion.

## V.   ARGUMENT AND AUTHORITIES

While the plaintiffs bring a number of claims of discrimination, harassment, and retaliation, each claim fails as a matter of law because the plaintiffs have produced no evidence raising a genuine issue of material fact on any claim.

### A.   FMCTI is Entitled to Summary Judgment on the Plaintiffs' Hostile Work Environment Claims

The one claim that all plaintiffs make in this case is that FMCTI subjected them to a hostile environment because the company found hangman's nooses in the workplace.  The evidence demonstrates, however, that eight of the twelve plaintiffs never saw a noose at all,[14] and two of the plaintiffs who saw one noose were not FMCTI employees at the time.[15]  Further, the plaintiffs have absolutely no evidence that any FMCTI employee was involved in the tying or displaying of any noose at their facility, and the undisputed evidence demonstrates that once the nooses were reported, FMCTI investigated and took prompt remedial action in response.  Besides the nooses, the plaintiffs make a variety of other claims of alleged harassment, but again, these claims do not withstand scrutiny.   FMCTI, therefore, is entitled to summary judgment on the plaintiffs' harassment claims.

To establish a racially hostile work environment claim, each plaintiff must prove: (1) he belongs to a protected class; (2) he was subjected to unwelcome harassment; (3) this harassment was based on his race/national origin; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassment but failed to

---

[14] One plaintiff who saw a noose saw it only after the noose had been removed and placed into a plastic bag. *Galimore Dep.*, *attached as Exhibit C*, *at 182.*

[15] Both did, however, apply for permanent employment at FMCTI after seeing the nooses, despite their claims that the company created an intolerable environment for them.

take prompt remedial action.[16]  *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005); *Hockman v. Westward Commc'ns*, 407 F.3d 317, 325-26 (5th Cir. 2004).[17]  The plaintiffs are not able to establish essential elements of their harassment claims, as demonstrated below.

### 1. The Noose Incidents, Standing Alone, are Insufficient to Establish a Hostile Work Environment.

While the plaintiffs each point to the presence of nooses in the workplace to support their hostile work environment claims, these allegations, on their own, are insufficient to establish a hostile work environment claim as a matter of law.  Eight of the plaintiffs admit they never personally saw the nooses at FMCTI's facility.[18]  As such, the noose incidents are based on hearsay and cannot be considered for their hostile work environment claims.  *See Casey v. Coca-Cola Enters.*, No. 05-0152, 2006 U.S. Dist. LEXIS 94378, at *24 (W.D. La. Dec. 28, 2006) (attached as Exhibit O); *see also Septimus*, 399 F.3d at 612 (holding evidence about the harassment of others not relevant if the plaintiff did not experience such conduct).  Furthermore, a plaintiff's mere knowledge of nooses in the workplace, even when viewed in conjunction with racist comments directed to him personally, does not rise to the level of a severe or pervasive hostile work

---

[16] Where the claim of harassment is against a supervisor, proving a hostile working environment requires four elements: (1) the employee belongs to a protected class; (2) the employee was subject to unwelcome harassment; (3) the harassment was based on his race/national origin; and (4) the harassment affected a term, condition, or privilege of employment.  *Lauderdale v. Texas Department of Criminal Justice, Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007).  Thereafter, the employer may affirmatively avoid liability if it can show that (1) it used reasonable care to prevent and correct any harassment; and (2) the employee unreasonably failed to make a complaint under the policy or to avoid harm otherwise.  *Id.*

[17] To establish a hostile work environment, the plaintiffs cannot simply make broad generalizations of harassment in the workplace to establish a hostile work environment.  Rather, each plaintiff must specifically identify the alleged harassment that they themselves experienced.  *Celestine v. Petroleos*, 108 Fed. Appx 180, 188 (5th Cir. 2004); *see also Septimus*, 399 F.3d at 612 (holding evidence about the harassment of others is not relevant because plaintiff did not personally experience such conduct); *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 303-04 (5th Cir. 2000); *Rios v. Rossotti*, 252 F.3d 375, 381 n.2 (5th Cir. 2001); *Speedy v. Rexnord Corp.*, 243 F.3d 397, 406 (7th Cir. 2001); *Swanson v. Gen Servs. Admin.*, 110 F.3d 1180, 1186 (5th Cir. 1997); *Fields v. J.C. Penney*, 968 F.2d 533, 538 (5th Cir. 1992); *Dogan-Carr v. Saks Fifth Ave.*, No. H-05-1236, 2007 U.S. Dist. LEXIS 12977 (S.D. Tex. Feb. 26, 2007); *Dixon v. Moore Wallace, Inc*, No. 3:04-cv-1532-D, 2006 U.S. Dist. LEXIS 47560, at *29 n.14 (N. D. Tex. July 13, 2006).

[18] *See Bryant*, attached as Exhibit J, at 209; *Mayo*, attached as Exhibit K, at 174, 182; *Grice*, attached as Exhibit B, at 179, 196; *McIntyre*, attached as Exhibit L, at 106 (admitting he learned about the noose only because of the company's response to the incident); *Brown*, attached as Exhibit D, at 159; *Beatty*, attached as Exhibit M, at 193, 205, 208, 211, 217; *Parejo at 178; Lucas*, attached as Exhibit N, at 188.

environment.  *Casey* at *22-25.  Instead, the presence of a noose in the workplace, even when viewed in connection with isolated derogatory comments, is simply the "equivalent of the 'mere utterance of an . . . epithet which engenders offensive feelings in an employee'" and does not support Title VII liability.  *Fisher v. Certified Safety Specialists, LLC*, No. H-06-2232, 2007 U.S. Dist. LEXIS 73989, at *21 (S.D. Tex. Oct. 2, 2007) (quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 595 (5th Cir. 1995)) (attached as Exhibit P).

Although the remaining four plaintiffs testify to seeing the noose in some form,[19] even the placement of a noose in the workplace, standing alone, is insufficient to establish a hostile working environment as a matter of law.  *Drummond v. Stone*, No. 91-2719, 1993 U.S. Dist. LEXIS 593, at *13 (E. D. La. Jan. 13, 1993), *aff'd on other grounds*, 7 F.3d 229 (5th Cir. 1993) (attached as Exhibit R).  This is particularly so where the noose is not directed at the employee personally.  *Id.*  Because the plaintiffs base their hostile work environment claims in great part on alleged nooses that they did not see, and, except in one case, did not discover,[20] these claims are based on insufficient evidence, and their hostile work environment claims should be dismissed.

### 2. Some Alleged Harassment was Not Based on Race or National Origin.

The plaintiffs identify certain other incidents of harassment without any evidence that the alleged conduct was based on race.  In February of 2008, Mayo found a black glove in his desk drawer with four fingers stapled down, exposing the middle finger, which he now claims was a racist act. *Complaint at ¶ 53*.[21]  There is no evidence, however, that this act, while boorish, was in

---

[19] *See Complaint at ¶ 62* (Pierre); *Galimore at 182* (saw noose after removed and placed in a plastic bag); *Newton, attached as Exhibit Q, at 115-16, 118* (saw noose outside his work area); *Sykes at 85* (saw, but did not discover, a noose).  After discovering the alleged noose on October 25, 2007, Pierre told Newton, his coworker, about the noose, and together they reported it to Bryan and Bolton.  *Complaint at ¶ 65; Ex. 1 at Ex. 7*.  Pierre was interviewed by Deboskie and later met with Vicky Vargas and ProStaff representative Paige Fuller.  *Complaint at ¶ 67*.

[20] Pierre discovered an alleged noose near his work area, although he was not an FMC employee at the time. *Complaint at ¶ 62*.

[21] Mayo complained to lead man Jon Troxell about the incident, who reported it to Assembly Test Manager Eric Heuring and Webb. *Id. at ¶ 54; Mayo at 120; Ex. A at Ex. 13*.  Mayo later complained to Human Resources Manager

any way based on race.  On the contrary, there is nothing innately racist about the hand gesture commonly referred to as "the bird."  Rather, Mayo simply assumed that it was intended to be a racist act. *Mayo at 192*.  The desk Mayo used was also used by all lead men, including Caucasians, and Mayo has no evidence that the act was specifically directed towards African Americans.  Furthermore, Mayo admits that the company's prompt investigation of this matter, followed by a "stand down" meeting, was an appropriate response to the situation. *Id. at 121-22*.[22]

Mayo also complains that Faucett "constantly berated [him] and embarrassed him in front of his coworkers [by making] demeaning comments" to him, such as "Get your stupid ass back on the floor," and "inbred," and that Roy Bolton[23] constantly criticized, berated, swore at and yelled at him publicly. *Mayo at 234; Complaint at ¶ 46, 58*.  While these statements are unprofessional, they are not based on race.  Mayo testified, in fact, that his only reason for believing they were racial is because he believes Faucett and Bolton are racists. *Mayo at 235-36*.[24]  Mayo's subjective beliefs are insufficient summary judgment evidence, and he has no other evidence that this alleged harassment was based on his race.  *Lenthan v. Boeing Co.*, 994 F. Supp. 776, 790 (S.D. Tex. 1998).

Galimore points to a number of allegedly offensive comments made to him by High Bay Lead Brett Mohn, such as calling him "Fat Albert," "Kool-Aid,"[25] "Sherman Klump," and telling him he needed to wear a bra. *Galimore at 75, 92-93; Complaint at ¶ 109*.  While rude, these comments appear more to be based on Galimore's size than his race.  Galimore further alleges that

---

Michelle Risinger about the incident, and Risinger explained that the matter was being investigated. *Id.; Mayo at 189*. The following Wednesday, Mayo met with Webb, Troxell, and Operations Manager Brian Janak to further discuss the situation. *Complaint at ¶ 55*. Following the investigation, FMCTI held a "stand down" regarding the incident. *Mayo at 121*. Mayo admits that this was an appropriate response to the situation. *Id. at 121-22*.

[22] As such, he cannot make out his *prima facie* case because he admits FMCTI took prompt, remedial action.

[23] Although the Complaint identifies Jon Troxell as this alleged offender, Mayo testified at his deposition that "Roy Bolton does the yelling things, not Jon Troxell." *Mayo at 247*.

[24] Mayo believes that Bolton, like Heuring, is a "known racist" because he is part of the alleged "racist clique" at FMCTI. *See Mayo at 88-91, 237*.

[25] Galimore also claims that Mohn once said to him "Hey Kool-Aid" because he was wearing a red shirt, but that after Galimore complained to Mohn about it, he agreed to stop. *Galimore at 92-93*.

Mohn told him "[Factory Authorized Testing (FAT)] requires a mind-set that you don't have." *Id*. Galimore did not ask Mohn what he meant by this comment. *Galimore at 116*. Now, however, Galimore apparently asserts it was based on his race. There is nothing inherently race-based, however, about a comment concerning someone's intellectual capability, and Galimore has no evidence that Mohn directed these comments to him because of his race. Non-race based discord is not actionable under the discrimination statutes. *Beaumont v. Tex. Dep't of Crim. Justice*, 468 F. Supp. 2d 907, 919-20 (E.D. Tex. 2006) (holding discrimination statutes do not protect against all harassment; only harassment that has a racial character or purpose can support a hostile work environment claim); *Wooten v. Fed. Express*, No. 3:04-cv-1194-D, 2007 U.S. Dist. LEXIS 2195, at *67 (N.D. Tex. Jan. 9, 2007) (attached as Exhibit S); *Beaumont*, 468 F. Supp. 2d at 919-20 (holding harassment that does not have racial character or purpose cannot support a hostile work environment claim). These comments and incidents cannot support the plaintiffs' harassment claims as a matter of law.

### 3.   Other Alleged Treatment Did Not Affect a Term, Condition, or Privilege of Employment.

In order to succeed on a hostile work environment claim, each plaintiff must prove, among other things, that he was subjected to harassment, and the harassment complained of affected a "term, condition, or privilege of employment," that is, that the harassment was so "severe or pervasive" as to alter the working conditions of employment and create an abusive working environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Hockman v. Westward Commun's, LLC*, 407 F.3d 317, 325 (5th Cir. 2004). Title VII is not "a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "For harassment to affect a term, condition, or privilege of employment, it must be both objectively and subjectively abusive." *Hockman*, 407 F.3d at 325 (internal citations omitted).

