# EXHIBIT 1

**1-A**

Patsy Livingston                                  August 21, 2009

1    policies or anything that's brought in question.  So you

2    would have to follow through on any type of information

3    that's given.  I don't need any person, I need the facts

4    in the investigation.  So the facts that are given to us

5    are the facts that we follow up on and then we conclude

6    the investigation.

7         Q.    When you conclude an investigation, do you

8    prepare a report?

9         A.    We prepare a summary, yes.

10        Q.    Is that the case, where all complaints of

11   discrimination or harassment that are made to Human

12   Resources result in a written report or summary

13   conclusion, something like that?

14        A.    Yes.

15        Q.    Where are those documents kept?

16        A.    It's documented on our drive, share drive.

17        Q.    Is there a specific file?

18        A.    It would be just "Investigations."  I believe

19   that's how it's titled.

20        Q.    So in the FMC server, I guess, there is a

21   folder called "Investigations"?

22        A.    Yes.

23        Q.    Within that folder, do you have a specific

24   sub-folder or is it everybody's investigations go into

25   the same one?

Patsy Livingston                          August 21, 2009

Page 142

1      A.   Some people have sub-folders, and there's a

2    general folder.

3      Q.   Did you prepare a conclusion or a summary

4    report in that file related to Mr. Parejo's allegation

5    that's raised in June of 2008?

6      A.   I don't recall if I have one specific to this

7    letter here.

8      Q.   Why wouldn't there be one?  I thought you had

9    said the protocol was for every investigation that's

10   conducted --

11     A.   Not every investigation.  I said if there is a

12   charge of harassment or discrimination that is founded,

13   yes, we would document it and make sure we have a clear

14   response to that.

15     Q.   So only if the investigation determines that

16   there's an actual finding of harassment or

17   discrimination is there a written report that goes into

18   that file.  Is that right?

19     A.   Yes.  It's just a format to document the issue

20   that was raised and the interviews that were conducted

21   and a summary of what actions we took.

22     Q.   How many times have you filled out that form

23   and put it into that folder in the server?

24     A.   Probably in like three major instances, yes.

25   Now, we have the Ethics Point, so that's where all my

Patsy Livingston                              August 21, 2009

Page 143

1   case are.

2        Q.   What were the instances where you prepared that

3   report and brought them to the folder because you only

4   do that when there's a finding of racial discrimination

5   or harassment?

6        A.   I know there was one with the racial symbol,

7   graffiti.  That one.

8        Q.   How about Mr. Mills?

9        A.   Again, that one is outlined, documented.  That

10  one is actually in Ethics Point, but again concluded by

11  Vicki Vargas.

12       Q.   How about Mr. Grice's allegations about Ken

13  Meredith?

14       A.   We collected all the documents, but I don't

15  know if there was a summary report.  The individual was

16  released, removed from the facility.

17       Q.   It was determined that there was a violation of

18  the harassment policy?

19       A.   Yes.

20       Q.   And since FMC has a zero tolerance harassment

21  policy that dictates that an individual is supposed to

22  be immediately removed and prosecuted to the fullest

23  extent of the law, was Mr. Meredith immediately removed

24  and prosecuted?

25       A.   I don't know about prosecuted.  That's

Patsy Livingston                                    August 21, 2009

Page 144

1      separate, but he was removed at FMC's request.

2           Q.   Now, Mr. Meredith is no longer working at the

3      FMC facility on Gears Road.  Is that right?

4           A.   That's correct.

5           Q.   But he remains a contractor doing business with

6      FMC.  Is that true?

7           A.   I don't know that to be true.

8           Q.   Where would you find that out if you wanted to

9      determine whether or not Mr. Meredith is a contractor

10     still doing business with FMC?

11          A.   I know he was employed by a third party.  He

12     was a third-party inspector employed by another company.

13          Q.   Is it your understanding that Mr. Meredith no

14     longer has access to the FMC workplace or workplaces?

15          A.   Not to my knowledge.  I'm not aware.

16          Q.   Do you know whether anyone called the

17     authorities?

18          A.   In this case?

19          Q.   Right.

20          A.   There were no criminal charges.

21          Q.   So the answer is no?

22          A.   No.

23          Q.   All right.  Any other situations where you can

24     recall filling out a written report and bringing it to

25     the server and the folder identified as

Patsy Livingston                                    August 21, 2009

Page 145

1    "Investigations"?

