UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BORIS BRYANT, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| vs. | § | CIVIL ACTION NO. H-08-cv-03744 |
| | § | |
| FMC TECHNOLOGIES INC, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

**I.  INTRODUCTION**

Before the Court are the plaintiffs', Boris Bryant, Lawrence Grice, Kevin McIntyre, Carlos Beatty, Marcus Parejo, Lamar Newton and Carlton Sykes, motion for entry of a judgment based on partial jury findings and request for a new trial only on damages (Dkt. Nos. 170, 175 and 179).  Also before the Court is the defendant's, FMC Technologies, Inc., response (Dkt. No. 174).  The Court has reviewed the parties' memoranda and arguments in support of their positions and relevant portions of the trial transcript.  Having concluded its review, the Court determines that the plaintiffs' motion for judgment should be granted and that a trial, only on damages, should be conducted.

**II.  FACTUAL AND PROCEDURAL BACKGROUND**

**A.  The Plaintiffs' Causes of Action**

The plaintiffs brought suit against the defendant, their employer, alleging claims of discrimination and hostile work environment based on their race and/or national origin.  In particular, plaintiffs Boris Bryant, Lawrence Grice, Lamar Newton, Marcus Parejo and Carlton Sykes alleged that they were discriminated against in that the defendant intentionally failed to

train and promote them when the opportunities presented themselves because of their race or, in the case of Parejo, national origin. In addition to these claims, the same plaintiffs, joined by Carlos Beatty and Kevin McIntyre, assert that they were subjected to a hostile work environment due to their race or, in the case of Parejo, national origin.

The evidence is undisputed that on numerous occasions, employees or contractors of the defendant placed "hangman nooses"[1] in the work areas where the majority of African-American laborers worked. While the defendant disputes that all of the displays were "true" hangman nooses, it is undisputed that it was uncharacteristic for the ropes commonly used in the work areas to be displayed as they were on the occasions in which the plaintiffs complain. Moreover, there is no evidence that the ropes were displayed in like manner at any time in the past. Finally, there is a dispute concerning a disfigurement burned into the defendants' lawn near its plant entrance. The plaintiffs argue that it was a cross burned into the lawn while the defendant argues otherwise.

The defendant disputes that race was a motivating factor in its decision to promote or train others ahead of the plaintiffs. As well, the defendant points to other factors as the basis for its decisions to deny any claimed promotion or training and further contends that it had legitimate, nondiscriminatory reasons for its decisions. Similarly, the defendant asserts that the harassing conduct, experienced by the plaintiffs was not so severe or pervasive as to alter the terms, conditions or privileges of their employment. In addition, the defendant points out that the plaintiffs failed to complain and/or complained to the wrong person(s) and, thereafter, failed

---

[1] The hangman noose is a racist symbol of lynching that was once common in America. The number of victims of hangings exceeds the number of persons killed at Pearl Harbor and by Hurricane Katrina combined. *See* S. Res. 396, 110th Cong. (2007); *see also* H. R. Res. 826, 110th Cong. (2007). The Resolution addressed, in part, the work environment created at FMC because of the hangman nooses. In fact, the Preamble reads, in relevant part: "whereas in the past two months, nooses have been found in a North Carolina high school, a Home Depot in New Jersey, a Louisiana school playground, the campus of the University of Maryland, a Columbia University professor's office door and a factory in Houston, Texas, . . . ."

to take advantage of preventive or corrective opportunities provided to them based on this alleged harassing conduct.

### B.     The Jury Findings of Fact

The testimony in this case was submitted to a jury over a period of twenty-one days. At the conclusion, the Jury was instructed on the law and directed to deliberate. They did so over a period of two days. On November 19, 2010, the Jury informed the Court that it was hopelessly deadlocked and that further deliberations would not advance the case. *See* Jury Notes, Dkt. Nos. 158-161. After a fourth note, the Court instructed the Jury to answer any and all questions upon which it was able to reach unanimous agreement and record those answers on the verdict forms provided by the Court. The relevant questions and answers are:

> **QUESTION NO. 1A:**
>
> Did the plaintiff prove that FMC subjected him to a hostile work environment because of his race or national origin?
>
> Each plaintiff has the burden of proof on his own individual claim by a preponderance of the evidence. Answer "Yes" or "No" as to each plaintiff.
>
> ANSWER:
>
> | Plaintiff | Answer |
> |---|---|
> | Carlos Beatty | Yes |
> | Boris Bryant | Yes |
> | Lawrence Grice | ~~Yes~~ |
> | Kevin McIntyre | ~~Yes~~ |
> | Lamar Newton | Yes |
> | Marcus Parejo | Yes |
> | Carlton Sykes | Yes |
>
> If you have answered Question No. 1A "Yes" as to one or more of the plaintiffs, then answer Questions No. 1B and 1C as to those plaintiffs only. If you answered Question No. 1A "No" for any plaintiff, do not answer Questions No. 1B or 1C and proceed to Question No. 2A.

**QUESTION NO. 1B:**

Did FMC exercise reasonable care to prevent and promptly correct the racially harassing behavior?

Answer "Yes" or "No" with regard to each individual plaintiff.

ANSWER:

| | |
|---|---|
| Carlos Beatty | [No Answer] |
| Boris Bryant | [No Answer] |
| Lawrence Grice | [No Answer] |
| Kevin McIntyre | [No Answer] |
| Lamar Newton | [No Answer] |
| Marcus Parejo | [No Answer] |
| Carlton Sykes | [No Answer] |

If you have answered Question No. 1B "Yes" as to one or more of the plaintiffs, then answer Question No. 1C only as to that plaintiff. Otherwise, proceed to Question No. 2A.

**QUESTION NO. 1C:**

Did the plaintiff unreasonably fail to take advantage of any preventative or corrective opportunities provided by FMC, or to avoid harm otherwise?

Answer "Yes" or "No" with regard to each individual plaintiff.

ANSWER:

| | |
|---|---|
| Carlos Beatty | No |
| Boris Bryant | No |
| Lawrence Grice | No |
| Kevin McIntyre | No |
| Lamar Newton | No |
| Marcus Parejo | No |
| Carlton Sykes | No |

. . .

**QUESTION NO. 5A:**

Did the plaintiffs prove by clear and convincing evidence that FMC acted with malice or reckless indifference to their right not to be subjected to a racially hostile work environment?

ANSWER:

| | |
|---|---|
| Carlos Beatty | Yes |
| Boris Bryant | Yes |
| Lawrence Grice | [No Answer] |
| Kevin McIntyre | [No Answer] |
| Lamar Newton | Yes |
| Marcus Parejo | Yes |
| Carlton Sykes | Yes |

Clear and convincing evidence is evidence that produces in your mind a firm belief or conviction as to the matter at issue. This involves a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard; however, proof to an absolute certainty is not required.

Responding to Question Number 1A, the Jury answered "Yes" that the defendant had subjected Carlos Beatty, Boris Bryant, Lamar Newton, Marcus Parejo and Carlton Sykes to a hostile work environment because of their race or national origin. The Jury was instructed that, in light of its unanimous "Yes" answers in Question Number 1A, that it was to answer Question Number 1B. That question inquired whether the defendant exercised reasonable care to prevent and promptly correct the unconstitutional behavior of its contractors and employees. As indicated by the verdict form, the Jury could not reach unanimous agreement concerning the defendant's corrective efforts. However, the Jury unanimously agreed, by "clear and convincing" evidence, that the defendant had acted with malice or reckless indifference to the plaintiffs' right not to be subjected to a racially/hostile work environment.

The Jury also unanimously addressed in Question Number 2A, Boris Bryant, Lawrence Grice, Lamar Newton, Marcus Parejo and Carlton Sykes' claims that they had been denied training and promotions because of their race or national origin. Specifically, in Question Number 2A, the Jury responded "No" as to each of the plaintiffs. As a result of their answers here, the Jury unanimously rejected the plaintiffs' claim that the defendant acted with malice or

reckless indifference to their right to be trained and/or promoted based on their race or national origin. The remaining unanswered questions, and the complaint that one of the jurors acted improperly during deliberations, form the basis for the remaining discussion.