In determining whether a work environment is objectively hostile or abusive and therefore

- 13 -

actionable under Title VII, courts look to the totality of the circumstances and examine the following factors: "1) the frequency of the discriminatory conduct; 2) its severity; 3) whether it is physically threatening or humiliating as opposed to a mere offensive utterance; 4) whether it unreasonably interferes with an employee's work performance; and 5) whether the complained-of conduct undermines the plaintiff's workplace competence." *Hockman*, 407 F.3d at 325-26; *Harris v. Forklife Sys., Inc.*, 510 U.S. 17, 23 (1993). Occasional comments, discourtesy, rudeness, or isolated incidents, unless extremely serious, are insufficient to establish a hostile work environment claim. *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999). Conduct that is "merely offensive" is not actionable. *See Hockman* at 325-26. Rather, "the conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 324 U.S. at 788.[26]

The plaintiffs' allegations, even if true, do not meet this demanding standard. For example, Grice claims he was subjected to a hostile work environment because his co-workers and FMCTI contractors made certain, isolated comments to him, such as "I don't think you wanted any coffee anyway because you are already dark enough," he received a company manual with a picture of a man allegedly in blackface,[27] and nooses were discovered by someone else at FMCTI's facility.[28]

---

[26] The United States Supreme Court and the Fifth Circuit impose a heavy burden on a plaintiff to show that the harassment is severe or pervasive. *See, e.g., Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-82 (1998); *Septimus*, 399 F.3d at 611-12; *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999). Whether conduct is "hostile" or "abusive" depends on the totality of the circumstances, including the frequency of the conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the employee's work performance. *Septimus*, 399 F.3d at 611. It is not enough for the plaintiffs to claim they were treated badly. *Mims v. Carrier Corp.*, 88 F. Supp. 2d 706, 713 n.3 (E.D. Tex. 2000); *see also Hockman*, 407 F.3d at 326 (stating "the alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents"); *Shepherd*, 168 F.3d at 874 (holding that even "boorish" and "offensive" comments are not enough to establish a hostile work environment); *Beaumont*, 468 F. Supp. At 919 ("conduct that only 'sporadically wounds or offends but does not hinder' an employee's performance is not actionable") (quoting *Skinner v. Brown*, 951 F. Supp. 1307, 1322 (S.D. Tex. 1996)).

[27] *See Ex. B at Ex. 45.* After Grice complained that the picture could be interpreted in this way, FMCTI immediately removed it from its training materials. *Ex. H at ¶ 4.*

[28] Grice admits that he never personally saw any of the alleged nooses. *Grice at 179, 196.* As such, the noose incidents are based on hearsay and cannot be considered for Grice's hostile work environment claim. *See Casey v. Coca-Cola Enters.*, No. 05-0152, 2006 U.S. Dist. LEXIS 94378, at *24 (W.D. La. Dec. 28, 2006).

*Complaint at ¶¶ 79-91.*[29]  Grice admits he never personally saw the alleged nooses. *Grice at 179, 196.* Accordingly, these incidents, which are isolated and relatively harmless, simply do not rise to the level of an actionable harassment claim under Title VII. *See, e.g., Hockman*, 407 F.3d at 236 (holding that "the alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents" and to survive summary judgment a plaintiff must establish that the harassment was so severe or pervasive that it destroyed his opportunity to succeed in the workplace).

Bryant claims he was subjected to a hostile work environment because he saw coworker James Bryan viewing a racist website,[30] he saw coworker Steven Henderson's rebel flag tattoo,[31] he viewed a training video in which the "n-word" was used as part of a historical segment,[32] and he was aware of someone else's discovery of nooses at FMCTI's facility. *Complaint at ¶¶ 30, 36; Bryant at 209, 211, 234, 283, 289.*  Bryant admits he never saw the nooses himself. *Id. at 209.*  To support his harassment claim, McIntyre alleges he heard fellow employee Stanley Norris make certain offensive comments, including calling another employee a "creole n----,"[33] that he watched a training video that contained the "n-word," and that someone else discovered a noose at FMCTI's facility. *Complaint at ¶¶ 94, 99, 100; McIntyre at 100.*  McIntyre never saw the noose himself. *Id.*

---

[29] Grice had a prior race discrimination lawsuit against FMCTI.  Judge Vanessa Gilmore rendered summary judgment for FMCTI on all claims made by Grice on May 24, 2006, and some of the evidence offered by Grice in support of his claims in this matter are the same evidence as Grice offered in his prior case.  The Fifth Circuit affirmed this decision on the merits on January 30, 2007.  216 Fed. Appx. 401 (5th Cir. 2007).

[30] Bryant complained to Deboskie about this incident, and Bryan was subsequently terminated. *Bryant at 283.*

[31] While Bryant's Complaint alleges Henderson also wore a swastika tattoo, Bryan clarified at his deposition that he did not see a swastika. *Bryant at 288.*  He further clarified that Henderson did not show him the tattoo, which was located on Henderson's back but that Bryant saw it when Henderson was working. *Id. at 289.*  Bryant complained to Deboskie about the tattoo, but admits there was nothing FMCTI could reasonably do to remedy the situation. *Bryant at 289.*

[32] Bryant admits he did not complain about the video at the time. *Bryant at 209, 211, 234; Complaint at ¶ 34.*

[33] McIntyre testified that despite hearing this comment from Norris, he never reported it or any other inappropriate comment by Norris to ProStaff's or FMCTI's Human Resources department or any supervisor. *McIntyre at 66-67.*  McIntyre also acknowledges that following an inappropriate comment by Norris in December of 2007, Norris was asked to retire from FMCTI. *Id. at 54.*

*at 106*.[34]  As such, these isolated incidents also do not establish the severe or pervasive working environment necessary to demonstrate a hostile work environment claim.  *See*, *e.g.*, *Casey*, 2006 U.S. Dist. LEXIS 94378, at \*22-25.  Bryant's and McIntyre's hostile work environment claims therefore fail.[35]

Other than the statements by Faucett and Bolton and the glove found in his drawer, which were not based on race, Mayo's only evidence of harassment by FMCTI are that someone else discovered nooses at the facility and he found the January 2008 training video offensive, though he never complained about it. *Mayo at 174; Complaint at ¶ 52*.[36]  Mayo did not personally see the nooses he cites. *Mayo at 174, 182*.  Because the noose incidents are insufficient on their own to establish a hostile work environment claim, as discussed above, Mayo's hostile work environment claim fails as a matter of law.[37]  Accordingly, FMCTI is entitled to summary judgment on these claims.

Brown claims he was harassed because Norris made isolated racial comments,[38] such as

---

[34] As McIntyre acknowledges, he learned about the noose only because of the company's response to the incident. *McIntyre at 106*. The presence of a noose in the workplace, even when viewed in connection with isolated derogatory comments, is simply the "equivalent of the 'mere utterance of an . . . epithet which engenders offensive feelings in an employee'" and does not support Title VII liability. *Fisher v. Certified Safety Specialists, LLC*, No. H-06-2232, 2007 U.S. Dist. LEXIS 73989, at \*21 (S.D. Tex. Oct. 2, 2007) (quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 595 (5th Cir. 1995)).

[35] Bryant also pleads a number of factual allegations from between 2001 and 2004. To the extent Bryant purports to raise these as independent grounds for his discrimination and/or harassment causes of action, these claims are time barred. Title VII claims are barred if not filed within 300 days of the event. *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162, 2171-72 (2002). Causes of action for hostile work environment and discrimination under § 1981 are subject to a 4-year statute of limitations. The plaintiffs filed this suit on December 26, 2008. Accordingly, any claims arising before December 26, 2004, are time-barred under both Title VII and § 1981.

[36] Mayo testified, however, that he never personally saw the nooses. *Mayo at 174, 182*. Evidence about the harassment of others is not relevant if the plaintiff did not personally experience such conduct. *Septimus*, 399 F.3d at 612.

[37] Mayo, like Bryant, also raises factual allegations that occurred before December 26, 2004. These claims cannot support an independent basis for a discrimination, harassment, or retaliation claim because they are time-barred. *See supra* note 35.

[38] Brown also alleges that he heard Norris call a particular recipe a "n----- recipe" and that he once said to Brown, "if you did that where I grew up, we would have drug you like they did to that guy in Jasper." *Complaint at ¶¶ 125, 126*. Brown admits, however, that he did not report these statements to anyone. *Brown at 152, 156-57*.

"who has you 'n-----'-rigging this?",[39] he saw graffiti in the restroom on one occasion,[40] and someone else discovered a noose at FMCTI's facility. *Complaint at ¶¶ 130, 132; Brown at 15*9. Brown admits he never saw any of the alleged nooses at the workplace. *Id.* Beatty alleges he was subjected to hostile treatment when Norris made certain, isolated comments, such as saying another employee was "not a n---- but a creole n----,"[41] and because someone else found alleged nooses at FMCTI's facility. *Complaint at ¶¶ 135, 139, 140.* Beatty admits that he never personally saw the alleged nooses, and he agrees that the company's response to them was appropriate. *Beatty at 193, 205, 208, 211, 217.*[42] Because mere knowledge of nooses in the workplace does not constitute actionable harassment, even when combined with racist comments directed to the plaintiff personally, FMCTI is entitled to summary judgment on Brown's and Beatty's claims.

To support his hostile work environment claim, Parejo claims that he noticed a racist symbol

---

[39] Brown reported the statement to lead man Louis Brown, who then told Shop Coordinator Eric Trammel. *See* Brown at *203, Ex. 213.* Trammel, in turn, questioned Norris, who admitted making the statement. *Id.* Trammel then held a meeting with both Brown and Norris, where Brown said he did not want to pursue the issue. *Id.* As a result of this incident, as well as other alleged conduct by Norris, FMCTI concluded that Norris's employment with FMCTI should be terminated. *Id.* Because Norris was eligible for retirement, FMCTI removed Norris from the facility immediately and facilitated his retirement application. *Id.*

[40] Specifically, Brown claims that on July 21, 2008, he saw racist graffiti in the restroom in the receiving area. *Complaint at ¶ 132.* But Brown acknowledges that in the time it took him to report the graffiti to another employee and return to the restroom, the door was locked and taped up. *Id.*; *Brown at 217.* Nine days later, on July 30, 2008, Brown delivered a letter to Human Resources complaining of the graffiti. *Brown at 218-19, Ex. 214.* Brown met afterwards with Human Resources Manager Patsy Livingston to discuss his letter, and Livingston told Brown that the matter was under investigation. *Id. at 220-21.* Brown admits that FMCTI responded appropriately to the graffiti by painting it to cover it up. *Id. at 229.* Brown complains that during his conversation with Livingston, she allegedly commented to him "I don't understand what's wrong with y'all." *Complaint at ¶ 133; Brown at 222.* Brown assumed Livingston was referring to African Americans with the word "y'all," but admits that this assumption was based only on his personal belief. *Id.*

[41] Beatty further alleges that Norris threatened James Brown by stating "if you did that where I grew up, we would have drug you like they did to that guy in Jasper." *Complaint at ¶ 136.* Although Beatty reported the "creole n----" comment to his lead man, Louis Brown, he did not report the comment to anyone else. *Beatty at 114-16,* and he never reported any other comments or allegedly hostile actions to anyone. *See Beatty at 121, 124, 173.* Furthermore, the position of "lead man" at FMCTI is not a supervisory position. *See Livingston, attached as Exhibit T, at 73.* While leads can report disciplinary issues or behavior to the supervisor, they cannot recommend disciplinary action. *Id.* Similarly, lead men monitor attendance issues and other violations and can report any problems to the supervisor. *Id. at 73-74.* Leads instruct assemblers on tasks to be completed and, in some cases, conduct training. *Id. at 74.* Lead men can recommend someone for employment but cannot make hiring decisions. *Mayo at 76.* Similarly, a lead man cannot make an independent decision to terminate an employee, although they can recommend it. *Id.*

[42] Furthermore, Beatty acknowledges that Stanley Norris was ultimately dismissed from his employment at FMCTI. *Beatty at 145.*

drawn on a piece of machinery,[43] he saw a coworker looking at a racist website,[44] an individual turned the Trinidad & Tobago flag on his locker upside down,[45] his supervisor, Tony Leal, scrutinizes his work and questions him when he takes a break,[46] and that the November 2007 noose was a racist act that offended him.[47] *Complaint at ¶¶ 149, 150, 153, 157, 158.*  Parejo admits he did not personally see the noose. *Parejo at 178.*  Accordingly, these isolated incidents, even when viewed collectively, are not sufficient to establish actionable harassment, and Parejo's claims fail as a matter of law.  *See*, *e.g.*, *Shepherd*, 168 F.3d at 874.

In support of his harassment claim, Lucas alleges a fellow employee made racial comments and jokes to him, such as commenting that African Americans eat "chicken and watermelons,"[48]

---

[43] Specifically, Parejo claims that in October of 2007, he noticed a "KKK" symbol drawn on a piece of machinery. *Complaint at ¶ 149*.  Parejo testified that the drawing was not of the words "KKK," but of  three triangles with a circle around it. *Parejo at 151*.  Parejo reported the symbol to Jon Troxell. *Id. at 152*.  When he went to find the equipment to show it to Troxell, Parejo could not locate it.  *Id. at 152-53*.  Parejo claims he later saw the piece of equipment with the symbol again, but that he did not report it.  *Id. at 153*.  Indeed, Parejo admits that his initial report of the symbol was the only time he reported an allegedly racist symbol at FMC. *Parejo at 125*.