2         A.   Again, specifically?  I can't recall specific

3    ones, but I know I have.

4         Q.   Are those the only times that you have prepared

5    a written report following an investigation into an

6    allegation of discrimination or harassment?

7         A.   I know right now I probably have.

8              Let me ask you to rephrase that.

9         Q.   Sure.  I was asking initially whether or not

10   the protocol of FMC when HR managers receive a complain

11   of discrimination or harassment, whether there was a

12   written conclusion document.  You said, yes, when

13   there's a finding of discrimination or harassment,

14   right, and those documents are kept on a file in the

15   server, entitled "Investigations"?

16        A.   Okay.

17        Q.   Stop me if I'm wrong.

18        A.   Go ahead.  Finish.

19        Q.   I asked you to identify the written summary

20   reports that you have prepared and concluded and placed

21   in that folder.  You identified a graffiti situation and

22   a situation with Mr. Mills, and you couldn't recall any

23   others.

24        A.   Let's just say in my tenure at FMC, we went

25   from a paper format, which was an outline that I was

Patsy Livingston                                        August 21, 2009

Page 146

1    given to follow to sum up an investigation.  So that was

2    the process in place when I started.  Now the process in

3    place is a systematic online tool that we would go in

4    there and fill out all of the information.  So all my

5    recent cases, at least ten or however many more than

6    that, are all documented in Ethics Point.  Prior to

7    that, it was typewritten in that format.

8        Q.   Understood.  With the new system in place with

9    Ethics Point, do you only type information into the

10   Ethics Point system if the complaint came via Ethics

11   Point, or all complaints that come to HR?

12       A.   All complaints.

13       Q.   All of them are processed through Ethics Point,

14   the system?

15       A.   Yes.

16       Q.   Regardless of whether the finding is that there

17   was discrimination, harassment, or not?

18       A.   Correct.

19       Q.   All right.  So did you conclude whether there

20   was discrimination or harassment with respect to

21   Mr. Parejo's allegation that's raised on June 16, 2008?

22       A.   With Mr. Parejo, it's been sort of a continuous

23   process with him.  So this is not the first letter that

24   he's written to look into his allegation of being denied

25   specifically welding positions.  He's brought it up

Patsy Livingston                                    August 21, 2009

Page 147

1    several times, and we have concluded as of late last

2    year that he has not been denied the opportunity to

3    test, to apply for the position.  So was there a charge

4    of discrimination based on that?  No.

5         Q.   Did you document your findings in any fashion?

6    Did you take any notes, handwritten, typed, anything

7    with respect to Mr. Parejo's allegation of

8    discrimination?

9         A.   Taken notes in the process and documented his

10   allegation, yes.

11        Q.   Where do you keep those notes?

12        A.   Again, it's going to be varied depending on

13   when we did this.  So the handwritten and typed or in

14   the system right now regarding Mr. Parejo.

15        Q.   Did you turn over all of those documents to

16   counsel, handwritten notes and --

17        A.   Everything I had.

18             (Exhibit 196 marked)

19        Q.   (BY MR. BOXER) I've marked as Exhibit 196 a

20   letter to FMC HR Department, Patsy Livingston, from

21   Mr. Grice, June 25th, 2008.  Ms. Livingston, do you

22   recall receiving a letter from Mr. Grice on or about

23   June 25, 2008, that we've marked as Exhibit No. 196?

24        A.   Yes.

25        Q.   This is the situation we discussed briefly

Patsy Livingston                                    August 21, 2009

Page 148

1    wherein Mr. Grice was complaining about Ken Meredith.

2         A.   Yes.

3         Q.   Let me read a couple of passage here.  It says:

4    "On Monday, June 23, 2008, I, Lawrence Grice, along with

5    Stephen Matula and David Dempsey were present to witness

6    the following commends made by third-party inspector

7    Ken Meredith."

8              First, let me ask.  What was Mr. Matula's

9    position in June of 2008?

10        A.   I'm not certain.  I believe Mr. Matula is a

11   lead.

12        Q.   Are leads supposed to immediately report acts

13   of discrimination or harassment up the chain of command?