### III. UNANSWERED QUESTIONS AND JUROR CONDUCT

#### A. The Effect of the Jury's Answers

The Jury was unable to reach unanimous agreement in Question Numbers 1B, 3, 4 and 5C. Based on its answer in Question Number 2A, it was unnecessary for the Jury to address Question Number 2B, concerning date(s) that the plaintiffs were denied training and promotions, and Question Number 4 concerning compensation related to their alleged denial of training and promotion(s). Question Numbers 3 and 5C, however, addressed compensatory damages and punitive damages, respectively. Having unanimously answered "Yes" to Question Number 1A, the Jury was free to answer Question Number 3. Likewise, having unanimously answered "Yes" to Question Numbers 1A and 5A and "No" to Question Number 5B, the Jury was free to answer Question Number 5C. Then, there are those Questions that the Jury did not answer. The Jury did not answer Question Numbers 3 and 5C, due to, what the Court later learned was an injection of impermissible bias on the part of one juror.[2] George's conduct was revealed to the Court by four of the six jurors after the Jury was discharged.

#### B. Colloquy With Concerned Jurors

When the Jury indicated by its fourth note that it was their unanimous vote and belief that further deliberations would be unproductive, the Court accepted a partial verdict from the Jury and discharged them. However, four of the six jurors remained and requested an audience with the Court based on their concerns that George had refused to meaningfully engage in

---

[2] For purposes of reference and to avoid publishing a juror's full name, the Court will refer to this juror as George.

deliberations.[3]  The transcript of the Court's inquiry, and the several jurors' responses have been filed under seal.  Relevant portions of this colloquy are as follows:

> THE COURT: All right. This is after a jury verdict and mistrial proceedings in Cause No. 08-3774, Boris Bryant versus FMC Technologies. And, for the record, the parties currently present before the Court are Shelby M. Butts, Deborah K. Jackson, Eyvone A. Stricklin -- I might not be pronouncing this perfectly -- and Marcy Ainsworth. And, so, let me start with whoever who would like to speak first. You might not all need to repeat the same thing, but you can certainly repeat or state what you believe to be, and what I think has been represented to me to be, some challenges that you each shared or experienced while serving as a juror in this case. Who wants to speak first?
>
> MS. BUTTS: I will.
>
> THE COURT: Please, would you make sure the court reporter can hear you?
>
> . . .
>
> MS. BUTTS: I'm Shelby Moses Butts. So, when we first went back for deliberation, the first comments that we got from one of the other jurors, George, was that he believed it was a conspiracy; that the plaintiffs had planned it all along and set all of these things in the workplace. And we said there was no proof of that, there was nothing in evidence to corroborate that, and let's just focus on the questions at hand. So, we began to talk about Question 1. He again raised conspiracy. We tried move past Question 1, and he told us that he was not going to move forward, that if he said okay on Question 1 and we said "no" to everything else, that he would agree to Question No. 1, because were all pretty together on that.
>
> . . .

---

[3] The Court did not place under oath any of the jurors, seeking only to determine the nature of their concerns.

MS. BUTTS: We said, "Well, let's just, you know, mark Question 1 and move forward." And we even assigned monetary amounts associated with it.

. . .

MS. BUTTS: And it was for all the plaintiffs, and he helped us assign the amounts.

. . .

MS. BUTTS: And then we said --

THE COURT: "He" being George?

MS. BUTTS: George, yes. George. And we began to move forward. When we began to move forward, he said, "Well, if you're going to not answer 'no,' on this one, then I'm going to take back No. 1." And, so, we began to discuss it, and he told us that he was a retired man, he had all the time in the world, he was not going to change his mind unless we took from him the direction that he wanted to go, and he could stay there until Christmas.

. . .

MS. BUTTS: Well, he [Tim] tried to be very pragmatic and say, "Well, George, earlier you said such-and-such and we moved forward based on that. Are you now telling us that you don't then believe it? Because earlier you said you would, you know, that was what you would believe." And he kept reminding us to -- he kept reading that statement in there that said we shouldn't go against – what's that phrase -- go against our --

. . .