[44] This coworker was employee James Bryan. *Complaint at ¶ 150*.  Parejo reported this conduct to Webb, and Bryan was subsequently terminated.  *Parejo at 116-17*.

[45] Specifically, Parejo alleges that he was harassed because of his national origin when an unknown individual took the Trinidad & Tobago flag on Parejo's work locker, turned it upside down, and wrote "Cuba is #1." *Complaint at ¶ 153; Parejo at 41*.  Parejo reported the incident to John Troxell, who investigated the situation. *Id*.  After this incident, FMCTI did not allow any employees to hang items outside their lockers.  *Parejo at 142*.

[46] Although Parejo complained of Leal's conduct to Turner and Livingston, he did not tell them he felt he was being harassed because of his national origin. *Parejo at 243*.  According to Parejo, the Caucasians that worked for Leal also complained about his hostile demeanor. *Id. at 271-73*.  Parejo was ultimately granted a transfer out of Leal's supervision. *Id. at 243-44*.

[47] Every plaintiff must demonstrate that he personally perceived the allegedly offensive behavior to be hostile and abusive.  *See*, *e.g.*, *Jeffrey v. Dallas County Med. Examiner*, 37 F.Supp. 2d 525, 531 (N.D. Tex. 1999).  Parejo acknowledges that nooses do not have the historical significance in Trinidad, where he is from, that they do in the United States. *Parejo at 271*.  Thus, even if he found the noose to be offensive, it likely did not arouse the same emotions in Parejo that the noose does for African Americans from the United States. *See*, *e.g.*, *Porter v. Erie Foods Intl.*, No. 08-1996, 2009 U.S. App. LEXIS 17843 (7th Cir. Jan. 7, 2009) (noting that those who view the noose as a mere symbol may not appreciate the significance of the noose) (attached as Exhibit U).

[48] Summary judgment is also proper because with regard to the racial comments Lucas alleges because he cannot show that FMCTI knew or should have known of these comments, and because he failed to take advantage of the corrective opportunities FMCTI offered.  *Hockman*, 407 F.3d at 329.  FMCTI's employee policies prohibit discrimination, harassment, or retaliation in any form and specifically outline the complaint procedure an employee must follow to report any prohibited conduct. *Ex. F at Ex. 15*.  Despite these avenues, Lucas never reported this allegedly offensive behavior. *Lucas at 168*.  Because Lucas unreasonably failed to take advantage of the remedial measures available to him, summary judgment on these claims is proper as a matter of law.  *Hockman*, 407 F.3d at 330; *Burrell*, 255 F. Supp. 2d at 614.

that manager Tim Hanus made a racial joke when he said "why are you guys over here playing with footballs like the monkeys do?",[49] that a fellow employee had a confederate flag on his dashboard,[50] that a contractor showed other employees racial jokes on a computer,[51] and that he was yelled at for the misconduct of his non-African American coworkers. *Complaint at ¶ 173-75, 178, 184.*  Lucas further complains that alleged nooses were discovered at FMCTI's facility, though he never saw any of the nooses personally, and that a training video contained the "n-word." *Complaint at ¶ 182; Lucas at 188.*   But isolated racial jokes and comments do not constitute severe or pervasive harassment under Title VII, even when viewed in conjunction with a noose that the plaintiff did not personally see.   *Casey*, 2006 U.S. Dist. LEXIS 94378, at *22-25; *Nat'l Passenger R.R. Corp. (AMTRAK) v. Morgan*, 536 U.S. 101, 115 (2002) (the mere utterance of offensive epithets does not sufficiently affect the terms of conditions of an individual's employment); *see also McCray v. DPC Indus., Inc.*, 942 F. Supp. 288, 292-93 (E.D. Tex. 1996) (finding no hostile environment even though supervisor made racial jokes and used racial slurs).   Accordingly, Parejo's and Lucas's harassment allegations cannot survive summary judgment.

Sykes claims he was harassed because certain unnamed employees displayed offensive tattoos[52] and because he saw, but did not discover, a noose.[53]  *Complaint at ¶ 194; Sykes at 85, 130-32.*[54]  Although there is no "'magic' threshold number of incidents" sufficient to establish a hostile work environment claim, courts generally require that a plaintiff show that "more than a few

---

[49] Lucas admits he did not complain to anyone about Hanus's alleged comment. *Lucas at 168.*

[50] Lucas complained to Faucett about the flag, and after he complained, the flag was taken down. *Lucas at 135-36.*

[51] Because contractors bring their own computers, this would not have occurred on an FMCTI-issued computer. *Faucett at 197.*

[52] Sykes cannot identify these individuals by name, and he admits he never complained to anyone about the tattoos.  *Id. at 130-32, 138.*

[53] Although Sykes references a November 2007 noose in his complaint, he referenced it at his deposition as the noose that Pierre and Newton discovered.  *Sykes at 84.*  This noose incident occurred in late October 2007.

[54] Sykes acknowledges that while he saw the noose, he did not discover it, and only viewed it after he noticed lot of activity in the area.  *Sykes at 85.*  By the time Sykes saw the rope, FMCTI had already begun an investigation into the incident.  *Id. at 84, 88-89.*

incidents of harassment have occurred." *Drummond*, at *13 (quoting *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1274 (7th Cir. 1991); *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988)).   Accordingly, Sykes's vague, isolated allegations of harassment cannot defeat FMCTI's motion for summary judgment on this claim.

Galimore claims that in addition to the noose incidents,[55] he was subjected to a hostile work environment because he saw a coworker viewing a racist website,[56] another coworker wore a tattoo Galimore perceived as racist,[57] and that during a 2007 farewell party for Faucett, he had to look at pictures of Faucett while he was eating.[58] *Complaint at ¶¶ 110, 113, 123; Galimore at 215-16.* Similarly, Newton alleges he was subjected to racial harassment because fellow employee Brian Holden called another employee "boy,"[59] he saw racist graffiti in the bathroom,[60] and alleged nooses were found at FMCTI's facility in October and November of 2007. *Complaint at ¶ 168; Newton at 150.*   Newton actually saw the October 2007 noose, but admits it was discovered in a place outside his assigned work area. *Id. at 115-16, 118.* It is reasonable, therefore, to assume the

---

[55] Galimore admits, however, that he only learned of the November 2007 noose immediately before FMCTI held a stand down to address the incident, and that he only saw the May 2008 noose after it had been removed and placed in a plastic bag. *Galimore at 178-79, 182.* The placement of a noose in the workplace is, standing alone, insufficient to establish a hostile working environment. *Drummond v. Stone*, No. 91-2719, 1993 U.S. Dist. LEXIS 593, at *13 (E. D. La. Jan. 13, 1993), *aff'd on other grounds*, 7 F.3d 229 (5th Cir. 1993).

[56] Galimore complained to Mayo and Deboskie about this conduct by James Bryan, and Bryan was subsequently terminated. *Complaint at ¶ 110; Galimore at 153-56.*

[57] Specifically, Galimore claimed that employee Leon Acosta displayed a prominent "Aryan Nation" spider web tattoo that was visible to all employees. *Complaint at ¶ 123.* After learning of this allegation, FMCTI immediately investigated and determined that the tattoo is not a racial symbol. *See* Ex. *H at Ex. 4.* Galimore admits Acosta also told him it was not a symbol of the Aryan Nation, but was just a tattoo he liked. *Galimore at 237.*

[58] Galimore initially claimed that the pictures of Faucett displayed him wearing a Confederate-style hat. Complaint at ¶ 113; Galimore at 215-16. He later explained that the hat resembled those worn in Civil War movies, but averred that it may just be that Faucett looks like a Confederate sergeant to him because he has a full white beard. *Id.* Galimore then testified that because he did not like James Faucett, he didn't want to look at any picture of him while eating. *Id.*

[59] Newton told Holden not to use that term around him, but he did not report the comment to management or HR. *Newton at 150.* Because Newton did not report this alleged comment, he unreasonably failed to take advantage of the remedial measures available to him, and summary judgment on these claims is proper as a matter of law. *Hockman*, 407 F.3d at 330; *Burrell*, 255 F. Supp. 2d at 614.

[60] After this graffiti appeared, Troxell held a stand down in the area, which Newton agrees was an appropriate response. *Newton at 148.*

noose was not directed at Newton personally.  As such, this act, even when combined with the other instances of harassment Newton alleges, does not rise to the level of a hostile work environment as a matter of law.  *Drummond*, 1993 U.S. Dist. LEXIS 593, at *13; *Casey*, 2006 U.S. Dist. LEXIS 94378, at *22-25.  Galimore's claims also fail for the same reasons.  *Id.*

Finally, to support his hostile work environment claim, Pierre alleges that his coworkers made isolated comments to him that were allegedly based on race, such as "Hey, Bro, how's it going?" *Pierre at 21*.  He also claims he saw a coworker's spider web tattoo, which he perceived as racist,[61] confederate flags on certain vehicles in FMCTI's parking lot,[62] and graffiti on the walls of the restroom.[63] *Id. at 92-94*.  Pierre also points to the alleged noose he discovered near his work area. *Complaint at ¶ 65*.  These events, even taken together, do not constitute actionable harassment because there is no evidence they destroyed Pierre's ability to succeed in the workplace.  *Hockman*, 407 F.3d at 326 (holding "to survive judgment, the harassment must be 'so severe [or] pervasive that it destroys a protected classmember's opportunity to succeed in the work place") (quoting *Shepherd*, 168 F.3d at 874); *Beaumont*, 468 F. Supp. 2d at 919-20 (same)); s*ee also Burrell v. Crown Petroleum, Inc.*, 255 F. Supp. 2d 591, 615-16 (E.D. Tex. 2003) (holding no hostile work environment because although plaintiff may have taken offense to conduct, it did not interfere with her work performance or undermine her competence).  To the contrary, the evidence shows that Pierre remained an employee in good standing at FMCTI until his abdomen injury required him to take a medical leave of absence.  *Ex. A at Exs. 16, 17*.  For these reasons, FMCTI is entitled to summary judgment as a matter of law.

---

[61] Pierre claims that the tattoo, a spider web worn by co-worker Leon Acosta (H), was a racial symbol relating to white superiority. *Pierre at 92-93*.

[62] Pierre did not complain about these comments or symbols to anyone at FMCTI.  *Pierre at 21, 93*.

[63] Pierre never reported this alleged graffiti to anyone.  *Pierre at 95*.  Because he unreasonably failed to take advantage of the remedial measures available to him, FMCTI is entitled to summary judgment on this claim.  *Hockman*, 407 F.3d at 330; *Burrell*, 255 F. Supp. 2d at 614.

### 4.   FMCTI Took Prompt, Remedial Measures.

The plaintiffs never complained about many of the alleged acts they now claim are discriminatory.   But the undisputed evidence shows that when FMCTI knew about the alleged discriminatory or offensive acts, or when the plaintiffs did complain, FMCTI took prompt remedial measures in response.   For this reason, FMCTI is entitled to summary judgment on the plaintiffs' hostile work environment claims.   For instance, after Bryant, Galimore, and Parejo each complained that he saw James Bryan viewing racist websites on the job, FMCTI terminated Bryan for this behavior.   *Bryant at 283; Galimore at 153-56; Parejo at 116-17.*   Similarly, after Brown reported a racist statement by fellow employee Stanley Norris, FMCTI terminated Norris's employment.[64]   *Brown at 203; Ex. D at Ex. 213; Beatty at 145.*[65]

FMCTI also took prompt, remedial measures in response on each occasion that they learned of alleged racial graffiti.   For example, after Newton discovered allegedly racist graffiti in the restroom in February 2008, Troxell held a stand down, which Newton agrees was an appropriate response.   *Newton at 148.*   While Brown discovered racist graffiti in the restroom in July 2008, he admits that in the time it took him to tell another employee about the graffiti and return to the restroom, FMCTI had locked and taped up the restroom door.   *Brown at 217.*   And Parejo acknowledges that Troxell immediately investigated his allegation of graffiti drawn on FMCTI machinery after he reported it.   *Parejo at 152-53.*[66]   In addition, FMCTI took prompt, remedial measures in response to Parejo's complaint that someone had defaced his locker by investigating the situation and instituting a rule that employees not hang items outside their lockers.   *Id. at 41,*

---

[64]   Because Norris was eligible for retirement, he took retirement upon termination, but the company involuntarily terminated his employment.   *See supra* note 33.