14        A.   All employees are supposed to do that.

15        Q.   Are they supposed do it to their immediate

16   manager, to HR, to both, Ethics Point, to whom?

17        A.   As quickly as possible to a member of FMC

18   management.  It doesn't have to be their line of

19   management.

20        Q.   Here's the quote.  It says:  "All these illegal

21   Mexicans want when they come into this country is a

22   white woman, a hot dog, apple pie, and a Chevrolet."  Do

23   you see that?

24        A.   Yes.

25        Q.   Do you believe that comment violated FMC's

f881da26-4a42-48e0-83e7-1216a64826d9

Patsy Livingston                                    August 21, 2009

Page 149

1    policy regarding harassment?

2         A.    Yes, it would be.

3         Q.    If Mr. Matula was present when that comment

4    would be made, he would have an obligation as a lead to

5    report that to his manager or Human Resources

6    immediately, right?

7         A.    Any employee.  Again, yes.

8         Q.    Mr. Matula included?

9         A.    That's correct.

10        Q.    Do leads have a special obligation?

11        A.    I wouldn't say special, but they're leading

12   tasks, they're working with a team.  They should report

13   the incident if they have knowledge of it.

14        Q.    It looks like then two days later, on

15   Wednesday, June 25, 2008, there were some more comments

16   made.  Let me ask you.  Do you know whether Mr. Matula

17   reported Ken Meredith's comments about illegal Mexicans

18   to anyone between June 23rd and June 25th?

19        A.    No, I don't know.

20        Q.    It says:  On June 25th, I, Lawrence Grice, was

21   working, using a sling to move pallets across the floor.

22   Ken Meredith shouted, "Yah, mule, yah; pull, mule,

23   pull."  Then it continued.  Later on it says:  "I told

24   Ken, 'God made me a man and not a mule.'  Ken replied:

25   'You are a mule.'"

**1-B**

Michelle Risinger                                      March 24, 2010

Page 29

1      Q.   For each of the 30 to 40 investigations that

2   you conducted regarding racial issues, did you draft

3   an investigative report?

4      A.   Yes.

10:33   5      Q.   Why is it important to draft an investigative

6   report?

7      A.   We did not always draft an investigative

8   report.  And we took notes on some of them, and some

9   of them, we created an investigative report to

10:34  10   document our notes and form a conclusion.

11      Q.   For the 30 to 40 about race, you did an

12   investigative report, is that right, or did that

13   change at some point?

14      A.   We did not do an investigative report for

10:34  15   each one of those.

16      Q.   Okay.  When did that change?

17      A.   I do not know that it changed.  I do believe

18   there was a point where we became more formal in our

19   investigative summaries.  That was probably -- I do

10:35  20   not know.

21      Q.   Can you give me a rough estimate?  Was it

22   yesterday or was it a couple years ago?

23      A.   It was a few years ago.

24      Q.   Okay.  Sometime in 2006, perhaps, 2007?

10:35  25      A.   I believe it was earlier than that, but I

8bb03325-c110-456d-b3c6-74f0ccab4b8a

Michelle Risinger                                        March 24, 2010

Page 30

1    don't -- I couldn't tell you how much earlier than

2    that.

3         Q.   How did that change come about?

4         A.   I do not know why that change came about.

10:35    5    Q.   Did one of your superiors say, Hey, we really

6    need to formalize these things?

7         A.   No.

8         Q.   How else?

9         A.   We had a co-worker start working with us,

10:35    10   another generalist who had worked in another company

11   where they had formats of investigative notes that we

12   adopted.

13        Q.   Who was that co-worker?

14        A.   Robert Empie.

10:36    15   Q.   Can you spell that last name?

16        A.   E-M-P-I-E.

17        Q.   Mr. Empie said in sum or substance, This is

18   the format we used to use at my other company.  What

19   do you think?  And FMC adopted that format, roughly?

10:36    20   A.   It wasn't FMC adopted.  Our department

21   adopted using that format, yes.

22        Q.   Okay.  Of the 30 to 40 investigations you

23   have conducted into racial issues, how many times did

24   you determine that the conduct complained of violated

10:36    25   FMC's policies about discrimination, harassment or

8bb03325-c110-456d-b3c6-74f0ccab4b8a