MS. BUTTS: Our conscience, but it was different wording but we shouldn't go against our true convictions. That's what it was. And we continued to try to say, "Well, tell us why you feel this way" and continued to try to come to agreements and continued to try to move through the document, answering further questions.

| | |
|---|---|
| THE COURT: | His question or his statement about the plaintiffs conspiring, was that made before you all got the evidence? I mean, when I say "the evidence," I mean before you started looking at the exhibits? Or was this after you all had gone through a number of the exhibits? |

. . .

| | |
|---|---|
| MS. AINSWORTH: | I think that it was at the very beginning when we started talking about the first question is when he said that. |

. . .

| | |
|---|---|
| MS. BUTTS: | No, we all asked him. |
| THE COURT: | "What is it?" |
| MS. BUTTS: | "Show us where you see any evidence to support your thoughts because we don't see any." |

. . .

| | |
|---|---|
| THE COURT: | Did he tell you anything other than that was his belief? |
| MS. BUTTS: | He told us that he felt like that given the amount of the money that these guys were going to get from this lawsuit, any one of them would have eagerly paid 20 or $30,000 to someone in the company that had access to come and plant the ropes. |
| THE COURT: | Okay. Okay. So, he was convinced, in a sense, almost before you really got into deep discussion, that this was all a conspiracy? |
| MS. BUTTS: | Yes. |
| THE COURT: | Or had been concocted by the plaintiffs? |
| MS. BUTTS: | Right. In fact, he said that when he saw the lawyers bringing the ropes out of the box, that he noticed the plaintiffs laughing and giggling. |
| THE COURT: | Uh-huh. Uh-huh. Okay. |

MS. AINSWORTH: Which, you know, wasn't true because --

THE COURT: Ms. Ainsworth? Yeah.

MS. AINSWORTH: Yes. I'm sorry. Marcy Ainsworth. Sir, if you just looked at the plaintiffs, they were sitting there. Nobody was laughing or anything. I mean, you can look around the courtroom.

THE COURT: Yeah. What was -- did you have that same experience, Ms. Stricklin, what they related here?

MS. STRICKLIN: Eyvone Stricklin. Yes. That was thrown out almost immediately, and that was in the afternoon. So, we came back on Tuesday morning; and before Tim could even call it to order and get us going, he said, "I can make this nice and easy." He said, "We can be out of here by this afternoon. All I'm asking you to do is to say 'no' on Question No. 2 and we can move right on. But if you don't say 'no,' I'm not going to agree to anything else."

THE COURT: Did he tell you what your answer "no" would mean to him?

. . .

MS. STRICKLIN: And his concern was that any money we would take from FMC would cause them to start layoffs and cause them to bankrupt and it would be a damage to everybody. Plus, his biggest concern was that if we ruled against the company and for the plaintiffs, that it would be an open door for anybody to start filing lawsuits.

. . .

MS. JACKSON: Well, I agree with everything -- Deborah Jackson -- with everything that's been said. And he talked to Eyvone in a threatening manner this afternoon.

. . .

MS. STRICKLIN: Well, we were still trying to come to consensus, and I said, "Tell me again, now, what is your hang-up

|  |  |
|---|---|
|  | on this FMC part? What is it that you object to that we could pull?" He said, "You talk to me one more time and I'll swear I'll stand in front of that Judge and tell him that you are harassing me." |

. . .

| | |
|---|---|
| MS. BUTTS: | Shelby Butts. He raised his voice. He leaned across the table and stuck his -- I mean, he was -- his body language was aggressive. |
| THE COURT: | Well, I got that impression from the CSO outside, who I think shortly after that opened the door because he thought that maybe there was some discussions that were getting out of hand. At some point he opened the door so that -- and were you the person who came out with the teary eyes? |
| MS. AINSWORTH: | Yes, sir, I was. Marcy Ainsworth. |

. . .

| | |
|---|---|
| MS. BUTTS: | And I think absent George's constant threats, you know, "You're going to lose 1700 jobs in the Houston area; these people are going to not be able to feed their families," absent that kind of rhetoric, we would have been able to negotiate a full settlement and a verdict. |
| THE COURT: | Okay. |
| MS. JACKSON: | He just -- and then he would say one thing and change his mind. |
| THE COURT: | Well, let me ask you something. You said you all had worked up some numbers? |
| MS. AINSWORTH: | Yes. |
| MS. BUTTS: | Yes. |
| MS. AINSWORTH: | We had the numbers. |
| THE COURT: | And you had them written down, apparently, either on the board or on your own papers. Had he agreed – that is, George -- had he agreed to these numbers? |