[65]   Despite claims that they were also offended by Norris's comments, neither McIntyre nor Beatty ever reported Norris's behavior to FMCTI management or human resources.   *McIntyre at 66-67; Beatty at 114-16.*

[66]   Parejo could not locate the graffiti, however.   *Parejo at 152-53.*   When Parejo later noticed the symbol again, he did not report it.   *Id. at 153.*

*142*.  The plaintiffs admit, however, that they often did not tell anyone in management about the graffiti, and FMCTI therefore could not respond.

Perhaps most importantly, FMCTI took significant remedial measures in response to the reports of nooses in the workplace.  Following the September 2007 noose, FMCTI launched an immediate investigation and ultimately banned three contractors from the facility. *Ex. I at Ex. 6*.  In October, after learning of a noose in the High Bay, FMCTI immediately assembled a team to investigate and removed the contractor who admitted to tying the noose. *Id. at Ex. 7*.  The following day, Barrett emailed all employees to inform them of the incident, and supervisors conducted meetings with employees regarding FMCTI's zero tolerance harassment policy. *Ex. F at Exs. 8, 26*.  The company also issued additional statements and memos regarding the incident and its response. *See id. at Exs. 16, 18, 19*.

In May of 2008, after an alleged noose was found, FMCTI investigated the incident, interviewing over 150 people. Ex. *I at Ex. 14*.  FMCTI held stand-down meetings with assembly personnel, and Barrett sent all-employee messages in response to the incident. *Id*.; *Ex. F at Exs. 22, 23*.  FMCTI arranged for counselors from its Employee Assistance Program to come onsite at the facility and hired a former FBI agent to investigate. *Ex. I at Ex. 56*.  FMCTI also self-reported the incident to the EEOC and FBI.  *Id.*[67]  Because FMCTI took prompt remedial measures in response to the noose incidents,[68] as well as other reported instances of alleged harassment, summary judgment is proper as a matter of law.  *See Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 616 (5th Cir. 1999); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 265 (5th Cir. 1999) ("by promptly invoking a company's grievance procedure, a plaintiff has received the benefit Title VII was meant to confer.  In such cases, an actionable hostile claim will rarely if ever have

---

[67] Despite these efforts, FMCTI was unable to determine who had tied and hung the noose.  *Ex. I at Ex. 56*.

[68] Several of the plaintiffs admit the company's response to the noose incidents was appropriate.  *See, e.g.*, *Mayo at 174, 182*.

matured.").

### B.       The Plaintiffs' Discrimination Claims Fail as a Matter of Law

Because the plaintiffs cannot make out *prima facie* cases of discrimination, summary judgment is proper on the plaintiffs' race and national origin discrimination claims under Title VII, § 1981, and the TCHRA.[69]   To establish a *prima facie* case,[70] each plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he was subject to an adverse employment action; and (4) he was replaced by someone outside of his protected class, or similarly situated employees outside his protected class were treated more favorably.  *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

### 1.       Some of the Plaintiffs' Claims Are Not Actionable Adverse Employment Actions.

The plaintiffs allege numerous claims of purported discrimination that, even if true, simply do not rise to the level of actionable adverse employment decisions under the law.  Indeed, it is unclear by the plaintiffs' pleadings and testimony whether they believe many of these acts to be discriminatory at all.  In support of their purported discrimination claims, the plaintiff cite numerous actions they believe to be unfair, though not necessarily discriminatory.  But even assuming the plaintiffs do claim these acts to be discriminatory in nature, they fail as a matter of law.[71]   For intentional discrimination claims, an actionable adverse employment action must be an "ultimate employment   decision"   such   as   "hiring,   granting   leave,   discharging,   promoting,   and

---

[69] To the extent Parejo alleges national origin discrimination claims under § 1981, FMCTI is entitled to summary judgment as § 1981 is reserved solely for race discrimination claims.  *Ingram v. Papa John's Int'l, Inc.*, 171 Fed. Appx. 439, 441 (5th Cir. 2006).

[70] Throughout this Motion, for the plaintiffs' § 1981 claims, the Court should apply the same summary judgment analysis as a race discrimination claim under Title VII.  *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004).  Likewise, the Court should apply the same Title VII analysis to the plaintiffs' TCHRA claims.  *Shackelford v. Deloitte & Touche, L.L.P.*, 190 F.3d 398, 404 n.2 (5th Cir. 1999).

[71] For many of these claims, it is unclear whether the plaintiffs claim they are discriminatory, retaliatory, or both. Because the legal standards for discrimination and retaliation claims are similar, *see infra*, the plaintiffs' claims fail regardless of how they are artfully plead.

compensating."[72]  *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007).  Many of the plaintiffs' claims simply fail to meet this standard.

### a.     Write-Ups

Bryant, Mayo, Galimore, and Lucas, for example, each complain of disciplinary write-ups they received for various reasons.  In particular, Bryant claims that in 2006, he was given a negative Performance Development Discussion (PDD) after a safety incident on the job site, even though Bryant was not present at the time and was found to be faultless.  *Complaint at ¶ 28*.  Bryant's March 19, 2007, PDD references a February 2006 safety incident in which Bryant was involved, where a piece of equipment was not landed properly, causing damage to the product.  *Bryant at Ex. 102, 104*.  Bryant does not dispute that he was present for this incident.  *Id. at 188-89*.  Instead, Bryant believes his PDD was discriminatory because he "believe(s) all negative things on [his] PDD [were] discriminatory because of [his] race." *Id. at 193*.  Bryant further alleges that as a result of a second safety incident in 2006, he was placed on probation for one year and denied a raise. *Complaint at ¶ 28*.  FMCTI has no record of Bryant being disciplined for this event.  *Ex. A at ¶ 8*, and Bryant admits he never complained to anyone about this incident.  *Bryant at 281*.  Furthermore, FMCTI records show that Bryant did receive a raise in 2006.  *Ex. A at Ex. 4*.

Mayo alleges that Faucett, his supervisor, gave him an unwarranted write-up in 2006 for failing to complete an assignment.  *Complaint at ¶ 47*.  FMCTI has no record, however, of any such write-up in Mayo's file, and Mayo admits he has never seen the alleged write-up. *Mayo at 238*.[73]

---

[72] The Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White* did not affect the standard regarding adverse employment actions for Title VII discrimination cases; rather, it only altered the test for adverse employment actions in the context of Title VII retaliation.  548 U.S. 53 (2006); *see also Dilworth v. Cont'l Constr. Co.*, No. 07-60850, 2008 U.S. App. LEXIS 13042, at *4-5 (5th Cir. June 19, 2008); *McCoy v. City of Shreveport*, No. 06-30453, 2007 U.S. App. LEXIS 16582, at *14-15 (5th Cir. July 11, 2007); *Preston v. Tex. Dep't of Family & Protective Servs.*, No. 06-20752, 2007 U.S. App. LEXIS 2870, at *12 n.18 (5th Cir. Feb. 7, 2007); *Pryor v. Wolfe*, 196 Fed. Appx. 260, 262-63 (5th Cir. 2006); *EEOC v. Hewlett Packard Co.*, No. H-05-1197, 2007 U.S. Dist. LEXIS 22957, at *9-10 (S.D. Tex. Mar. 29, 2007).

[73] Mayo claims that he complained about this write-up to Heuring and that Heuring resolved the problem by transferring Faucett.  *Mayo at 236-37*.

Similarly, Lucas claims that he was he was criticized for the misconduct of his non-African American coworkers during a near-miss forklift incident. *Complaint at ¶ 178; Lucas at 241-43*. Lucas acknowledges, however, that he was never formally disciplined for the incident. *Id. at 243-44*. And Galimore claims John Troxell unfairly wrote him up on June 6, 2008, for "bringing negativity to the workplace." *Complaint at ¶ 120*.[74] Disciplinary write-ups such as these, however, are not actionable adverse employment actions as a matter of law. *See, e.g., Hart v. Life Care Ctr. of Plano*, 243 Fed. Appx. 816, 818 (5th Cir. 2007) (holding disciplinary warnings not "ultimate employment decisions") (attached as Exhibit V).[75] Accordingly, these discrimination claims fail.

### b.   Performance Reviews

Bryant, Mayo, and Galimore also each complain that they received negative performance reviews[76] because of their race. *See Complaint at ¶¶ 28, 46 104*.[77] But "negative performance evaluations, even if undeserved, are not adverse employment actions giving rise to actionable discrimination claims." *Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 536 (S. D. Tex. 1999) (citing *Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir. 1997), among others). Accordingly, FMCTI is entitled to summary judgment on these claims.

---

[74] Galimore complained to Livingston, who told him it was just a memo, not a write up and that he need not worry about it. *Complaint at ¶ 121; Galimore at 232*.

[75] Mayo also claims that he was accused of being a "no-call/no-show" even thought his leave was approved (Complaint at ¶ 49), but admits that the problem was later corrected. *Mayo at 238-39*. Mayo was on medical leave at the time, and eventually his doctor submitted the paperwork to FMC, which resolved the issue. *Id. at 239*.

[76] Mayo makes this assertion despite receiving a "Good/Meets Requirements" rating from Faucett in 2004 through 2007. *Ex. K at Exs. 232-235*. Mayo testified that he believes Faucett's performance reviews were discriminatory because Caucasian employees received better performance appraisals. *Mayo at 145-46*. He admits, however, that he bases this belief only on other employees' verbal reports of their evaluations. *Id.*

Galimore claims that the basis for the negative evaluation was that he could not work independently in different areas, and alleges that this was because he was denied the opportunity to train in those areas because of his race. *Id.* While Galimore points to some non-African American employees he believes were given opportunities to train, he admits he did not have personal knowledge of those employees' education or work history. *Galimore at 54-57, 119-120*. Furthermore, as Galimore did not become a full-time FMCTI employee until August 25, 2008. *See Ex. A at Ex. 6*, this review would have been issued by Pro Staff before his employment at FMCTI began.

[77] As Bryant testified, the only reason he believes this evaluation was discriminatory is because he "believe(s) all negative things on [his] PDD [were] discriminatory because of [his] race." *Bryant at 193*.

### c.      Training

Pierre, Grice, Lucas, and Sykes each complain that they were discriminated against when they were denied particular training opportunities.  Specifically, Pierre claims he was discriminated against by being denied FAT training, which he avers is a requirement for being hired full-time by FMCTI.  *Pierre at 57-59, 249*.  But Pierre admits he was hired to be a full-time FMCTI employee despite not having FAT training.  *Id. at 59*.  Grice alleges he was denied training that was required for promotion to a lead man position.  *Complaint at ¶ 81*.  Grice admits, however, that several African American employees have been lead men, including himself, Darren Mayo, and Will Cartha.  *Grice at 38, 146*.  He further admits that his supervisor never told him he was denied training because of his race.  *Id. at 51*.

Lucas claims generally that throughout his employment with FMCTI, he was denied training opportunities that were given to non-African American employees.  *Complaint at ¶ 179*.  Lucas recognizes, however, that after he complained to Faucett about this disparity, FMCTI revised its training system.  *Lucas at 140.*[78]  Sykes also complains that he was denied training opportunities and assistance.  In support of this claim, he states that when he would ask Caucasian employee Billy Hensarling a question about how to do something, Hensarling wouldn't answer.  *Sykes at 79, 146-49*.  Sykes admits he never complained  to any manager or HR representative about Hensarling.  *Id. at 152-53*.

Unless denial of the training at issue would result in the elimination of the plaintiff's job position, however, an employer's failure to provide training or refusal to allow an employee to attend training is not an adverse employment action.  *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999); *see also Dollis v. Rubin*, 77 F.3d 777, 779-82 (5th Cir. 1995) (refusal to allow employee to attend training sessions not an adverse employment action); *Roberson*

---

[78] Lucas also does not allege that the denial of training opportunities prevented him from getting a raise.  *Lucas at 140*.

*v. Game Stop/Babbage's*, 152 Fed. Appx. 356, 361 (5th Cir. 2005) (same); *Martin v. Lennox Int'l, Inc.*, 342 Fed. Appx. 15, 18 (5th Cir. 2009) (denial of training that does not result in a change of the plaintiff's employment status, benefits, or responsibilities does not constitute an adverse employment action). The plaintiffs do not claim that they were denied training opportunities that were sufficiently critical under this standard. While Pierre alleges that the training at issue is a requirement for full-time employment at FMCTI, he admits that FMCTI hired him to be a full-time employee despite not having this training. *Pierre at 47-49, 249*. Similarly, although Grice alleges he was denied training that FMCTI required for the promotion to a lead man position, he admits he has served in a lead man role. *Complaint at ¶ 81; Grice at 38, 146*.[79] Lucas vaguely alleges he was denied training opportunities that were given to non-African American employees, but he acknowledges that FMCTI revised its training system while he was still in a position to train. *Complaint at ¶ 179; Lucas at 140*. Sykes complains only about informal training opportunities. *Sykes at 79, 146-49*.[80] These actions simply do not rise to the level of an "ultimate employment decision" under Title VII.