| | |
|---|---|
| MS. BUTTS: | On two or three different occasions he agreed and then rescinded it because we wouldn't answer a certain way on other questions he wanted. |
| | . . . |
| MS. BUTTS: | And then further to that, at the very end when Tim was trying to write down what we had agreed to all along, he made us take two names out. |
| THE COURT: | I saw that strike-through. |
| MS. JACKSON: | Yes. That was George. |
| THE COURT: | Why did he -- that was not your agreement, though, -- |
| MS. BUTTS: | No. |
| THE COURT: | -- initially? Let me just say it that way. |
| MS. BUTTS: | No, it was not our initial agreement. |
| MS. STRICKLIN: | We all had "yeses" for all seven of them. |
| THE COURT: | I saw that as I looked through the others. |
| MS. STRICKLIN: | But then when we came to court and came back and you said, "Well, take a vote to see what we agreed on," and he said, "Nope, those two were not in high bay and I don't want them on it." |

## IV. STANDARD OF REVIEW

Generally speaking, juror conduct that potentially deprives the parties of a fair trial falls into two categories: irregular conduct on the part of the jury where one or more juror's conduct is at issue, and juror misconduct from within the panel where extraneous and potentially prejudicial information reaches the Jury. *See* Denise M. O'Malley, *Essay Impeaching A Jury Verdict, Juror Misconduct, and Related Issues: A View From the Bench*, 33 J. Marshall L. Rev.

145 (Fall 1999). In these circumstances, a court is permitted to receive the testimony or statements of jurors in order that the court may determine whether: (a) extraneous prejudicial information was brought before the jury; (b) any outside influence was improperly before the jury; and/or (c) there was a mistake in recording the verdict onto the verdict form. *See* Fed. R. Evid. 606(b). Here, the colloquy appears to reveal that extraneous prejudicial information and/or conduct was at the heart of the Jury's inability to conclude its deliberations.

The Fifth Circuit Court of Appeals has long held that a district court judge has a duty to attempt to reconcile a jury's inconsistent responses to special interrogatories, when possible. *See Davis v. West Comty. Hosp.*, 755 F.2d 455, 465 (5th Cir. 1985) (citing *Gallick v. Baltimore & Ohio R. Co.*, 372 U.S. 108 (1963)). Therefore, federal district courts are granted considerable latitude in interpreting special interrogatories. *See Geosearch, Inc. v. Howell Petroleum Corp.*, 819 F.2d 521, 527 (5th Cir. 1987). This is so because a trial judge is in the best position "to analyze the jury's intention and thus, is charged [ ] with the obligation of giving effect to those intentions in light of the surrounding circumstances." *P & L Contractors, Inc. v. Am. Norit Co., Inc.*, 5 F.3d 133, 138 (5th Cir. 1993) (citing *McVey v. Phillips Petroleum Co.*, 288 F.2d 53, 59 (5th Cir. 1961)).

## V.   ANALYSIS AND DISCUSSION

In this case, the Court exercises its discretion, adopting a view that reconciles the Jury's answers based on answers that are clear and consistent and undisputed evidence. *See, e.g., Mercer v. Long Mfg. N.C., Inc.,* 671 F.2d 946, 948 n.1 (5th Cir. 1982) (reasoning that if there is a view of the case which makes the jury's answers consistent, the court must adopt that view and enter judgment accordingly). The Court is of the opinion that the Jury's answers in Question

Numbers 1A and 5A, taken together, explain their inability to answer Question Number 1B. And, in this regard, the Court will, accordingly, enter a judgment only on liability.

Asserting opposition to the plaintiffs' motion for judgment based on the Jury's answers in Question Numbers 1A and 5A, the hostile work environment findings, the defendant argues that: (a) the jury failed to unanimously reject the defendant's affirmative defense that the defendant took appropriate corrective action in responding to the alleged work place harassment; (b) the Jury failed to unanimously agree on the answers recorded in Question Number 1A as to the plaintiffs, Grice and McIntyre; (c) because the factual finding of a hostile work environment and the inquiry into punitive damages are inextricably intertwined, a re-trial on liability and damages is necessary; (d) errors in the jury charge necessitate a full re-trial; (e) the Jury's findings of malice/reckless indifference juxtaposed to its lack of a finding concerning the defendant's affirmative defense is irreconcilable and indicates a compromise on the part of the jurors, necessitating a re-trial on both claims; and (f) a retrial on both liability and damages promotes judicial efficiency and conserves the time and resources of the parties with respect to any appeal. The Court will address these objections summarily and in turn.