### d.  Miscellaneous Actions

The other actions of which the plaintiffs complain can in no way be considered "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensating." *Dixon v. Moore Wallace, Inc.*, No. 3:04-cv-1532-D, 2006 U.S. Dist. LEXIS 47560, at *26-27 (N. D. Tex. July 13, 2006). For example, both Newton and Galimore claim they were assigned menial work tasks, such as sweeping and mopping, because of their race.[81] *Complaint at ¶ 103, 167;*

---

[79] Grice also admits his supervisor never told him he was being denied training because of his race. *Grice at 51*.

[80] Specifically, Sykes claims that when he would ask Caucasian employee Billy Hensarling a question about how to do something, Hensarling wouldn't answer. *Sykes at 79, 146-49*.

[81] Newton testified that all employees, including Caucasians, had to sweep or do maintenance tasks from time to time. *Newton at 208-09*.

*Galimore at 46-47.*[82]   Being asked to do more physical labor, however, is not actionable under Title VII. *Stanley v. Univ. of Tex. Med. Branch, Galveston*, 425 F. Supp. 2d 816, 824 (S.D. Tex. 2003) ; *see also Martin v. Kroger Co.*, 65 F. Supp. 2d at 539 (being assigned a heavier work load not an actionable adverse employment action); *Hart v. Life Care Ctr. of Plano*, No. 06-11347, 2007 U.S. App. LEXIS 15206 (5th Cir. June 26, 2007) (holding being assigned more difficult tasks is not actionable).   Newton also claims his supervisor scrutinized his breaks while non-African Americans were free to take lengthy smoke breaks,[83] while Galimore complains he had one of his breaks shortened.[84] *Complaint at ¶ 107, 167; Newton at 207-08; Galimore at 86.*   This treatment also does not rise to the level of an adverse employment action under Title VII.   *See Stanley*, 425 F. Supp. 2d at 824 (holding that receiving unequal breaks are not actionable); *see also Wilkinson v. Potter*, No. 06-30921, 2007 U.S. App. LEXIS 11941, at **5-6 (5th Cir. May 21, 2007) (holding supervisor staring at employee and making unnecessary visits to work area not actionable); *Grice v. FMC Techs.,* No. 06-20509, 216 Fed. Appx. 401, 407 (5th Cir. Jan. 30, 2007) (holding supervisor closely watching employee not actionable).

In support of their discrimination claims, Parejo alleges he was denied a login for company computers because of his race[85] and/or national origin, and Galimore complains that he received his

---

[82] According to Galimore, on his first day of work at FMCTI, James Faucett told him that if he didn't understand what they were doing on the floor, to pick up a mop and broom. *Galimore at 46-47.*   Although Galimore interpreted this instruction to be a racial act, he admits that all assembly techs were expected to mop and sweep. *Id. at 51-52.* Galimore testified that he no longer feels he is being assigned menial tasks. *Galimore at 221.*

[83] Newton testified that whenever he would take a little break, Aaron would give him "funny looks." *Newton at 207-08.*

[84] Specifically, Galimore alleges he was discriminated against on one occasion in June or July of 2007, when his supervisor, Brett Mohn, ordered him to return to work two minutes into a 15-minute break, while non-African American employees were allowed to continue relaxing. *Complaint at ¶ 107.*   Galimore admits, however, that Mohn later apologized to him for this incident. *Galimore at 86.*

[85] Parejo testified that he considers himself black because of his dark skin color. *Parejo at 83, 85.* Parejo categorizes himself as "black" because he does not fit the race categories of white, Hispanic, or Asian. *Id.*   On occasion, however, he identifies himself as "Asian or Pacific Islander." *Id. at 86.*   If he had the choice, Parejo would characterize his race as "West Indian or Caribbean." *Id. at 85.*

FMCTI jacket later than the other employees in his department. *Complaint at ¶ 122, 147-48.*[86]
These events certainly do not qualify as "ultimate employment decisions" akin to "hiring, granting
leave, discharging, promoting, and compensating." Accordingly, FMCTI is entitled to summary
judgment on these claims.

Finally, plaintiffs Brown and McIntyre both claim that FMCTI discriminated against them
when it required them each to take a second drug test before hiring them as permanent employees.
*McIntyre at 90; Complaint at ¶ 128; Brown at 91.*[87] Both plaintiffs were required to take a second
pre-employment drug test because their first specimens were reported to be diluted. *Ex. D at Ex.
211; McIntyre at 90.* As a result, Brown's FMCTI employment was delayed approximately one
week, and McIntyre's was delayed three weeks;[88] however, the company ultimately hired both
plaintiffs. *Id. at 93-94; Brown at 91.*[89] There were no other assembly technicians hired between
November 2006 and January 2007. Brown and McIntyre cannot succeed on these discrimination
claims because drug tests are not adverse employment actions as a matter of law. *See Dotson v.
Gulf,* No. H-05-0106, 2006 U.S. Dist. LEXIS 1893, at *31-32 (S.D. Tex. Jan. 9, 2006) (citing
*Felton v. Polles,* 315 F.3d 470, 486-87 (5th Cir. 2002) (attached as Exhibit W); *Pegram v.*

---

[86] Specifically, Galimore avers that in December of 2008, every employee in the Low Bay and High Bay areas was given an FMCTI jacket, with the exception of him. *Complaint at ¶ 122.* Galimore did not receive a jacket at the same time as the other employees, however, because his size was on back-order. *See Ex. H at Ex. 2.* Instead, Galimore received his jacket on December 29, 2008. *Id.*

[87] On February 6, 2007, Brown was offered a position with the company, subject to his passing a routine drug test and background check. *Ex. D at Ex. 209.* Brown accepted FMCTI's offer of employment on February 7, 2007, and on February 8, he took the requisite drug test. *Id. at Exs. 210, 211.* The drug test was returned with a negative result but with the notation "specimen dilute; suggest recollection;" accordingly, FMCTI asked Brown to take another test. *Id.* On February 23, 2007, Brown took a second drug test, the results of which were the same as the first test. *Id.* FMCTI accepted these results as a negative test, and Brown began work as an Assembler on February 28, 2007. *Id. at Ex. 212.*

[88] McIntyre even testified that this time period did not seem unusual to him. *McIntyre at 93-94.*

[89] Brown further alleges that after this second drug test, his hiring was delayed when ProStaff terminated him because of the results of a federal background check. *Brown at 92-100.* After Pro Staff determined that the background check had pulled results for a different James Brown, ProStaff and FMC apologized, and Brown was hired by FMC. *Id. at 95-97.* Brown subsequently testified that he has no basis other than his own personal belief that FMC's error in running the background check was intentional. *Brown at 132-33.* Brown does not specifically assert in his Complaint that FMC discriminated against him because of ProStaff's decision to terminate his employment and, accordingly, FMC does not address the merits of this allegation in this Motion.

*Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004).[90]  In addition, the company did not deny Brown or McIntyre full-time employment at FMCTI because of the results of the drug test.

Simply put, "[n]ot everything that makes an employee unhappy is an actionable adverse employment action."  *Martin*, 65 F. Supp. 2d at 535.  None of these acts were significant enough to interfere with the terms or conditions of the plaintiffs' employment.  Accordingly, the plaintiffs cannot make out *prima facie* cases of discrimination on these claims, and FMCTI is entitled to summary judgment as a matter of law.

### 2.     The Plaintiffs Fail to Identify Similar Situated Employees.

The plaintiffs assert certain other claims that fail as a matter of law because the plaintiffs cannot satisfy another prong of their *prima facie* case – that similarly situated employees outside their protected class were treated more favorably.   *Okoye*, 245 F.3d at 513.  Specifically, the plaintiffs have no evidence that there are non-African American employees who received preferential treatment in "nearly identical" circumstances.  *Preston v. Tex. Dep't of Family & Protective Servs.*, No. 06-20752, 2007 U.S. App. LEXIS 2870, at *12 (5th Cir. Feb. 7, 2007) (attached as Exhibit X); *Okoye* 245 F.3d at 512-14; *McCoy-Eddington v. Brazos Cty.*, No. H-05-0395, 2007 U.S. Dist. LEXIS 30052, at *16 (S.D. Tex. Apr. 24, 2007) (attached as Exhibit Y); *Wooten*, 2007 U.S. Dist. LEXIS 2195, at *36-40; *Chambers v. Joseph T. Ryerson & Son, Inc.*, No. 3:05-cv-1553-D, 2007 U.S. Dist. LEXIS 48338, at *18, *28-32 (N.D. Tex. July 2, 2007) (attached as Exhibit Z) (holding that to be nearly identical, comparator must have same supervisor, same job responsibilities and capabilities, and have engaged in same conduct).

---

[90] Furthermore, to the extent Brown or McIntyre bases his discrimination claim on the requirement that he report for an additional drug test after his first, inconclusive result, his claim fails because he testified he cannot point to any non-African American employee who failed a drug test under nearly identical circumstances but was not required to take an additional test.

### a.      Hiring or Position Decisions

Specifically, Bryant claims he was denied a "service tech" position in November of 2006,[91] but he fails to identify any individual outside his protected class who did receive a service position at this time.[92]   Similarly, Sykes contends that non-African Americans were offered full-time employment positions more quickly than he was. *Sykes at 191.*   Although Sykes points to a few non-African American employees whom he believes were hired more quickly, Sykes admits he does not know whether they applied for employment before or after he did. *Id. at 123.*[93]   He further claims he was denied a training coordinator position in favor of Justin Barr, a non-African American employee.[94]   But Sykes acknowledges that Barr had some college education and that he was not familiar with Barr's work history. *Id. at 110-11.*[95]   Company records further show that Sykes had been an FMCTI employee for only six months when the position became available, as compared to Barr who had been an employee with the company for over two years and had previous experience as a training instructor. *Ex. A at ¶ 7.*   Because Sykes and Barr did not have the same qualifications for the position, they are not similarly situated employees. *Chambers,* 2007 U.S. Dist.

---

[91] Bryant asserts in his Complaint that he was interviewed for the position by James Philips, a non-African American employee whom Bryant had trained.   *Complaint at ¶ 29.*   Bryant clarified at his deposition, however, that the individual's name is Jason Philips, and he did not train Philips because Philips worked in the low bay and Bryant worked in the high bay.   *Bryant at 282.*

[92] Although Bryant did not receive the position after his first application, he ultimately did receive a service tech position.   *Bryant at 196.*   Bryant currently holds this position and does not allege any discrimination or race-related problem related to his work in this position.   *Id. at 207.*

[93] Sykes was hired as a full-time FMC employee less than a year after beginning work at FMC's facility.   *See Complaint at ¶¶ 188, 192.*

[94] FMCTI records show that Justin Barr received a training specialist position in September 2007, but there is no record of Sykes applying for this position.   *Ex. A at ¶ 7.*   Sykes does not know who made the decision for the training coordinator position.   *Sykes at 114.*

[95] Sykes further alleges he was denied a planner position in favor of a non-African American employee.   *Sykes at 110.*   But because Sykes admits he did not have the requisite experience for this position, he cannot make out an element of his *prima facie* case – namely, that he was qualified for the position.   *Id. at 119.   Okoye,* 245 F.3d at 513.

LEXIS 48338, at *18, *28-32.[96]

Parejo alleges FMCTI discriminated against him when it denied him a welding position in July of 2008 and instead gave the position to a Caucasian employee with less seniority. *Complaint at ¶ 155.* As Parejo acknowledges, however, he was not even certified to be a welder in July of 2008, while the employee selected for the position had been welding for several years and probably did have licenses. *Parejo at 74-76.* Similarly, Newton claims he was denied a position in FMC's Field Service Technician Apprenticeship Program because he had not been working in the shop at least a year; rather, he had been there only four or five months. *Newton at 20-21; Complaint at ¶ 162.* Although Newton claims that other employees were hired into the program with less than a year's experience, he fails to identify a single individual outside his protected class who was selected after only five months of service. *Newton at 20-21.*[97] Newton further alleges he was denied the opportunity to transfer into the international division of the service department,[98] where he would have received a pay increase, while two Caucasian employees were chosen. *Complaint at ¶ 170; Newton at 152-53.* The two individuals selected for the positions, however, had special expertise in controls, while Newton had hardware experience.[99] *Id.*[100] Once again, employees with different qualifications are not "similarly situated." *See Ceasar v. Lamar Univ.*, 147 F. Supp. 2d 547, 553 (E.D. Tex. 2001) (citing *Krystek v. University of S. Mississippi*, 164 F.3d 251, 257 (5th

---

[96] Sykes further alleges that non-African-American employees are routinely granted promotions or transfers without having been in their positions for a year. *Id. at ¶ 193.* When asked about this allegation at his deposition, Sykes pointed to the training coordinator position he did not receive. *Sykes at 100-101.*

[97] Just a few months later, in January 2008, Newton was offered and accepted a service department job. *Newton at 20-21.* Newton never complained about this hiring process. *Id.* at 174.