First, the defendant argues that the Jury failed to answer Question Number 1B, which it was instructed to address if it answered Question Number 1A in the affirmative. Question Number 1B addressed the defendant's affirmative defense. In light of this failure, the defendant contends that the Jury's affirmative answers recorded in Question Number 1A should be disregarded. The Supreme Court spoke to this issue in *Faragher v. City of Boca Raton*, 524 U.S. 765, 775 (1998). In *Faragher*, the Supreme Court pointed out that an employer's affirmative defense to a victim's claim of a hostile work environment is a two-part inquiry. Initially, the inquiry is whether the employer exercised reasonable care to prevent and correct the hostile work

environment; and next, did the victim fail to take advantage of any prevent or corrective opportunities provided.

This two-part inquiry was presented to the Jury in Question Numbers 1B and 1C. In Question Number 1B, the Jury was asked whether the defendant exercised reasonable care to prevent or promptly correct the hostile work environment. Hence, the Jury was unable to reach a unanimous agreement as to whether the defendant exercised reasonable care to prevent the hangman noose display from creating a hostile work environment or whether it properly sought to correct the environment once it existed. However, in light of the Jury's answers in Question Number 5A, the only reconcilable answers that could have been recorded by the Jury in Question Number 1B are answers of "No."

In light of this reasoning, the Jury's answers in Question Number 1C, makes sense and, therefore, explain its lack of unanimity in Question Number 1B. In Question Number 1C, the Jury was asked whether any plaintiff unreasonably failed to take advantage of preventative or corrective opportunities provided by the defendant. To this question, the Jury answered "No" as to all plaintiffs, including Grice and McIntyre. Hence, the Jury found that the plaintiffs did not unreasonably fail to take advantage of the defendant's preventive or corrective opportunities. In essence, the plaintiffs took full advantage of the preventive and corrective opportunities provided by the defendant, yet to no avail. This finding is further corroborated by evidence that the defendant found itself internally conflicted by various events. The evidence is undisputed that those responsible for preventing and correcting the environment disputed the seriousness of it and spent the majority of their time in an investigative mode—not a preventive/corrective mode. Therefore, based on the Jury's answers in Question Numbers 1B and 1C, the Court concludes

that the defendant failed to prove at least one of the elements of the *Faragher* test and, thereby, failed to prove its affirmative defense.

The Court's conclusion, that the defendant failed to establish its affirmative defense, is further supported by the Jury's answers in Question Number 5A. Question Number 5A inquired whether the plaintiff's proved "by *clear and convincing* evidence that the [defendant] acted with malice or reckless indifference to [the plaintiffs'] right not to be subjected to a racially hostile work environment." By answering "Yes" to that question as to each plaintiff, the Jury found, utilizing the highest civil legal standard of scrutiny, that the defendant's conduct did not merit affirmative findings in Question Number 1B. Affirmative answers to Question Number 1B would have been incompatible with the Jury's finding of malice or reckless indifference in failing to prevent or correct a hostile work environment. Hence, it is illogical that a defendant could act with malice or reckless indifference and simultaneously exercise reasonable care to prevent and correct that same misconduct. *See Bridges v. Chemrex Specialty Coating, Inc.,* 704 F.2d 175, 180 (5th Cir. 1983) (internal citations omitted) (holding that "a jury's failure to reach a verdict on every interrogatory does not prevent a court from accepting the properly-answered interrogatories."). Therefore, the Court overrules each of the defendant's objections and assertions concerning the Jury's failure to answer Question 1B.

The defendant's assertions that the hostile work environment claim and the punitive damages claim are inextricably intertwined such that a compromise is implicit in the Jury's responses is also unfounded. There is no evidence that the Jury's answers constitute a compromise outside the bounds of the "give and take" that is implicit in the deliberative process. If the defendant places reliance for its argument on the colloquy conducted by the Court with the four discharged jurors, its reliance is misplaced as there is no evidence, and the colloquy does not

reveal, that the jurors "traded" answers. It merely reveals that George was intent on disregarding the Court's instructions or otherwise disrupting the deliberation process.