[98] Newton first expressed interest in joining the international division in December 2008, and he began working internationally in April of 2009. *Newton at 24.*

[99] When Vargas explained this rationale to Newton, he said he was not aware of it previously and now fully understood. *Newton at 194-95.*

[100] Newton also asserts that the decision to deny him an international service position "might have been" retaliation for his involvement in the noose incident. *Newton at 188.* Because Newton has no evidence to establish a causal connection between the noose and this decision, any retaliation claim premised on this action fails as a matter of law. *See Septimus v. Univ. of Houston*, 399 F.3d 601, 610 (5th Cir. 2005).

Cir. 1999)); *see also Nunnery v. Elgin Joliet Eastern Railway Co.*, 48 F. Supp. 2d 1122, 1131 (N.D. Ind. 1999) (employees with different levels of experience are not "similarly situated").

### b.      Other Employment Actions

Though Pierre claims he was discriminated against because he received a forklift license later than non-African Americans, he testified he cannot identify a single employee who received a license more quickly.  *Pierre at 48*.[101]  Bryant claims he was suspended for three days for being tardy while Brad Hooker, a non-African American employee with whom he carpooled, was not disciplined for the same conduct.  *Complaint at ¶ 26*.  Bryant acknowledges, however, that in addition to these tardy instances, he had 13 sick days, seven absences, two tool issues, and four additional late days, and that he doesn't know whether Hooker had similar attendance issues. *Bryant at 162*.[102]  Because Bryant and Hooker did not engage in the same conduct, they are not similarly situated.  *Chambers*, at *28-32.  Bryant also alleges he was denied a raise following a safety incident in 2006.  *Complaint at ¶ 26*.  Although FMCTI has no record of this discipline, and indeed the company records show that Bryant was given a raise, Bryant's claim fails because he cannot identify a non-African American employee who was involved in a similar safety incident but who did receive a raise.  Because the plaintiffs cannot identify similarly situated employees who were treated more favorably, these claims of discrimination fail as a matter of law.

### 3.      The Plaintiffs' Failure to Hire and Promote Claims Fail.

Several of the plaintiffs claim they were discriminated against when FMCTI declined to hire or promote them in favor of non-African American employees.[103]  To establish a failure to promote

---

[101] Pierre also admits that he received his license only about a year after beginning work at FMCTI.  *Pierre at 48*.

[102] Because Bryant does not know whether Hooker had other absence issues, his claim fails.  *See Preston*, 2007 U.S. App. LEXIS 2870, at *12-14 (holding plaintiff had not established a white employee received preferential treatment in "nearly identical" circumstances because she had no personal knowledge about the circumstances surrounding the employee's situation).

[103] Applicant data from 2006 and 2007 demonstrates, however, that there was no statistically significant underselection of minorities compared to non-minorities in the Subsea Assembly Department.  *Ex. H at ¶ 6*.

claim, a plaintiff must show: (1) that he was within a protected class, (2) that he was qualified for the position sought, (3) he was not promoted, and (4) the position he sought was filled by someone outside of the protected class. *Blow v. City of San Antonio*, 236 F.3d 293, 296 (5th Cir. 2001).[104]

FMCTI does not dispute that certain hiring and promotion decisions of which the plaintiffs complain would, if true, constitute adverse employment actions under Title VII.  Instead, these claims fail because the plaintiffs have no evidence that they actually sought the positions in question or were denied an actual employment opportunity.  As such, the plaintiffs have no evidence they suffered an adverse employment action because of FMCTI's alleged discrimination, and FMCTI is entitled to summary judgment on these claims.

For example, while McIntyre alleges FMCTI discriminated against him by not promoting him to a Level II, he admits he has never applied for a Level II position or any other position since his hiring.  *Complaint at ¶ 102; McIntyre at 21.*  Similarly, although Parejo claims he was not given the opportunity to join FMCTI's welding apprenticeship program because of his race and/or national origin, he admits that the program was not even in existence at the time he expressed interest.  *Complaint at ¶ 147; Parejo at 109-110.*[105]  Lucas, likewise, alleges he was denied a lead position in 2006, but admits he never actually applied for the position and that he did not have the normal qualification of first holding an Assembler II position.  *Complaint at ¶ 177; Lucas at 144, 174.*[106]  Because these plaintiffs cannot show they "sought" a position and FMCTI denied their

---

[104] The remainder of the *McDonnell Douglas* burden shifting analysis also applies to failure to promote claims.  That is, once the plaintiff makes the required *prima facie* showing ,the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the challenged employment action.  *Id.*  If the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination; or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor if the plaintiff's protected characteristic.  *See, e.g.*, *Rosales v. TXI Operations*, No. 3:03-CV-2923-N, 2005 U.S. Dist. LEXIS 3977, at *7 (N.D. Tex. March 14, 2005).

[105] Furthermore, Parejo also admits that FMCTI did allow him to test for a welding position.  *Parejo at 111.*  In fact, Parejo tested for welding three times – once on June 1, 2007, again on November 5, 2007, and again on July 24, 2008 – but failed each time. *Ex. A at Exs. 22 and 23; Ex. E. at Ex. 178.*

application, they cannot make out a *prima facie* case of discrimination as a matter of law.

Grice alleges that Assembly Test Manager Eric Heuring denied him a promotion to Assembler IV in the fall of 2007 even though a previous manager, Heath Herren, had promised him the position. *Complaint at ¶ 77.*[107]  But because the undisputed evidence demonstrates Grice was not actually qualified for an Assembler IV position, Grice cannot make out a *prima facie* case of discrimination. *Blow*, 236 F.3d at 296. Grice's allegation that he was promised an Assembler IV position is based on his 2007 PDD, in which Herren listed the training Grice needed to complete before becoming a level 4 competency level in his assembler position. *See Heuring Dep., attached as Exhibit BB, at 57-59, 116; Grice at Ex. 42.* As Grice was an Assembler II at the time of this PDD, he would not have been eligible or qualified for a promotion to Assembler IV, as the criteria listed in Grice's PDD for moving to a level 4 competency are distinct from the requirements for an employee to become an Assembler IV. *See Heuring at 57-59.* As such, Grice cannot demonstrate he was qualified to be an Assembler IV, and his *prima facie* case of discrimination fails.[108]

Finally, Bryant claims he was denied a lead position in 2006 in favor of a non-African American with less experience. *Complaint at ¶ 27.* Bryant has clarified, however, that this "position" merely required certain individuals to perform interim lead duties and that there was no formal application process for the "position." *Bryant at 279.* Bryant does not allege that he was

---

[106] Specifically, Lucas claims he expressed interest in a lead position in the summer of 2006, but that Team Lead James Faucett told him "because of who you associate with, you need not apply." *Complaint at ¶ 176.* According to Lucas, the position was given to Chris Aaron, a non-African American employee. *Id. at ¶ 177; Lucas at 240.* Lucas admits, however, that he never actually applied for the lead position and that normally an employee could not be a lead man without first holding an Assembler II position. *Lucas at 144, 174.* Lucas did apply for an Assembler II position and was promoted into the role on September 30, 2007. *Id. at 144.*

[107] Specifically, Grice alleges that Heuring required him to take a test before being promoted, but that none of the non-African Americans were required to take such a test. *Id.* As Heuring explained, however, the test he required Grice to take was for advancement to a level 4 competency, not an Assembler IV position. *See Heuring at 54-56.*

[108] To the extent Grice alleges he had already been selected for an Assembler IV position, an argument that is based only on complete speculation, Grice's claim is akin to an allegation of demotion. To make out a *prima facie* case when the adverse employment action at issue is a demotion, the employee must show (1) that he was demoted, (2) that he was qualified for the position he occupied, (3) that he was in a protected class, and (4) that he was replaced by a person outside his protected class. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). Because Grice cannot demonstrate he was qualified for the Assembler IV position, this claim fails.

denied any actual, permanent position or a compensation increase concurrent with this decision. Accordingly, his alleged denial does not constitute an adverse employment action. *See McCoy*, 492 F.3d at 559.

Newton claims that FMCTI generally hired non-African Americans for full-time employment more quickly than African Americans. *Complaint at ¶ 161.* Newton admits, however, that he never applied for a full time position with FMCTI until he applied for a Service Department position in October 2007. *Newton at 28-29.* But as Newton recognizes, it is the Service Department's practice to look for workers who have at least a year's experience in the shop before hiring them into the Department. *Id. at 77.* Although Newton complains that the hiring process is delayed for African Americans, he admits he was hired into a full-time position in the Service Department after only ten months, which is more quickly than FMCTI's general practice. *Id. at 77-78.*[109] Because Newton was actually hired *more quickly* than a typical Service Department FMCTI employee, he cannot demonstrate that he suffered an adverse employment action at the hands of FMCTI.

Finally, Galimore complains that he was continually denied employment by FMCTI. *Complaint at ¶ 105.* Specifically, Galimore claims he applied repeatedly for an assembly tech position and that his applications were lost on three different occasions. *Galimore at 121.* Galimore is unable, however, to point to any open positions during the period in which he applied. *Id. at 125-26.*[110] As such, he cannot present evidence that FMCTI subjected him to an adverse employment action because of his race.

---

[109] Newton states he believes he was hired more quickly only because of the alleged nooses that were discovered. *Newton at 77-78.* Newton testified, however, that no manager told him this was the case, and that he merely formed this as his personal belief because of the sequence of events. *Id. at 78.*

[110] Further, Galimore was ultimately hired into an assembly tech position. *Ex. A at Ex. 6.*

### 4.        The Plaintiffs Cannot Establish Pretext.

In addition to the claims briefed above, the plaintiffs bring other allegations of alleged adverse treatment because of their race and/or national origin.  Even assuming for the sake of argument that the plaintiffs can establish *prima facie* cases of race discrimination in these instances, FMCTI is entitled to summary judgment because FMCTI has articulated legitimate, nondiscriminatory reasons for the employment actions, and the plaintiffs have no evidence of pretext.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (holding that employer bears only a burden of production, not persuasion, when tendering its nondiscriminatory reason).

Once FMCTI presents its legitimate, nondiscriminatory reasons, any "presumption of discrimination vanishes."  *Okoye*, 245 F.3d at 512.  Each plaintiff then bears the burden of establishing either: (1) FMCTI's legitimate reason is not true, but a mere pretext for discrimination (the traditional pretext approach); or (2) although FMCTI's reason is true, it was only one reason for its conduct and the plaintiff's race was a motivating factor in the disputed employment decision (the mixed motive approach).[111]  *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).  Under either approach, the burden of persuasion remains at all times with the plaintiff.  *Reeves*, 530 U.S. at 153; *Rachid*, 376 F.3d at 312.[112]  The plaintiffs cannot establish pretext in these situations because they have no evidence that the actions at issue were motivated by race.

#### a.        Hiring or Position Decisions

Specifically, Galimore alleges he was denied an apprenticeship position because of his race.  *Complaint at ¶ 110.*  As Galimore recognizes, however, FMCTI told him he was ineligible for the

---

[111] The mixed motives approach only applies if the plaintiff concedes that discrimination was not the sole reason for the alleged discriminatory conduct and instead argues it was only a motivating factor.  *See Richardson v. Monotronics, Int'l, Inc.*, 484 F.3d 327, 333, 335 (5th Cir. 2005).  Should the plaintiffs pursue this alterative approach, their damages are limited to declaratory relief, certain types of injunctive relief, attorneys' fees, and costs.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003) (citing 42 U.S. § 2000e-5(g)(2)(B)).  To date, the plaintiffs have not argued mixed motive; therefore, this Motion examines the pretext alternative.

[112] Furthermore, it is not this Court's place to substitute its judgment for the business decisions of the employer.  *See, e.g., Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991).

position because it was open to veteran employees only.  *Id*.; *Galimore at 133*.  Galimore admits he has no reason to believe this stated reason was not true and, accordingly, he has no evidence that it was merely a pretext for race discrimination.  *Id*.  Parejo alleges that because of his race, he was denied a transfer from the high bay to a different department while Caucasian employees were allowed to transfer.  *Complaint at ¶ 159*.  Company policy provides, however, that an employee must hold their position for a year before they can be transferred.  *Ex. F at Ex. 15*.  Parejo was hired as a full-time Assembler on August 23, 2007, and in October 2008 he was transferred to a lead position in the customer support department.  *Ex. A at Ex. 10; Ex. E at Ex. 182*.  Because Parejo has no evidence with which to overcome this legitimate, nondiscriminatory reason for the decision, his claim fails.