## VI. THE GRICE/MCINTYRE CONTENTIONS

The Jury rendered a verdict on a finding that the defendant had subjected the plaintiffs to a hostile work environment because of their race or national origin. And, the Jury's verdict revealed that the foreman struck through the names of Lawrence Grice and Kevin McIntyre, while simultaneously making that finding in behalf of Carlos Beatty, Boris Bryant, Lamar Newton, Marcus Parejo and Carlton Sykes. However, based on the mistaken or biased view of George that only employees in the High Bay area could assert a civil rights claim, the remaining jurors were erroneously persuaded to change their answers. This view and the change are erroneous and contrary to both the facts and law. Nevertheless, the Court is at a loss to understand the logic for this disconnect in the Jury's fact finding, particularly in light of fact that the undisputed evidence shows that all of the defendant's employees in both Houston plants, whether in High Bay, Low Bay, black, white or Asian, were impacted by the numerous "noose displaying" events.[4]

Grice and McIntyre argue that the evidence supports the entry of a judgment in their favor based on the doctrine of collateral estoppel. Citing *Southmark Corp. v. Coopers & Lybrand*, 163 F.3d 925, 932 (5th Cir. 1998), they argue that it was the work environment that was made hostile by the defendant's conduct. And while they may not have worked in High Bay, they too were subjected to the same racially hostile work environment that permeated the defendant's workplace. Because the Jury found a hostile work environment, collateral estoppel

---

[4] The evidence revealed that an Asian employee was the subject of a noose event when a noose was placed around his neck. The evidence also revealed that a Caucasian female employee expressed concerns about her safety in the workplace during the hangman noose events.

bars re-litigation of this claim amongst the same parties, i.e., the defendant and its African-American employees.

The defendant argues that the use of collateral estoppel as an offense tool is unfair in that it prevents the defendant from advancing procedural opportunities that were unavailable in the first trial. Presumably, the defendant is referring to its claims that there were erroneous jury instructions presented that could be corrected and that a judgment in Grice and McIntyre's favor would be inconsistent with a judgment in another case.

The Court overrules the defendant's self-serving arguments. It appears that the defendant's arguments are the source of George's view that for Grice and McIntyre to establish liability against the defendant, they must have worked in the "High Bay" area. That view is confounded by the facts and law. The evidence establishes that both Grice and McIntyre were exposed to the same environment as the prevailing plaintiffs and other employees.[5] The defendant's conduct permeated the workplace environment of all of its employees -- black, white and Asian, although admittedly, with differing effects. The Court, therefore, is of the opinion that the principle of collateral estoppel applies here.

Equally, the Court is of the opinion that the defendant has been fully heard on its affirmative defense and, based on the undisputed evidence and the Jury's findings, a reasonable jury would have found in favor of Grice and McIntyre. *See* Fed. R. Civ. P. 50(a)(1) and (b)(3); *see also Parklane Hosiery Co., v. Shore*, 439 U.S. 322, 327 (1979). Therefore, the Court grants Grice and McIntyre's claim and sets aside the Jury's erroneous findings.

---

[5] "The hangman's noose remains a potent and threatening symbol for African-Americans, in part because the grim spector of racially motivated violence continues to manifest itself in present day hate crimes." *Williams v. N.Y.C. Hous. Auth.*, 154 F. Supp. 2d 820, 825 n.3 (S.D.N.Y. 2001).

## VII.    CONCLUSION

Based on the foregoing discussion and analysis, the Court enters a judgment of liability against the defendant, in behalf of Carlos Beatty, Boris Bryant, Lawrence Grice, Kevin McIntyre, Lamar Newton, Marcus Parejo and Carlton Sykes on their claims that the defendant subjected each of them to a hostile work environment because of their race and/or national origin. The Court further determines that the plaintiffs proved by clear and convincing evidence that the defendant acted with malice or reckless indifference to their rights not to be subjected to a racially hostile work environment. Therefore, a jury trial will be conducted only on the plaintiffs' claims for damages.

It is so **ORDERED**.

SIGNED at Houston, Texas this 18th day of February, 2011.

_____
Kenneth M. Hoyt
United States District Judge