In support of his discrimination claim, Bryant asserts that in 2006,[113] he was denied a lead position because of his race.  *Complaint at ¶ 24*.  Specifically, Bryant argues that he applied for one of four open lead positions in 2006, and that three non-African American employees were given positions and the fourth was never filled.  *Id*.  The evidence demonstrates, however, that Heuring, who participated in the hiring decision for these positions, believed the other candidates had better interviews and showed better signs of leadership potential.  *Declaration of Eric Heuring, attached as Ex. AA, at ¶ 3*.  Heuring also felt Bryant did not possess the positive attitude and communication skills necessary to become a lead man.  *Id*.  Bryant himself admits that he knew nothing about the other candidates' backgrounds or qualifications and that he never complained to anyone at FMCTI about this decision.  *Bryant at 273, 276*.  Bryant simply has no evidence upon which to argue that these reasons for the selection decision were merely a pretext for discrimination.  On the contrary,

---

[113] Although Bryant alleges in his Complaint that this application and denial occurred in 2005, *see Complaint at ¶ 24*, it is clear from his deposition testimony that this event occurred in 2006.  Specifically, Bryant references, among other things, that this event occurred shortly after Sykes's arm injury.  *See Bryant at 274*.  Sykes's injury occurred on September 22, 2006.  *Sykes at 264*.

Bryant makes no racial allegations against Heuring. *Id.*[114]

Parejo claims he was denied a full-time welder position in April 2007 because he had not been with the company a full year, yet Caucasian employees with less seniority were given full-time positions. *Complaint at ¶ 146.* Although Parejo expressed interest in welding positions on a number of occasions, FMCTI has no record that Parejo applied for any welder position in 2007. *Ex. A at ¶ 11.*[115] Furthermore, FMCTI did not have a welder position open in 2007; the high bay welder position was held at the time by Adrian Bulos. *Id.* Accordingly, to the extent Parejo was denied a welding position in April 2007, it was because FMCTI did not have a welder opening and Parejo never applied. *Id.* Parejo has no evidence that FMCTI was motivated by discrimination in denying him this position. Rather, Parejo testified that the only evidence he has of discrimination is his own "personal belief" that he was denied the position because he is West Indian and the other employee was Caucasian. *Parejo at 93, 231.* Such a subjective belief is insufficient to defeat summary judgment as a matter of law. *Robertson v. Alltel Info. Servs.*, 373 F.3d 647, 654 (5th Cir. 2004); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000).

Grice also claims he was discriminated against in July of 2006, when he was denied an Assembler II position in the MMRS department in favor of a non-African American employee with less experience. *Complaint at ¶ 73.* This employee, Bernabe Villerreal, was selected for the position because he was currently working in MMRA and, as such, had experience in that area. *Ex. A at ¶ 6.* Grice has no evidence that this decision was motivated instead by race. *Grice at 128.*[116] Similarly, Mayo claims he was denied a promotion to a team lead position in May of 2007 and that

---

[114] Indeed, the company eventually offered Bryant a lead position, but he turned down the position to accept a job as a service tech.

[115] In fact, Parejo's July 2007 application states he had not previously applied for employment at FMCTI. *Ex. E at Ex. 171.*

[116] Grice testified that while he heard that some of the decision-makers had made racial comments, he never heard them make such comments towards him. *Grice at 128.*

the position was given instead to Bolton, a non-African American with less seniority. *Complaint at ¶ 49*. According to Mayo, Heuring made the decision to promote Bolton over him. *Mayo at 157*. Like Parejo, however, FMCTI has no record that Mayo applied for the team lead position he claims he sought in May of 2007. *Ex. A at ¶ 10*. Accordingly, if FMCTI subjected Mayo to an adverse employment action by denying him this promotion, it is because Mayo never applied. *Id*. The only evidence Mayo has that Heuring, the decision-maker, was actually motivated by discrimination is his own personal belief that Heuring is a "racist." *Mayo at 88-91*. In particular, Mayo testified that he believes he was denied the promotion because of his race because an alleged "racial clique" existed at FMCTI, made up of Team Lead James Faucett, Heuring, and Bolton. *Mayo at 88-89*.[117] Mayo cannot create a fact issue regarding pretext by relying on his own subjective belief. *Robertson*, 373 F.3d at 654; *Byers*, 209 F.3d at 427. Accordingly, Mayo's and Grice's discrimination claims cannot survive summary judgment.

### b.      Training and Overtime Opportunities

Parejo alleges FMCTI denied him the opportunity to practice welding because of his race and/or national origin. *Complaint at ¶ 147*. In support of this allegation, Parejo testified that once, when he was practicing in the weld shop after work, welding supervisor Heath Herren told him he could not weld in the shop without proper paperwork. *Parejo at 163-64*. The only evidence Parejo cites for the notion that the decision was actually discriminatory is that Herren appeared to be Caucasian. *Id. at 165-66*. Parejo has no evidence that the real reason FMCTI denied him a transfer or refused to allow him to weld was because of his race or national origin.[118]

---

[117] According to Mayo, Faucett is a "known racist," and he believes Heuring and Bolton are also racist because they associate with Faucett. *Mayo at 89-91*. Mayo also testified that he further believes Bolton, Heuring, and Faucett are racist because they give promotions unfairly and because Heuring once allegedly tied a noose from a rope in Bolton's office. *Mayo at 102-04*. Mayo did not personally observe this alleged rope-tying incident, and he admits that this allegation is based only on hearsay. *Id. at 102-103*.

[118] Furthermore, in April of 2008, after learning of Parejo's desire to practice welding, Heuring and Risinger met with Parejo to inform him that he would be allowed to practice in the weld shop when time permits and that this time would

Lucas claims he was discriminated against when FMCTI denied him overtime opportunities in favor of non-African American employees. *Complaint at ¶ 180*. As Faucett has explained, in response to complaints about employee fatigue, FMCTI restructured its scheduling in late 2006 to limit the amount of hours an employee could work. *Faucett Dep., attached as Exhibit EE, at 205*. Although some employees were permitted to work overtime in some instances, this work was either voluntary or based on who had the most familiarity with a particular project. *Id. at 206*. Overtime hours were not assigned based on any employee's race or nationality, *Id. at 205*, and Lucas has no evidence that these decisions were actually motivated by discrimination.

### c.      Lost Applications

Finally, McIntyre, Beatty, and Brown each allege that FMCTI lost his application for employment, which delayed his hiring. *Complaint at ¶¶ 96-97, 127, 137*. Specifically, McIntyre claims that FMCTI lost his application "numerous times," and he had to "continuously fill one out." *McIntyre at 13*. Beatty claims that his initial application for employment was lost, *Complaint at ¶ 137*, and Brown claims he applied for full-time employment with FMCTI "on multiple occasions" and that FMCTI lost his applications. *Id*. at ¶ 127. McIntyre, Beatty, and Brown first applied for permanent employment at FMCTI in late 2006 after Bryan Sangster told them that there was an opening. *McIntyre at 51, 87; Brown at 71, 74-75*.[119] The three individuals applied for the position at the same time. *Id. at 76*. Approximately two or three weeks later, Brown inquired about the status of his application to Human Resources representative Michelle Pop, who told him she didn't have any information. *Id. at 77-78*. About a month later, Brown asked Heath Herren (C), his supervisor, about the status of his application. *Id. at 79*. Herren spoke to Human Resources and responded to the employees that FMCTI had lost their applications and that they would need to

---

be paid. *Ex. A at Ex. 2*. They explained to Parejo that this practice would be in preparation for his certification to become the High Bay Assembly Welder. *Id*.

[119] Brown testified that they learned about the position in a safety meeting. *Brown at 74-75*.

reapply.  *Id. at 79-80; McIntyre at 111; Beatty at 95-96.*[120]  The plaintiffs then completed other applications, and they were subsequently hired.  *Brown at 81; McIntyre at 87; Complaint at ¶ 98, 137.*[121]  Heuring testified that this problem was not limited to African American employees, but that the Human Resources department lost applications for employees of all races.  *Heuring at 143.*

The plaintiffs have no evidence that FMCTI's error in losing their initial employment applications was racially motivated.  On the contrary, McIntyre admits that he doesn't know what happened to his applications and whether or not they were innocently lost.  *McIntyre at 17-18.*  Although Beatty ostensibly doubts FMCTI's stated explanation that his applications were lost, Beatty admits that he is speculating when he says FMCTI lied in making this assertion.  *Beatty at 95-96.*  Any suggestion that FMCTI acted with discriminatory animus in handling their employment applications is refuted by the fact that their Caucasian supervisor helped discover the problem and further their application processes.  *See McIntyre at 111; Brown at 79-81; Beatty at 85, 92.*  Furthermore, although Beatty alleges that numerous non-African American employees with less experience were hired in the interim.  *Complaint at ¶ 137*, Beatty testified that he never saw any non-African Americans be hired on full time instead of him.  *Beatty at 96, 254.*[122]  Instead, the only evidence the plaintiffs offer to support their allegations of race discrimination are their own subjective beliefs, which is insufficient to defeat summary judgment as a matter of law.  *Robertson v. Alltel Info. Servs.*, 373 F.3d 647, 654 (5th Cir. 2004); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000).  Accordingly, the Court should grant FMCTI's summary judgment on these claims.

---

[120] Herren inquired on behalf of Brown, Beatty, and McIntyre at the same time and gave each of them the same response. *Brown at 79-80; Beatty at 85, 92.*

[121] Brown acknowledges that FMC did not lose his second application and that this application was processed as it should have been. *Brown at 83.*

[122] In this way, Beatty's claim also fails because he is unable to identify a similarly situated employee outside his protected class who received more favorable treatment.

## C.    The Plaintiffs Cannot Establish Retaliation

The *McDonnell Douglas* burden-shifting framework used in discrimination cases is also applicable to retaliation cases.  *See Nicholas v. Lewis Grocer et. al.*, 138 F.3d 563, 566 (5th Cir. 1998).  That is, in the absence of direct proof of retaliation, the plaintiff must follow the three step burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 93 S. Ct. 1817, 1824 (1973): 1) the plaintiff must establish a *prima facie* case of retaliation;[123] 2) FMCTI must offer a legitimate, non-discriminatory reason for its actions; and 3) the plaintiff must prove that this reason was pretextual.[124]  *Reeves v. Sanderson Plumbing Prods, Inc.*, 120 S. Ct. 2097, 2106 (2006).

The plaintiffs point to certain incidents that they allege constitute retaliation for their participation in this lawsuit and/or for filing a charge of discrimination.  Of these incidents, the vast majority do not constitute materially adverse employment actions as a matter of law.  The plaintiffs have no evidence that discriminatory animus was the true reason for their remaining allegations of retaliation, and FMCTI is entitled to summary judgment as a matter of law.

### 1.    The Plaintiffs Did Not Suffer Materially Adverse Employment Actions.

In order to state a cause of action for retaliation, a plaintiff must plead facts sufficient to demonstrate that, if true, the retaliation in question has produced an injury or harm that a reasonable employee would have found to be "materially adverse," one that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006).  The purpose of this objective standard is "to separate significant from trivial harms" and "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional

---

[123] To establish a *prima facie* case of retaliation, each plaintiff must show (1) he engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse action. *Septimus v. Univ. of Houston*, 399 F.3d 601, 610 (5th Cir. 2005); *See also Burlington N.*, 126 S. Ct. at 2414.

[124] A plaintiff's ultimate burden is to prove that engaging in the protected activity was the "but for" cause of the adverse employment action at issue.  *Pineda v. United Parcel Service, Inc.*, 360 F.3d 483, 487 (5th Cir. 2004); *Septimus*, 399 F.3d at 608; *Long v. Eastfield Coll.*, 88 F.3d 300, 305 (5th Cir. 1996).

teasing." *Id.* Title VII "does not protect an individual from all retaliation," and "trivial harms," "petty slights," and/or "minor annoyances that often take place at work and that all employees experience" are not sufficient to state claim for retaliation. *Id.*

Many of the plaintiffs' claims can be characterized as no more than complaints of "petty slights" or "trivial harms" that are insufficient to state a claim of retaliation. For example, Pierre claims that since filing his lawsuit, Troxell and Bolton are not as responsive and generally "don't really look at [him] or face [him]." *Pierre at 130-31.* Brown testified that since filing his charge and/or lawsuit, other employees at FMCTI are more paranoid around him and always make sure to say hello to him. *Brown at 248-49.*[125] Beatty claims he was retaliated against[126] when lead man Steven Matula asked him to clean off a table to serve food to visitors, but then did not invite Beatty to the lunch. *See Beatty at 181-83.*[127] Sykes alleges generally that individuals on the floor have treated him differently or have made little, unidentified comments since he filed his lawsuit, without identifying anyone specifically, *Sykes at 209-210,* and Parejo claims that Troxell was not patient and his expressions were sarcastic during a meeting with Parejo about his PDD. *Parejo at 33-35.* These actions simply do not rise to the level of "materially adverse" actions sufficient to state a *prima facie* case of retaliation. *See*, *e.g.*, *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009) (being chastised by superiors and ostracized by co-workers not materially adverse); *Burlington N.*, 548 U.S. 53 at 69 (a "supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight");[128] *see also Hart*, 2007 U.S. App. LEXIS 15206, at *4 (being assigned more difficult work tasks not a materially adverse employment action).

---

[125] This alleged different treatment by his coworkers is the only way in which Brown believes he has been treated differently since filing his charge and/or lawsuit. *Brown at 250-51.*

[126] To the extent Beatty claims that this action was discriminatory, his claim fails because this action is not an ultimate employment decision.

[127] Beatty acknowledges that the lunch in question was for Nexen, one of FMCTI's customers, and that none of the other assembly techs ate the lunch. *Beatty at 185-86.*

[128] As a lead man, Matula was not a supervisor. *See Livingston at 73.*

McIntyre alleges FMCTI retaliated against him when someone stenciled "Kevin's Crane" on one of the overhead cranes in the workshop. *McIntyre at 69.* McIntyre complained of this situation and McIntyre's manager, Cynthia Polnick, responded by calling a stand-down meeting that morning to ask who did it. and employee David Dempsey admitted to writing the stencil as a joke. *Ex. H at Ex. 3.* Polnick instructed Dempsey to clean it up. Dempsey was subsequently disciplined. *Id.* McIntyre testified that he has no complaints about Polnick's response. *McIntyre at 71.*[129] Because any harm McIntyre suffered as a result of this incident was trivial at best, McIntyre cannot sustain a retaliation claim on this basis.

Sykes claims FMCTI has acted in a retaliatory manner because as a lead man, he has never been asked to evaluate people he does not work for, while non-African-American lead men have been asked. *Sykes at 164, 209.* Sykes presents no evidence that he has actually been harmed by this alleged slight.[130] Being denied the obligation to perform additional required work can hardly be seen as a "materially adverse," action that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68. Finally, Galimore asserts that Troxell retaliated against him for filing his EEOC charge when he had Pro Staff write him up for "bringing negativity to the workplace." *Complaint at ¶ 120.* FMCTI explained to Galimore that the document in question was just a memo, *Id. at ¶ 121; Galimore at 232*, and Galimore was subsequently hired full-time by FMCTI two months later. As such, this alleged write up was not a materially adverse employment action sufficient to state a *prima facie* case of retaliation. *See Slaughter v. Jones Day*, No. H-05-3455, 2007 U.S. Dist. LEXIS 2198, at *17-18 (S.D. Tex. Jan. 11,

---

[129] McIntyre also made a brief reference at his deposition that FMC retaliated against him for filing this lawsuit by shorting his checks approximately six times. *McIntyre at 22-24.* According to McIntyre, the problem occurred because there was an issue with Eric Trammel approving McIntyre's time entries. *Id. at 81.* McIntyre acknowledged that Trammel and Bridget Gaspard in payroll tried to fix the situation. *Id. at 81-82.* McIntyre admits that he has no reason to think that either Trammel or Gaspard intentionally tried to alter his paychecks. *Id. at 83.* Because this claim is not specifically referenced in Plaintiffs' Complaint, FMC does not address the merits of this allegation.

[130] Sykes also admits he does not know who made this decision, and doesn't know if other African American leads were also denied the opportunity to evaluate others. *Sykes at 165-66.*

2007) (attached hereto as Exhibit CC) (holding an employment counseling that did not revoke the plaintiff's privileges or alter her employment status not "materially adverse"); *see also Molina v. Equistar Chems., L.P.*, No. C-05-327, 2006 U.S. Dist. LEXIS 47075, at *28-30 (S.D. Tex. June 30, 2006) (attached as Exhibit DD) (holding plaintiff who was given a "Last Chance Agreement" did not suffer an adverse employment action under *Burlington Northern*).   Finally, Grice claims that in July 2007, Assembly Test Manager Eric Huering told him that because of his prior complaint, Winkler would never promote him or consider him for a lead man position.  *Complaint at ¶ 75.*[131] FMCTI has no record, however, of Grice applying for any lead man position since his transfer into the DVA department in October 2006.  *Ex. A at ¶ 9.*  Accordingly, Grice cannot demonstrate that he actually suffered an adverse employment action in this instance.[132]  For these reasons, summary judgment for FMCTI is proper as a matter of law.

### 2.  The Plaintiffs Have No Evidence of Pretext.

The plaintiffs' remaining retaliation claims cannot survive summary judgment because they have no evidence that their alleged protected activities were the "but for" cause of the adverse employment actions.  *Pineda v. UPS*, 360 F.3d 483, 487 (5th Cir. 2004); *Septimus*, 399 F.3d at 608; *Long*, 88 F.3d at 305.  As such, the plaintiffs' remaining claims of retaliation fail, as demonstrated below.

### a.  Overtime Opportunities

Parejo claims he was retaliated against after complaining to Bolton in February 2008 about

---

[131] Eric Trammell testified he never heard that Winkler said Grice would never be a lead man.  *Trammell, attached as Exhibit FF at 75.*

[132] Furthermore, none of these actions constitute retaliation because they did not dissuade a reasonable person from filing a discrimination complaint.   To the contrary, after these alleged acts occurred, the plaintiffs filed this discrimination lawsuit.  *See DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed. Appx. 437, No. 05-21087, 2007 U.S. App. LEXIS 1362, at *11 (5th Cir. Jan. 19, 2007) (holding that written warning was not retaliatory because it did not dissuade a reasonable employee from filing a charge of discrimination because a charge was in fact later filed); *Beaumont v. Tex. Dep't of Criminal Justice*, 468 F. Supp. 2d 907, 925 (E.D. Tex. 2006) (holding supervisor's conduct not retaliatory because it did not dissuade reasonable employee from complaining because employees did in fact complain).

being denied welding opportunities by subsequently being denied overtime.  *Complaint at ¶ 150-51.*
The overtime opportunities Parejo complains of, however, were not scheduled overtime hours;
rather, these were times when Parejo would come to work on his own volition to voluntarily cross-
train.  *Parejo at 37-38.*   When FMCTI learned that Parejo was working unscheduled overtime
hours, they informed him he could not do so without prior approval.  *Id. at 38.*   Furthermore, as
Parejo acknowledges, at some later point during his employment, FMCTI issued a directive to
reduce the amount of overtime hours worked generally, particularly without pre-approval.  *Id. at
153-54.*   This directive applied to every employee, including Parejo.  *Id.*   Parejo simply has no
evidence on which to overcome these legitimate, nondiscriminatory reasons for denying him
overtime hours.

### b.       Terminations

Mayo alleges that FMCTI retaliated against him for filing this lawsuit by terminating his
employment.  *Complaint at ¶ 59.*   As the undisputed evidence demonstrates, however, FMCTI
terminated Mayo after discovering in September 2009 that a large volume of sexually explicit and
offensive electronic material had been stored and distributed under Mayo's computer account.  *See
Ex. H at Ex. 1.*   After initially discovering the material in question,[133] Mark McDonald, FMCTI's
Global Director of Human Resources, collected and delivered it to HR Manager Mike Turner and
requested that Turner conduct an investigation into the inappropriate material.  *Id.*   In the course of
the investigation, Mayo alleged that specific former and current FMCTI employees also engaged in
similar behavior.  *Id.*   Turner investigated these additional allegations in conjunction with the
investigation into Mayo's alleged activities.  *Id.*[134]   As a result of the investigation, Turner
concluded that Mayo had received, stored, and distributed a large volume of inappropriate material

---

[133] FMCTI IT personnel discovered the material when gathering electronic documents for review and production in
conjunction with this lawsuit.

[134] Because of the volume of allegations raised by Mayo, portions of this investigation are still ongoing.  *Id.*

from 2004 until September 2009, and FMCTI terminated his employment because of this behavior. *Id.* Mayo has no evidence upon which to refute this legitimate, nondiscriminatory reason for his termination. On the contrary, FMCTI also terminated the employment of four Caucasian employees, who had not engaged in protected activity, for the same conduct and suspended or reprimanded numerous others. *Id.* FMCTI is therefore entitled to summary judgment on this claim as a matter of law.

Lucas also contends that his termination from FMCTI was retaliatory. *Lucas at 233.* Lucas was terminated on February 5, 2009, because of numerous discrepancies between his time records and FMCTI's official badge scans. *Complaint at ¶ 187; Ex. A at Ex. 20.* Specifically, on January 27, 2009, Service Training Coordinator Robert Clauson contacted Human Resources Manager Vickie Vargas regarding apparent discrepancies in Lucas's time reports. *See id.* In response, Vargas reviewed Lucas's badge scans, which identified times when Lucas entered and left Company facilities, and which reflected discrepancies between the time Lucas entered and left the facility for nearly every day from what Lucas had recorded on his time sheets. *Id.* On January 29 and 30, 2009, Service Manager Domingo Velarde questioned Lucas about the time sheet discrepancies, and Lucas assured Velarde that he did work the time recorded on his sheets. *Id.* Because of the numerous discrepancies between Lucas's time records and FMCTI's official badge scans, however, the company terminated Lucas's employment on February 5, 2009, for falsifying time records. *Id.*; Complaint at ¶ 187. FMCTI also terminated Caucasian employee Wesley Hall, who had not engaged in protected conduct, for falsifying time records as part of the same investigation. *Id.*[135]

As the undisputed evidence demonstrates, FMCTI conducted a thorough investigation of Lucas's time discrepancies, and the only reasonable conclusion was that Lucas had submitted false

---

[135] Shortly thereafter, Jason Campos and Billy Mills, both Caucasian, were also terminated for clock violations. *Id.*

time reports.  Although Lucas subjectively believes that his termination was in retaliation for filing this lawsuit, he has no other evidence that FMCTI had a retaliatory motive for terminating his employment.  *Lucas at 233.*  Lucas's subjective belief is insufficient to defeat summary judgment as a matter of law.  *Robertson v. Alltel Info. Servs.*, 373 F.3d 647, 654 (5th Cir. 2004); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000).   Accordingly, FMCTI is entitled to summary judgment on each of these claims of retaliation.

## VI.    <u>CONCLUSION</u>

Based on the facts presented and the relevant authorities, Defendant FMC Technologies, Inc. respectfully submits that the plaintiffs have failed to establish any of their discrimination, retaliation, or harassment claims as a matter of law.  Accordingly, Defendant FMC Technologies, Inc. respectfully requests that this Court grant it summary judgment and all other relief to which it is entitled.

Respectfully submitted,

Of Counsel:

Kelley Edwards

State Bar No. 24041775

Federal ID No.  560755

Sarah Stoffregen

State Bar No. 24066151

Federal ID No. 966164

LITTLER MENDELSON

A PROFESSIONAL CORPORATION

1301 McKinney Street

Suite 1900

Houston, TX  77010

713.951.9400 (Telephone)

713.951.9212 (Telecopier)

/s/  Kerry E Notestine

Kerry E Notestine (Attorney-in-Charge)

State Bar No. 15116950

Federal ID No. 2423

LITTLER MENDELSON

A PROFESSIONAL CORPORATION

1301 McKinney Street

Suite 1900

Houston, TX  77010

713.951.9400 (Telephone)

713.951.9212 (Telecopier)

ATTORNEYS FOR THE DEFENDANT

FMC TECHNOLOGIES, INC.

CERTIFICATE OF SERVICE

I certify that I sent a copy of this document to the following on this 1st day of June, 2010 by the Southern District of Texas's electronic filing system:

Joshua D. Boxer

Steven L. Robinson

LAW OFFICES OF MAYOR JOSEPH L.

ALIOTO & ANGELA ALIOTO

jboxer@aliotolawoffices.com

srobinson@aliotolawoffices.com

James M. Cleary, Jr.

W. Jackson Wisdom

MARTIN, DISIERE JEFFERSON & WISDOM, L.L.P.

cleary@mdjwlaw.com

wisdom@mdjwlaw.com

/s/  Kelley Edwards

Kelley Edwards

Firmwide:95615743.4 042176.1117

- 51 -